Pages 1 - 86

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE JUDGE

LORI GRAY, et al,,                     )
                                       )
            Plaintiffs,                )
                                       )
  VS.                                  ) NO. C 08-00722 EDL
                                       )
GOLDEN GATE NATIONAL RECREATION        )
AREA, et al.,                          )
                                       )  San Francisco, California
            Defendants.                )  Monday
                                       )  December 17, 2012
_____)  10:00 a.m.


                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          DISABILITY RIGHTS ADVOCATES
                         2001 Center Street
                         Fourth Floor
                         Oakland, California  94612
                  BY:  LAURENCE PARADIS, ESQ.
                       RON ELSBERRY, ESQ.


For Defendants:          UNITED STATES DEPARMENT OF JUSTICE
                         Civil Division
                         20 Massachusetts Avenue, N.W.
                         Washington, D.C.  20530
                  BY:  JONATHAN G. COOPER, ESQ.
                       JESSE GRAUMAN, ESQ.

Also Present:            RICHARD E. DE LA O
                         DEPUTY SUPERINTENDENT AARON ROTH


Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court

```
 1  MONDAY, DECEMBER 17, 2012                              10:00 A.M.

 2                        P R O C E E D I N G S

 3           THE CLERK:  Calling Case No. 08-722, Gray, et al.

 4  versus Golden Gate National Recreation Area, et al.

 5           Counsel, please state your appearances for the

 6  Record.

 7           MR. PARADIS:  Good morning, Your Honor.  Laurence

 8  Paradis and Ron Elsberry from Disability Rights Advocates for

 9  the Plaintiffs.

10           THE COURT:  Good morning.

11           MR. COOPER:  Good morning, Your Honor.  Jonathan

12  Cooper and Jesse Grauman from the Department of Justice for the

13  Defendants.

14           With me at counsel's table is also Aaron Roth, the

15  Deputy Superintendent of Golden Gate National Recreation Area;

16  and Richard De La O, the accessibility manager for the Golden

17  Gate National Recreation Area.

18           THE COURT:  And, are you going to be primarily

19  arguing?

20           MR. COOPER:  Yes, I am, Your Honor.

21           THE COURT:  Okay.  Just, it just turns out -- I

22  wonder if you could switch places with someone or something,

23  I'm not sure.  Even maybe sit on the Plaintiffs' side.  But,

24  you're blocked partially by the computer here, and that's kind

25  of an awkward angle for me.
```

1           If you can sort of turn around and face me, I think

2    that would be better, if that's all right.

3        (Request complied with by Counsel)

4           **MR. COOPER:**  Is this better, Your Honor?

5           **THE COURT:**  Somewhat.  Or maybe -- I don't know if

6    you would mind sitting there, or would it get you too far away

7    from your stuff?

8           **MR. COOPER:**  At Plaintiffs' counsel table?

9           **MR. PARADIS:**  That's fine with us.

10          **THE COURT:**  I don't want to make you uncomfortable;

11   it's just not comfortable for me.

12       (Request complied with by Counsel)

13          **THE COURT:**  So, if that's all right.  Tell me, if

14   it's a problem, let me know.

15          All right.  Well, we have a lot of ground to cover,

16   and, you know, I -- I am willing to give you an hour, hour and

17   a half or so to argue.  But, of course, I want to make sure we

18   address questions that I, you know, think are important.  There

19   are a lot of legal issues.  And, also just things that I need

20   clarification on.

21          In general, I'm struggling because on the one hand, I

22   think the defense has taken a pretty narrow view of, in the

23   end, saying, I think, that Plaintiffs only have the right to

24   challenge one thing.  At one place.  And, I don't -- I think

25   that that is excessively narrow.

1          However, I think the Plaintiffs, somewhat

2    surprisingly to me, spent a lot of time disagreeing with

3    something I've already ruled on, about standing and the fact

4    that class certification doesn't change the standing game, that

5    you look at standing of the Named Plaintiffs at the time that

6    they brought the suit.

7          And so, the fact that I certify the class is not --

8    and I don't even want time wasted further on that argument.

9    I've rejected it.  You know, go to the Ninth Circuit on that.

10          But because the Plaintiffs took a sort of maximalist

11    position on that, I don't know what I'm left with.  And for the

12    Court to have to try to sort through these different things is

13    somewhat difficult.  I looked, and on that respect, it seems

14    important.

15          There's a stipulation about the areas where the

16    Plaintiffs were -- visited, or were specifically deterred from

17    visiting.  And I have that.  That's helpful.

18          And, that has a number of places that it would seem

19    to me there likely is standing, particularly as it's coupled

20    with declarations or depositions saying, you know, "I would go

21    back if I knew that the barriers were fixed."

22          On the other hand, I'm not sure what -- and I need

23    the Defendants to explain to me -- what their Appendix A means.

24    I don't really understand it.

25          The barriers that Plaintiffs lack standing to

1   challenge, it says (As read):

2            "No personal injury and no future injury to

3            any Named Plaintiffs."

4      And then, for example, it has places that in the

5   stipulation seem to -- do include a number of places that the

6   Plaintiffs actually have been to.  So, I'm not quite sure what

7   that's supposed to mean.  Then it has -- especially, that's the

8   long first -- first bullet point, dark bullet point.

9            After that, there's "injury not fairly traceable,"

10  and there are separate arguments regarding partners, and

11  special-use permits, and things like that.  And those may be

12  the basis of the second category.

13           Then the third category:

14           "No personal injury to a Named Plaintiff with

15           a vision disability and no future injury to

16           any Named Plaintiff."

17     But then I look at those, and it seems as though some of

18  the blind Named Plaintiffs have said they have been to these

19  places.  So, again, I'm not sure what -- what the argument is.

20  Unless it's all based on, well, they haven't said for sure

21  they're going back.  And if so, I'm not sure that's the

22  standard.

23           If they said, "I'd like to go back, in general, if I

24  knew that the problems were remedied," that might well be

25  enough.

1          On the other hand, I think Plaintiffs -- I think the

2    Defendants are the only ones, and through their expert, who

3    have really given me a proposal about what programs -- what the

4    programs are.  And the Plaintiff seems to disagree, but doesn't

5    present any competing program.

6          I mean, it really is program access.  It's not

7    feature by feature by feature by feature access, the way it

8    would be if we were talking -- you know, not the Rehab Act, but

9    the ADA and specific buildings, for example.

10          And so, I am inclined to accept that those are the

11    programs.  And in general, that I -- I think, you know, to the

12    extent that the Plaintiffs are proposing essentially that the

13    self-evaluation be enforced, of course, I can't do that.

14          And so I think, in general, the approach that the

15    defense expert has, at a very high level, which is saying, you

16    know, there's -- like, say, there's the program of coastal

17    overlooks.  You need to go to -- probably more than one coastal

18    overlook ought to be accessible, but not all of them.  I agree

19    with that.  The question is:  Where, in between?

20          I'm not completely sure -- the Defendants' briefs

21    tend to say "Two," or something along those lines.  And that

22    might be right.  But, when I read the expert report, it seems

23    the argument is there are more than that.

24          But it seems to me, for example, a coastal overlook

25    of the bay wouldn't really satisfy a coastal overlook of the

1  ocean.  Or a coastal overlook of a very small, pristine cove

2  might be different from a sweeping ocean view.

3         But nobody's really identified that, and I don't know

4  that the Court -- is that a matter of common sense?  Is it a

5  question of law?  Or is it something -- you know, the

6  Plaintiffs really gave me no evidence on, and therefore, they

7  lose?

8         So, I'm struggling with a lot of these things.  I

9  think, going back to what -- what do you have standing to

10 challenge when you've been, for example, to Muir Woods?  I

11 don't think that means -- I really do not agree with the

12 Plaintiffs' position they can challenge every barrier within --

13 and every area within Golden Gate National Recreation Park, on

14 the one hand, because I don't think the class certification

15 adds to standing.  And I don't think that's analogous to once

16 you encounter one barrier at one store, you can challenge all

17 the stores.

18        Or, alternatively, if there was a nationwide chain of

19 motels, if all of them had the exact -- or like, say, golf

20 courses.  If all of them had the exact same policy, "We won't

21 ever let you use an automated golf cart," or something you

22 would need, then could you challenge all of them.  Short of

23 that, though, it's been said that you can't.

24        So, unless there's some policy -- other than the lack

25 of a transition plan, which is not actionable -- that is

1  sweeping, then I think you have to go facility by facility.

2          But, I think that the Defendant's goes too far when

3  they say "Well, it's Building A at Fort Mason," for example.

4          I think, you go to Fort Mason; it's all the buildings

5  at Ft. Mason.  People tend to visit Fort Mason, they go around,

6  they look at different things there.  So, I don't think it's

7  that micro.

8          But I think -- for example, I don't think there's a

9  single Named Plaintiff that's gone anywhere or alleged they've

10 been specifically deterred anywhere in the South Bay.  So, I

11 think that's really -- all of that area, I think, is off the

12 table.

13         Again, unless you can tell me otherwise.  Because I

14 -- it's very hard for me -- and maybe this Appendix A was meant

15 to do part of this.  I certainly think the stipulation was

16 meant to address some of this.

17         But, I'm left with some uncertainty about the

18 contours, even when I'm giving you the guidance, in general,

19 how I would look at it.  I'm still not sure what fits within

20 that.  So, I'm going to need a lot of help.

21         But I really don't -- I mean, I think both sides have

22 somewhat hurt themselves by taking somewhat maximalist

23 positions, making it very, very difficult for the Court.

24         **MR. PARADIS:**  Well, Your Honor, I'll -- let me start

25 with the small issue of whether a Named Plaintiff has been to

1    the South Bay.

2           Plaintiff Lori Gray, in her declaration, recounts

3    that she went to Mori Point, which is in San Mateo County, and

4    encountered the very same kind of barriers she has encountered

5    in every other visit to GGNRA:  Trails that were not

6    accessible; lack of information in any format she can

7    understand, because she's blind; and a wheelchair user.

8           So, we have covered all three counties.

9           **THE COURT:**  I would tend to look at that as covering

10   Mori Point, only, in San Mateo.  But, yes.  Okay.

11          **MR. PARADIS:**  Okay.  So, I -- I hear Your Honor, that

12   you -- you don't want us to reargue an issue on standing.

13          But --

14          **THE COURT:**  Well, particularly, one I've decided.  I

15   mean, I put a lot of work into that decision.  And I laid out

16   what I viewed.  And, and I do not agree -- and I will not agree

17   now, and so I don't want to hear more about it -- that by

18   having certified a class, that's going to extend the standing

19   beyond the Plaintiffs.

20          I've looked at the *Armstrong* case, and I've -- I set

21   forth my reasoning, at length, before.  So, I'm not changing my

22   view on that.

23          **MR. PARADIS:**  I hear you, Your Honor.  Could I have,

24   like, two minutes on it, though?

25          **THE COURT:**  You can, but I think you're wasting your

1    time, and deducting from the things you might -- you might lose

2    everything, if you keep rearguing things I'm never going to

3    budge on unless the Ninth Circuit tells me to.

4            But, go ahead.  But it's your time, but, I mean, I

5    think it's questionable why you would do that.

6            **MR. PARADIS:**  Okay.  Well, in the last briefing, we

7    did not fully brief this issue because they had not raised the

8    issue here.  They had raised the issue whether with any Named

9    Plaintiff had standing, had been injured, and had a likelihood

10   of return.  And that's what we had briefed.

11           So, we did not brief the question of:  What is the

12   scope of relief for the entire class?  And, you did refer to

13   the *Armstrong* decision in your order, but you referred to a

14   different section of the *Armstrong* decision in your order.  You

15   referred to the section of *Armstrong* where the Court was

16   discussing:  Have the Named Plaintiffs shown sufficient injury

17   or likelihood of injury?

18           But, there's a whole section in *Armstrong* called

19   "System-wide Relief," where this very question was presented,

20   where the Defendants argued the relief sought was limited to

21   only the injury that the named plaintiffs had experienced.

22           And the court said, "No," that the certification

23   process, quote, "alters the Court's inquiry."

24           **THE COURT:**  Yeah, I don't -- I don't read the case --

25   I've read the entire thing.  And I don't read it to alter the

1  entire inquiry.

2          What it says is that because other members of the

3  class are similarly situated, the fact that they're continually

4  experiencing the same bad pattern bolsters the plaintiffs' --

5  named plaintiffs' exposure to the same bad pattern.  But it

6  doesn't somehow give them standing to challenge things they

7  couldn't have done otherwise, I don't think.

8          **MR. PARADIS:**  I just point out, that is in a

9  different section of *Armstrong*, where the court was addressing

10  whether you can look at evidence of other class members to show

11  standing of the named plaintiffs.

12          And, it's a separate section of *Armstrong* that says

13  what is the scope of relief, once the named plaintiffs have

14  standing.  Is the limited -- is the scope of relief limited to

15  what they have experienced, the injury they have experienced?

16          And the court said that when you certify the class,

17  that's not the case that the plaintiff, quote, "has been

18  brought in to include the class as a whole."  And so, the Ninth

19  Circuit explicitly addressed that very issue here in a separate

20  section of *Armstrong*.

21          In addition, we briefed the fact that *Newberg on*

22  *Class Actions* says the same thing.  That in a certified class,

23  the scope of relief sought is defined by the scope of the

24  class, not by an injury of the Named Plaintiffs.

25          Wright on civil practice says the same thing.  That

1  when a class is certified, the scope of relief sought is

2  brought in to cover the scope of injury suffered by the whole

3  class.

4         We have an entire body of case law that says even

5  when a named plaintiffs' class representative's claims are

6  moot, the claims of the class continue, because it's a separate

7  entity from the named plaintiffs.  So, to say that --

8         **THE COURT:**  I think that has to do with a different

9  doctrine, really.

10        **MR. PARADIS:**  It's just that we have been litigating

11 the case now for years on the contemplation, the understanding

12 that we had certified a class to cover all barriers, all

13 systemic conditions.  And we have declarations from class

14 members about barriers they have experienced at locations that

15 only the -- that the Named Plaintiffs have not been to, but the

16 class members have.

17        And, if we now cut it back to just the injury of the

18 Named Plaintiffs, you potentially have other lawsuits where --

19 we have to bring, that the same kind of barriers have to be

20 litigated all over again.

21        And it doesn't make any sense in a class action, if

22 there's commonality, why you would limit the scope of relief to

23 just the claims of the Named Plaintiffs.

24        **THE COURT:**  Yeah, I'm not -- I can't revisit what I

25 think would be a good idea, or Newberg even thinks was a good

1  idea in class action.  I have to look at the case law of the

2  Ninth Circuit, and the Supreme Court.

3          And I think some of that has not been -- it's not

4  quite as broad as you say.  But, okay.

5          **MR. PARADIS:**  And the last point on that is that

6  *Armstrong* even discusses *Lewis v. Casey*, the case that

7  Defendants are citing for their argument.  And says, no, *Lewis*

8  *v. Casey* in this section doesn't mean limit the scope of relief

9  to just the named plaintiffs.  It just means that you have to

10  look at the injury, and does it expand -- does it cover class

11  members as well.

12          So, *Armstrong*, Ninth Circuit, embodies a very clear

13  statement of what the class-action device is used for.  And,

14  and says, as clearly as they could have, that you -- when you

15  certify it, you don't thereafter look at the just injury of the

16  named plaintiffs.

17          **THE COURT:**  Okay.  That's way over two minutes.

18          **MR. PARADIS:**  Sorry.  okay.

19          **THE COURT:**  So --

20          **MR. PARADIS:**  So, we have a fallback position, which

21  is the standing of the Named Plaintiffs.  And you don't have to

22  look at that issue if you do follow *Armstrong*, as we phrased

23  it.  But, you don't.

24          The Named Plaintiffs all live in the Bay area.  They

25  are regular out -- their regular activities take them to the

1 parks in the Bay area.  Ms. Gray leads tours for outings for

2 disabled people.  Ms. Sieck has a website where she tries to

3 give information about outdoor adventures in the Bay area.

4 Mr. Mendoza has been to GGNRA dozens of times.  Mr. Sutton, who

5 is blind, has been to GGNRA dozens of times.  They've been to

6 all types of GGNRA facilities throughout the bay.

7        We have one demo exhibit that we brought which just

8 lists where the Named Plaintiffs and class members have been,

9 and where does -- the stipulation does not cover class members,

10 and the dates of their visits.

11        **THE COURT:**  So, what is the fallback?  If I don't

12 agree with you on *Armstrong*, then that exhibit would include

13 things that I wouldn't be looking at.

14        So, what is the fallback?

15        **MR. PARADIS:**  The fallback is that the Named

16 Plaintiffs are regular visitors to any park areas in the Bay

17 area where they can find access.  And they have each stated in

18 their declarations and in their deposition testimony that if

19 they could know that GGNRA was accessible, and could find out

20 information about access, they would go to GGNRA regularly, and

21 to all parts of GGNRA, because they love to go outdoors.

22        And for decades, they've been trying to go to GGNRA,

23 and get access.  And over and over again, they experienced

24 barriers.  And as a result, some of them have given up until

25 those barriers are fixed.

1          Like, Mr. Mendoza testified he's given up until he

2   can find for sure that there's access, and he won't go again to

3   a GGNRA facility and not be able to use a restroom, or to

4   trails that he can't use.

5          So there is, in fact, deterrents that each of the

6   Named Plaintiffs have experienced that covers the entire GGNRA

7   system.  Because they want to go to this park in their

8   backyard.

9          **THE COURT:**  Yeah.  I -- I just am very skeptical of

10  that.  It just -- it's not a park like Central Park or, you

11  know, it's -- what is it, 75,000 acres?  And only one of the

12  people has been to one place, for example, in the South Bay.

13         So I do think, you know, I -- and when you say that's

14  a fallback, that's just a different theory of achieving exactly

15  the same thing.  I.e., 100 percent of the territory.

16         And, I just am very skeptical about that.  I think,

17  you know, the cases so many times say yeah, the whole store.

18  But, every place, you know, within that gigantic area, I'm -- I

19  don't think that you -- you haven't been able to point to

20  anything that's similar to that.

21         On the other hand, I disagree with the defense, but

22  I'm not getting any help, so -- from either side, in coming up

23  with what I think is a reasonable middle ground, really.

24         **MR. PARADIS:**  Well --

25         **THE COURT:**  Not because I just think I should go for

1   the middle, but because of what I think -- trying to look at

2   the cases, what do I think they mean?  They mean, one barrier

3   in a store?  No.  All the barriers in the same little store?

4   Yes.  It's a store, a corner store that someone goes to

5   frequently.

6          There's that hotel case where the woman has to show

7   not only that she went there, and would like to go back, but

8   she specifically is going to go back and stay in that city

9   several times, and that's the hotel, because of price and

10  features, she would like to go to.  It's very specific.

11         So, I have to look at these cases, which I'm doing.

12         MR. PARADIS:  Certainly.  And the *Chapman* and the

13  *Doran* cases say if a plaintiff has experienced a barrier and

14  doesn't know to what extent there are remaining barriers, that

15  establishes standing.

16         THE COURT:  At that one place.

17         MR. PARADIS:  Yes.

18         THE COURT:  Not all 7-Elevens, for example.  So, I

19  mean, to say the entire Golden Gate National Recreation Park, I

20  don't think that's right.

21         MR. PARADIS:  There are very few areas in the GGNRA

22  that the Named Plaintiffs have not, in fact, been to.

23         THE COURT:  Okay.  Well, I would like to know which

24  ones they are, and which ones they aren't.

25         MR. PARADIS:  Okay.

1          THE COURT:  But the ones that I think that they

2   haven't been to are probably off-limits.

3          MR. PARADIS:  Okay.  We have presented Your Honor

4   with a demonstrative exhibit, which, it does include class

5   members, but it also includes the Named Plaintiffs, and the

6   dates and places they have visited.

7       (Document handed up to the Court)

8          THE COURT:  So, how is this different from the

9   stipulation that I refer to, except that it adds absent class

10  members?

11         MR. PARADIS:  It probably overlaps, but it includes

12  the -- I think it is generally the same, as far as the Named

13  Plaintiffs.

14         THE COURT:  Yeah.

15         MR. PARADIS:  So -- and Named Plaintiffs include

16  members of the organization of the Plaintiffs, CCB.

17         THE COURT:  Right.  And I think that's probably fair,

18  and they're in that stipulation, as well.

19         MR. PARADIS:  They are.

20      Is that right?

21         MR. ELSBERRY:  Yes.

22         MR. PARADIS:  Yeah.  The -- the point being that when

23  you look at where they have been, and their declaration

24  testimony about how they want to go back -- Ms. Sieck wants to

25  go camping.  She testified in her declaration she recently went

```
 1  camping, but she can't go camping at GGNRA because they have no
 2  accessible campsites.
 3          Now, they've got campsites in several locations, but
 4  none of them are accessible.  And she wants to go camping.
 5          THE COURT:  Right.  And they say they're going to
 6  make Kirby Cove accessible.
 7          MR. PARADIS:  2013 or 2014, they plan.  Currently,
 8  again, it's not accessible.  That's just one of literally a
 9  dozen different programs that are not accessible, currently.
10          And, we're talking about 30 years after the statute
11  went into effect.
12          THE COURT:  Yeah.  I'm familiar with that.
13          MR. PARADIS:  Yeah.  So, so, we -- there's evidence
14  that the Named Plaintiffs have experienced systemic denial of
15  program access in dozens of programs.
16          THE COURT:  Well, let's -- the "dozens of programs" I
17  have a problem with, because only the Defendants have
18  identified programs.  The Plaintiff expert did not.  He just
19  says there's a lot of other programs.  He never says what they
20  are, why they are, where they are.
21          So I'm left with a vacuum on summary judgment on that
22  issue, on the Plaintiff side.  I think the Plaintiff has
23  forfeited that issue.  Because there's nothing.  Nothing.
24          MR. PARADIS:  Well, that's because of the history of
25  how Defendant went about its -- its work with NCA.
```

1          **THE COURT:**  But, I've -- you know, I understand that

2     this case has taken many turns -- I would say many turns for

3     the worse -- over time.  But, but, it is -- we have to deal

4     with where it is now.

5          And, the Plaintiff had the chance to have a different

6     expert than the NCA, or to add to what the NCA did.  I

7     understand the NCA took a different phased approach, and there

8     was an agreement on, at one point.  But I'm now left with

9     disagreement.

10         And given the disagreement, I have -- I have to

11    address what are the programs.  And, the NCA study did not look

12    at programmatic access in the same way.  And, the expert that

13    you have hasn't opined what is the program.  He says there's

14    more than the Defendants say, but he doesn't say what they are.

15         **MR. PARADIS:**  Well, even if you work with Defendants'

16    expert --

17         **THE COURT:**  Yeah.

18         **MR. PARADIS:**  -- listing of programs --

19         **THE COURT:**  I think I have to.  I think I'm left with

20    nothing else.

21         **MR. PARADIS:**  Well, even if you work with that,

22    there's a few things that they clearly missed that Mr. Margen

23    has addressed, like the park headquarters building.

24         **THE COURT:**  Uh-huh.

25         **MR. PARADIS:**  It's not addressed by Defendants,

1  because Mr. Blackseth said he was given a list of programs, and

2  that wasn't on it.

3          **THE COURT:**  Uh-huh.

4          **MR. PARADIS:**  And there's undisputed evidence that

5  it's a -- the headquarters building is a place to which the

6  public regularly is invited.  It's a place where Mr. Blackseth

7  says disabled visitors are supposed to be to get special-use

8  permits.  There's a visitor information center there.  On the

9  website, it directs people to go there.  So that's one program

10  that should be added, clearly.  And Mr. Margen addresses it in

11  his declaration testimony, and in his report.

12          So, that's one program that's currently not

13  accessible, that's undisputed to be a key program in this park

14  unit.  It's their headquarters building.

15          **THE COURT:**  Okay.  What else?

16          **MR. PARADIS:**  Okay.  Then there's hiking.  It's

17  covered by Mr. Blackseth, has a program.  They have 196 miles

18  of trails.  And in all of those trails, if you look at the ones

19  in the wild areas, there is virtually none of them that are

20  compliant with the proposed standards from the access board.

21          And, every class member, every Named Plaintiff, every

22  time they've gone out to try and hike in the GGNRA, has

23  experienced difficulty with trails.

24          **THE COURT:**  What do you mean by "the wild areas"?

25          **MR. PARADIS:**  Well, essentially, there's only two

1   trails in the GGNRA that have -- that are close to these

2   standards for access for trails.  There's the walk along Crissy

3   Field --

4           **THE COURT:**  Right.

5           **MR. PARADIS:**  -- which is in an urban area, you know,

6   next to parked cars virtually the entire stretch.  And so, it's

7   not a nature trail.

8           **THE COURT:**  And Muir Woods.

9           **MR. PARADIS:**  There's 500 feet of walk at Muir Woods

10  that is now accessible.  That's according to Mr. Blackseth.

11  Five hundred feet, at the beginning of the most popular crowded

12  trail, in a park with seven miles of trails, where NCA

13  recommended the whole trail that's the Redwood Creek Trail be

14  made accessible, plus two other trails.  And only 500 feet, so

15  far, has been made accessible.

16          **THE COURT:**  And is that the two you're talking about?

17          **MR. PARADIS:**  There's one third, actually.  There's a

18  small segment of trail at Lands End that's newly built.  And

19  that's really it, for 196 miles of trails in the whole park

20  system.

21          So that trail experience is currently not

22  programmatically accessible, under Mr. Blackseth's own data.

23          **THE COURT:**  Well, he says it is, I think.

24          **MR. PARADIS:**  Well, he says that it is, but when you

25  look at the underlying data, it is Appendix A --

1          THE COURT:  But how -- okay.

2          MR. PARADIS:  And when you look at what he says is

3  planned for trail access, there's no dispute that there's no

4  trails other than those three that actually meet the proposed

5  access guidelines.

6          THE COURT:  And, the proposed access guidelines are

7  guidance, but they're not binding, of course.  So the fact that

8  they don't meet them does not, by itself, say "No access."

9          So, if I can't simply -- if no one can say you have

10  to do exactly that, then how much do you have to do?

11          MR. PARADIS:  Well, every --

12          THE COURT:  And then, also, of course, what do you --

13  you know -- well, okay.  Go ahead.

14          MR. PARADIS:  All right.  We're surely dealing with a

15  case where there's proposed guidelines that have been in

16  existence for a decade, that have not yet been formally

17  adopted.

18          And the question is:  What purpose do those

19  guidelines serve in defining what makes a facility readily

20  accessible to and usable by people with disabilities?  That's

21  what the regulation says is the standard, readily accessible to

22  and usable by.

23          KLS, the program access manager for the NPS, admitted

24  in her deposition that the proposed guideline should be used to

25  define what makes a facility readily accessible.  The NCA --

1   head of NCA testified the same way.  And they were hired as an

2   agent by NPS to assess these conditions that --

3            **THE COURT:**  Right.  But Blackseth disagrees.  So at a

4   minimum, there's a -- he says they're appropriate guidance.  I

5   think everyone's agreed on that.  But, they are not directly

6   enforceable.  And I -- I think that that is because they

7   haven't been adopted.

8            I mean, maybe there's some reason they haven't been

9   adopted for ten years.  But, they have not been.  And so, they

10  are not, per se, enforceable.  So, then, what happens at that

11  point?

12           **MR. PARADIS:**  Well, this is an issue of law for

13  Your Honor to decide.  That's one reason why it's not --

14  doesn't make it a triable issue --

15           **THE COURT:**  Well, I think they're guidance, but

16  they're not enforceable.

17           **MR. PARADIS:**  Okay.

18           **THE COURT:**  So, I mean, I think, for example, that

19  one of the things that would mean, that, you know, if you had

20  some -- you know, that something short of 100 percent

21  compliance with them could still pass muster.  Now, what short

22  that is would be a difficult question.

23           But, I think that as a matter of law, that's one of

24  the things that means.  Unquestionably, in my mind.

25           **MR. PARADIS:**  Okay.  Now, these standards, you should

 1  know, are compromise standards.  Because they don't provide

 2  full access.

 3       **THE COURT:**  Nonetheless.  They are not enforceable.

 4  They are guidance.

 5       **MR. PARADIS:**  And that same issue was addressed in

 6  the *Pasquini v. Yankee Stadium* (Phonetic) issue.  And it was

 7  addressed in *Chaffin v. Kansas State Fair*.

 8            Those two other circuits, they looked at the

 9  question:  Okay, for program access, if we don't have directly

10  applicable standards that are legally enforceable, what do we

11  do to decide whether something is readily accessible?

12            And they said, look to the most applicable standards

13  that do exist.  Most current, closely-applying standards.

14            So for buildings, they said, look to what's called

15  ADAG, which is the ADA building code.

16       **THE COURT:**  Right.

17       **MR. PARADIS:**  Even though it's not directly

18  applicable in existing facilities, they said look to that to

19  decide.

20       **THE COURT:**  These are trial court decisions in other

21  jurisdictions, right?

22       **MR. PARADIS:**  They are.  This Court -- this

23  jurisdiction has not yet addressed this issue, Your Honor.  And

24  the question is:  What -- unless you look to the draft

25  guidelines that Defendants' own witnesses say should set the

```
 1  standard --
 2          THE COURT:  Some of their witnesses.
 3          MR. PARADIS:  Yes, the ones who have not been hired
 4  as litigation consultants.
 5          THE COURT:  But that doesn't -- you know.
 6          MR. PARADIS:  Yeah.
 7          THE COURT:  I don't judge credibility at the
 8  summary-judgment stage, so --
 9          MR. PARADIS:  But, you do have admissions.  You have
10  a retained expert saying one thing.  You've got their regular
11  head of access compliance saying the other.  And, you can use
12  an admission by Defendants on summary judgment.
13          THE COURT:  That's evidence.  It's not -- this is all
14  about -- expert opinion doesn't tell me an answer of law, for
15  one thing.  But --
16          MR. PARADIS:  Okay.  And the last thing is every
17  Named Plaintiff, when they go out to use the trails at GGNRA,
18  encounter actual difficulty.  They run into barriers that cause
19  them difficulty, slopes that are problems.
20          There's not a piece of evidence that Defendants have
21  submitted by any disabled person who's been to GGNRA who says,
22  "Yes, I was able to use the trail without problems."
23          THE COURT:  All right.  And then, I mean, there's --
24  I think maybe I want to break this into segments, so, just to
25  preview, and here are some things -- go over a few.  There are
```

1   other programs you think, as defined by the Defendants, that

2   there is not evidence that there's access or programmatic

3   access, then I'll turn to you.

4           Later, we'll get to things like undue burden,

5   deferred maintenance issues, things like that.  And, and

6   relief.  But, there are many other issues, but -- but I want to

7   sort of take them one at a time, and hear from both of you on

8   some of those.

9           So, are there other programs -- fishing.  Does any

10  Named Plaintiff say that they want to do fishing?

11          **MR. PARADIS:**  No, we don't have that evidence,

12  Your Honor.  That would be a class-member issue.

13          Interpretive exhibits.  Many, many class members and

14  Named Plaintiffs have testified that -- Ms. Gray, for example,

15  and Mr. Sutton, when they go to GGNRA facilities, they're

16  constantly looking for any form of information that's available

17  in alternative-accessible formats.  Braille, audio.

18          Ms. Gray and Mr. Sutton, every time they've gone to a

19  GGNRA park, have not been able to get any information in

20  alternative-accessible formats.

21          NCA, in their assessment, said this is a policy

22  deficiency that spans the entire park, because they have a

23  policy of providing that information in visual form only.

24          Mr. Blackseth, in his deposition, said he did not

25  know how much information was available in only visual format.

1            **THE COURT:**  He did say, I think, he pointed to

2   examples of information that was available in audio format, and

3   other -- and tactile format, and things like that.

4            **MR. PARADIS:**  Yes.  He identified a few -- well,

5   first of all, he's identified one park in the entire system

6   that now has an audible tour designed for blind people.  That

7   is Alcatraz.

8            **THE COURT:**  Uh-huh.

9            **MR. PARADIS:**  That occurred during the life of this

10  case.  There's not one other park in the entire system that has

11  an audible tour designed for people that are blind.

12            And what they have are audible tours for general

13  people that don't -- that blind people can't follow, because

14  they don't have the tactile markings to tell the blind person

15  where they are.

16            So, there's one --

17            **THE COURT:**  So, you're listening to a tour, but it

18  doesn't say, "Okay, when you feel this particular thing you

19  know you're in Spot 2"?  Or --

20            **MR. PARADIS:**  Correct, correct.  And until this new

21  Alcatraz tour was developed, they had the regular kind of

22  audible tour that is for the general public, that says, "Walk

23  ten feet to your right and you'll see this or that."

24            And our Named Plaintiffs experienced those audible

25  tours, Ms. Gray, and said it was of no use to her.  And others

1  said it was of no use, because it wasn't designed for a blind

2  person.

3          So, one park out of 30 now has one form of accessible

4  audible tour that is available to a blind person.  None of the

5  others have any audible tours designed for blind people.

6          And all of them have exhibits, they're called

7  "wayside exhibits," that tell you information about what is in

8  front of you, and the history of the park and the culture.  And

9  none of the Named Plaintiffs have encountered any such exhibits

10 that are at all accessible to them.

11          In fact, Ms. Gray had to cancel a planned visit to

12 Crissy Field because no docent was available, and none of the

13 exhibits were available to her in accessible formats.

14          None of the maps that sighted people use to orient

15 themselves to the parks are available in accessible formats.

16          **THE COURT:**  "Accessible" meaning Braille?

17          **MR. PARADIS:**  Supposedly, there's one Braille map

18 for -- Braille is one form.  Audible descriptions of maps is

19 another form.

20          Supposedly, there is one Braille form now for Muir

21 Woods.  But Ms. -- Ms. Gray and others have been to Muir Woods

22 multiple times, asked for anything in accessible formats, and

23 told there's nothing.

24          **THE COURT:**  So, when you say "supposedly," does this

25 post-date their visits?

1          **MR. PARADIS:**  It's unclear when they say this Braille

2    map for Muir Woods was developed.  But, again, that would be

3    one park with one Braille map.  And, most of the information

4    that's presented at Muir Woods still is fully -- solely in --

5    in visual form only.  Trailhead signage.

6          None of the trails in the national -- GGNRA system

7    have trailhead signage that tell what you the trail conditions

8    are, or tell you any information in accessible format.  And

9    Ms. Gray and Mr. Sutton have both testified that, as a problem.

10   So --

11         **THE COURT:**  What do you mean by "trail conditions"?

12   I mean, when -- for --

13         **MR. PARADIS:**  To say what's the maximum slope of the

14   trail, what's the minimum width of the trial, what barriers

15   will you -- you know, is it going to be accessible in any form,

16   for what period, for what stretch of the trail.  And, orient

17   you to where the trails are.  Which trail is which.

18         **THE COURT:**  And if that were provided, for example,

19   on a website, would it have to be provided at the trailhead?

20         **MR. PARADIS:**  It should be at both.  According to the

21   undisputed testimony by Mr. Margen, it should be in both forms,

22   so that people with vision disabilities and mobility

23   disabilities know what to expect and how to orient themselves

24   in the park.

25         And that's just completely absent, except for perhaps

```
 1   one map at Muir Woods.  So, the whole system of interpretive
 2   information that's provided is generally not accessible.
 3        THE COURT:  Now, if -- and I'll hear from the
 4   Defendants later.
 5            I mean, if a docent were available, that would be
 6   another way, wouldn't it?
 7        MR. PARADIS:  It's one way, but it doesn't provide
 8   program access.  As Ms. Gray noted, they had a docent available
 9   for one time she went to Crissy Field, but they didn't have a
10   docent for the other time she wanted to go.  And in other
11   experiences she's described, docents have only been available
12   for part of the time.
13            So, any time you have to rely upon a human staff
14   person to assist you, that is not the same level of -- that
15   doesn't provide program access, because it doesn't provide you
16   the independent usability.
17        THE COURT:  Well, on the independent usability, I --
18   those are two different issues.  One is reliability.
19            In other words, if -- if there were lots and lots of
20   docents, as, for example, it may be the case at Alcatraz -- I
21   don't know -- and so you never had to cancel a trip, you
22   wouldn't have a lack of access.  Now, independent -- on the
23   other hand, you would be depending on a person, rather than
24   your own steam, arguably.
25            And the question is:  Where is that written in the
```

1    standard?  I understand that that's a preference of the

2    disabled community, and I can -- sympathetic to that.  But, I

3    don't know where -- that it's a legal requirement.  And I

4    didn't see any addressing of that on either side.

5           **MR. PARADIS:**  We actually briefed in the briefing

6    that it's in the regulations, the notion of independence.  The

7    -- the 504 regulations, in fact, say that independence is

8    important for program access.

9           And, the Treasury case, talking about the currency,

10   makes very explicit that the independence is important for

11   program access.

12          So, we cited --

13          **THE COURT:**  I guess I viewed it -- and, I mean, I'll

14   go back and look at that -- it's sort of, it's a factor to

15   consider overall, but not an independent requirement.

16          **MR. PARADIS:**  So, in our brief, we cited to --

17   actually, it's a statute.  Rehab Act, 29 U.S.C., Section

18   701(b)(1)(F), says that (As read):

19              "The purpose of the Rehab Act is to empower

20              individuals with disabilities to maximize

21              independence..."

22      Among other things.  And that was cited in the currency

23   case, *American Council of the Blind v. Paulson*.

24          So -- and it doesn't take expert testimony to see

25   that normal people want to be able to go out to a park system

1   and enjoy it, without having to plan ahead, and call for a

2   docent, and try to hope that the docent will arrive.  That's

3   not the same.  It doesn't meet the Rehab Act's notion of

4   independence, self-sufficiency.

5          **THE COURT:**  And that -- I mean, there's two levels of

6   that.  That there's -- you point to that.  On the other hand,

7   if, for example, you go to Alcatraz and there's 20 people

8   hanging around at all times there, saying, "Would you like a

9   docent," that would be different than calling ahead, "Can I

10  come tomorrow?"

11         "No, you can't," you know, nobody there tomorrow or

12  maybe the next day, that sort of thing.

13         So, that's one issue.  The other one would be, which

14  we'll get to later, but if it were an undue burden to provide

15  independent everything, then at that point, something less than

16  optimal might be justified.

17         **MR. PARADIS:**  Certainly.  But again, we have about --

18  you know, many declarations -- the declaration of the Named

19  Plaintiffs talk about -- for example, Mr. Sutton.

20         He has never been able to go to a GGNRA park, and be

21  able to navigate around independently.  He has tried.  He has

22  gone to Ocean Beach, and been unable to navigate anywhere

23  beyond the foot of the steps at Ocean Beach, because he doesn't

24  have any assurance of how to get around and get back.

25         So, the actual evidence is undisputed that disabled

1  people are trying to go to GGNRA, and are not being provided

2  the benefits of the park because of lack of infrastructure that

3  will enable them to actually benefit from the system.

4          And, of course, the NCA assessments in hundreds of

5  cases say you need to provide -- modify exhibits, provide

6  information that's available to disabled people and blind

7  people so that they can experience these facilities without --

8          **THE COURT:**  All right -- well, we're going back to

9  interpretive exhibits.  But --

10          **MR. PARADIS:**  Sure.

11          **THE COURT:**  All right.  Are there any other programs

12  you want to single out, that you say --

13          **MR. PARADIS:**  Yes.  Yes, Your Honor.

14          **THE COURT:**  Go ahead.

15          **MR. PARADIS:**  The -- the beach program, itself.

16          **THE COURT:**  Uh-huh.

17          **MR. PARADIS:**  No dispute, Mr. Blackseth admits that

18  having a beach program accessible is one of the key programs

19  offered by this park system.

20          They have no ocean beaches currently that provide the

21  minimum level of access that wheelchair users need, many of

22  them, to be able to experience that environment at all.

23  Mr. Blackseth admitted that the beach wheelchairs don't serve

24  the full population of people with mobility disabilities.  And,

25  in fact, many of them will not be able to use a beach

1  wheelchair, or would not want to because it makes you

2  dependent, and you have to be pushed like a child.

3  　　　　　And so --

4  　　　　　**THE COURT:**  But, and what about the "can't"?  The

5  "can't" is there's -- is what?  Can't use them.

6  　　　　　**MR. PARADIS:**  Can't.  Yes, you have to be picked up,

7  and placed in this beach chair.  And many people use

8  specialized wheelchairs with head restraints and straps to hold

9  them in place, because they have no upper body strength.

10 　　　　　**THE COURT:**  And, are any of those Named Plaintiffs?

11 Does that affect any of the Named Plaintiffs?

12 　　　　　**MR. PARADIS:**  I believe Ms. Gray would have great

13 difficulty getting into a beach wheelchair.

14 　　　　　**THE COURT:**  And, has she said that?

15 　　　　　**MR. PARADIS:**  I don't believe so.  Ms. Sieck has

16 talked about the fact that she could not -- she would not be

17 able to use a beach wheelchair in the same way as if she could

18 get onto the beach independently in her power chair.

19 　　　　　She has put in her information that she would like to

20 go to Rodeo Beach in her powered wheelchair, and go on to the

21 beach in her powered chair, and not be dependent and rely on

22 somebody to push her.  And she has -- and that's just one of

23 many beaches that have no way for a wheelchair user to get out

24 onto the beach.

25 　　　　　**THE COURT:**  And I would agree with what -- again, I

```
 1  have -- a big hole, it seems to me, is that essentially, I
 2  think, Mr. Blackseth opines that you've got Stinson Beach and
 3  you have got -- which is the other one he says?
 4         MR. PARADIS:  Crissy Field.
 5         THE COURT:  Crissy Field.  So you've got -- and the
 6  Stinson Beach, I know Plaintiffs' argument is that it's not in
 7  the winter.  I want to hear from the Defendants about that.
 8  But, I suspect that has something to do with storms, but --
 9  which would affect ocean beaches more than they would affect
10  bay.
11         If that's not enough beaches, what other beaches?  I
12  don't think it's all beaches --
13         MR. PARADIS:  No.
14         THE COURT:  -- in order to have program access.  So,
15  and Plaintiff doesn't address that at all, and say, "Well, you
16  know, there's certain beaches that are unique."
17         I think it's a good point that you make now, well,
18  there ought to be an ocean beach, at least, and bay beach.  I
19  think that that makes sense.
20         Maybe there should be -- you know, some beaches that
21  are long beaches, you know, more like I believe Ocean Beach is,
22  and some that are coves.  But, I don't think we have got
23  anything like that from the Plaintiff, that I'm aware of.  At
24  least, not in the briefs.
25         MR. PARADIS:  Well, that's primarily because we're
```

1   not asking the Court at this time -- this is really a remedies

2   issue, to some extent.

3          THE COURT:  Well, I agree with the Defendants that

4   your remedies address was woefully inadequate.  And -- but

5   still, you know, I said in the previous class certification,

6   you know, we're not ready to craft a remedy, but there has to

7   be more ability to see down the line that a remedy can be

8   crafted.  And to say, "Well, you can get a special master,"

9   that doesn't answer it at all.

10         So, I don't agree that we can defer all of that, to

11  that degree.  I mean -- and I think, between the *Wal-Mart* case

12  and then just good old, you know, Federal Rules of Civil

13  Procedure, you can't be so vague any more about remedy.

14         MR. PARADIS:  Well, we've also tried to be as

15  explicit as we can.  The issue is:  Are they providing enough

16  access now for beaches, to meet program access?

17         And, they -- they currently have no beaches that

18  provide program access.

19         THE COURT:  Well, I don't know about that.  All

20  right.

21         MR. PARADIS:  Well, the Stinson Beach, that --

22  Mr. Blackseth acknowledges that there's many other barriers at

23  that park system that make the park not fully accessible.

24         THE COURT:  Like not perfect parking, and the path of

25  travel, and things like that.

```
 1              MR. PARADIS:  Right.  In fact, they say it's severely

 2   deteriorated parking and paths of travel.  And Mr. Margen has

 3   noted slopes that travel up to 12 percent, which are dangerous.

 4   So -- and the mat is out there only for a few months per year.

 5   So you have no beach access -- program access to the beach

 6   there.

 7              Crissy Field, Mr. Margen noted they're not even

 8   maintaining the path of travel to that beach access mat from

 9   the disabled parking.

10              NCA looked at the issue of:  Where do you need beach

11   access routes in order to meet program access standards?  And

12   they opined in their assessment, and Defendant put in their

13   draft transition plan, it should be at Ocean Beach for sure.

14   That's a mild --

15              THE COURT:  At Ocean Beach, itself.

16              MR. PARADIS:  At Ocean Beach.

17              THE COURT:  Not "an ocean beach," but --

18              MR. PARADIS:  No.  At Ocean Beach Park, which is over

19   a mile in length, and has no beach access route anywhere.  They

20   said, absolutely there.

21              They said China Beach, it might be technically

22   infeasible, which is right above Ocean Beach.  And they said

23   don't assume it's infeasible, because that calls for a

24   feasibility study.  So, they recommended that.  They said if

25   it's not feasible there, then direct people to Ocean Beach and
```

1   to Baker Beach.

2          So, and, and so clearly, every --

3          **THE COURT:**  Baker is which one?

4          **MR. PARADIS:**  Baker is further north than China

5   Beach.  So, they're running -- curling around the upper

6   peninsula, Ocean Beach to the south, then China Beach, then

7   Baker Beach.

8          And so, several beaches in San Francisco clearly need

9   beach access routes.

10         **THE COURT:**  Well, I don't think there's any

11  "clearly."

12         And the NCA, it's evidenced, there is -- I mean, they

13  -- there's some equivocation as to -- to some degree, they shot

14  beyond the minimum required for program access.  I think that's

15  undisputed.  But to what degree that is, I'm very unclear.

16         **MR. PARADIS:**  Well, I asked Sherril York, the head of

17  NCA, in her deposition exactly what are the areas where they

18  went beyond program access.  And she listed four areas.  She

19  said it's the number of picnic tables, the number of benches,

20  the number of trash receptacles, and one other --

21      (Off-the-Record discussion between Counsel)

22         **MR. PARADIS:**  I think it was just those three.

23  Picnic tables, benches and trash receptacles.  Every -- no

24  other -- that was it.

25         So, when it came to beach access, to interpretive

 1  exhibits, to trails, she said their goal was to simply identify

 2  the minimum needed for program access.  And, that's in the

 3  papers.

 4          **THE COURT:**  Okay.

 5          **MR. PARADIS:**  And it's undisputed that that's what

 6  she -- you know, the MOU asked them to identify what's

 7  necessary for program access.  And she said that's what they

 8  did, except for those three areas.

 9          So, so beaches are not accessible, trails are not

10  accessible, exhibits are not accessible.  Camping is not

11  accessible.  The website is still not accessible.

12          **THE COURT:**  Yeah.  Let me say -- I mean, this is a

13  different subject, so I want to let Defendants chime in.  Quite

14  a bit of time been used already on some of these.  But, I will

15  get to this afterwards.

16          But, what -- let's just take the standing.  What the

17  Defendants say, and I don't think Plaintiffs really responded,

18  is that not a single Named Plaintiff tried to use the website

19  and had a problem prior to filing a lawsuit.

20          **MR. PARADIS:**  Mister -- prior to filing the lawsuit,

21  no.  But Mr. Sutton --

22          **THE COURT:**  After.

23          **MR. PARADIS:**  Yes.  He experienced other forms of

24  difficulty with not having alternative accessible formats, and

25  not being able to get information about the GGNRA system before

1   the filing of the lawsuit.

2          So, in his declarations he -- he talked about how he

3   has experienced difficulty getting information about GGNRA,

4   when he goes to the park system.  The website is just one form

5   of distributing information about the park system.

6          **THE COURT:**  And, we'll get to the park partners

7   later.  But, I will say as a general matter, I can understand

8   that it's frustrating when you're trying to litigate a case,

9   but this is inherent in injunctive-relief-only cases, that the

10  Defendant keeps making improvements.

11         You're saying, "Oh, well, I'm not sure."  I can't --

12  I can't ignore them.  I mean, if they've improved things and

13  taken care of it by -- by this point, then there's no

14  likelihood of future problems.  So --

15         **MR. PARADIS:**  Well, this is an important issue,

16  because for decades, the website was inaccessible.  When we

17  filed the lawsuit, the website was inaccessible.

18         **THE COURT:**  But now --

19         **MR. ELSBERRY:**  When Plaintiffs' expert assessed it.

20         **THE COURT:**  So, what do we do now?

21         **MR. PARADIS:**  Yeah.  So, on the eve of trial, when

22  Defendants make a partial fix, the courts say that's not going

23  to be sufficient to defeat summary judgment -- the need for

24  injunctive relief.

25         **THE COURT:**  If it's partial.  If it's truly partial.

1  One, if there's standing, which I think is a serious question

2  now, because not a single person -- I understand -- I'll think

3  about that theory that, well, it's just part of a larger

4  interpretive thing.

5          But, if there is standing, normally, you would -- you

6  know, it's not clear to me if it's been fixed sufficiently for

7  program access.  But that may be the case, even if there's one

8  or two lingering imperfections.

9          **MR. PARADIS:**  Okay.  Well, the other thing is, if

10 this strategy is allowed, to simply respond to the expert

11 reports by fixing things literally in the month before the

12 hearing, that means that as soon as Your Honor rules, if you

13 were to find that there's no need now for injunctive relief,

14 because websites are constantly changing, the very next month

15 they could go back to their usual pattern.

16         **THE COURT:**  Well, then you could sue them again, I

17 suppose.  I mean, I'm not saying that's terribly efficient, but

18 I don't think that that's necessarily what all the standards --

19         **MR. PARADIS:**  But, that was exactly the issue we had

20 in *Cupolo v. BART*, Your Honor, which was in front of Judge

21 Wilken.

22         **THE COURT:**  Yeah.  I think it's a little different.

23 But --

24         **MR. PARADIS:**  But in many ways, the same.  The main

25 problem there was lack of maintenance of elevators.  And so on

1  the eve of a hearing for summary -- for preliminary injunction,

2  they came up with a new plan to maintain the elevators.

3         **THE COURT:**  That's a little different, the plan

4  versus have they actually fixed it.  I mean, maintenance is

5  something that is inherently ongoing.

6         But anyway, I think we need to give the other side

7  some time, and then we'll come back.  There's some more --

8         **MR. ELSBERRY:**  Okay.

9         **THE COURT:**  -- things that I want to --

10        **MR. PARADIS:**  So, the visitors center -- I mean, the

11  park headquarters, all the trails, the exhibits, the beaches,

12  all the things I've covered, systemic non-compliance with

13  program access.  Even when you look at Mr. Blackseth's own

14  report.

15        **THE COURT:**  All right.  All right.  Let's hear from

16  you.

17        **MR. COOPER:**  Thanks, Your Honor.

18        **THE COURT:**  Is that okay for you, arguing there?

19        **MR. COOPER:**  It's fine with me, if it's fine with

20  you, Your Honor.  It's fine with me.

21        I just want to start by saying, at a broad level, a

22  fundamental part of the mission of the Golden Gate National

23  Recreation Area is to make the -- this treasured national park

24  accessible to all people, including those with disabilities.

25  So, there is no disagreement that access is an important thing,

1    and the park is doing what it can.

2              I think, though --

3         **THE COURT:**  Well, it's certainly -- I don't think

4    that dwelling on the past is terribly helpful for me, because

5    I'm looking at an injunctive-relief suit.  But, I think it's

6    fair to say that it has been treated as a very low priority,

7    until very recently.  Most of the time.

8         **MR. COOPER:**  I respectfully disagree --

9         **THE COURT:**  With no disrespect to Mr. De La O, and

10   people who have been trying to do something.  But, there's been

11   a lot of neglect.

12        **MR. COOPER:**  I would refer Your Honor to our

13   declarations, and I think you can see some more facts about the

14   broader point.

15             But, to move to your specific questions, because I

16   think you raise a lot of things, and there's a lot of things

17   that I disagree with that my opposing counsel mentioned.

18             As a preliminary matter, you mentioned Appendix A of

19   our brief --

20        **THE COURT:**  Yeah.

21        **MR. COOPER:**  -- about standing.  And I'll explain to

22   you --

23        **THE COURT:**  I just really -- explain to me --

24        **MR. COOPER:**  Yeah, I'm happy to explain to you what

25   I'm trying to do.  And, because this is such a massive case, as

1  Your Honor knows, and we didn't have all the room we wanted to

2  explain everything in great detail, we tried to put in this

3  appendix to give sort of a summary of our view.

4          When we say that there's no personal injury and no

5  future injury, that means that no Named Plaintiff has gone

6  during the actual actionable period to that place.  And also --

7          **THE COURT:**  Meaning, before filing the lawsuit?

8          **MR. COOPER:**  Before filing the lawsuit, and also

9  within the statute-of-limitations period.  So, between 2002 and

10  2008.  And --

11          **THE COURT:**  But if they, for example, went there in

12  2001, and said, "I didn't go back between 2002 to 2008 because

13  I had no reason -- I was uncertain whether the barriers had

14  been fixed," they would have standing.

15          **MR. COOPER:**  We would disagree, Your Honor, for a

16  couple of reasons.  First, if it's before the

17  statute-of-limitations period, I think Your Honor, in the order

18  on the motion to dismiss, said things outside of the

19  statute-of-limitations period can't be used for standing.  We

20  cite that in our brief.

21          And, the more broad point is if the Plaintiff has

22  only said that, "We're going back because we're not sure," and

23  they haven't done anything to check it out, then I think that

24  could be a problem, especially if it's, at this point, eleven

25  years old.

1             And if you look specifically at Footnotes 4 and 5 of

2    our cross motion, we go through there and list all of the dates

3    from the declarations and the depositions of when -- of these

4    untimely visits.  And I think -- I haven't looked through

5    entirely, and I do -- I have noticed a couple of errors, but I

6    think for the most part Plaintiffs' demonstrative exhibit that

7    they've just submitted backs this up.

8             If you look at it, for example, Lori Gray only went

9    to Alcatraz in 2010.  That's too late.  The Plaintiffs mention

10   that Lori Gray's gone to Mori Point, but that was in 2011.

11            No Plaintiff before the filing of this lawsuit went

12   to any part of GGNRA in San Mateo County.

13        (Reporter interruption)

14            **MR. COOPER:**  I'm sorry about that.

15            And, if you look at Footnotes 4 and 5, we provide the

16   citations to the record.  So, to the extent that those agree

17   with the Plaintiffs' demonstrative exhibit, then that can be a

18   handy guide.

19            Similarly, Peter Mendoza, Plaintiffs mention, went to

20   Ocean Beach.  But that wasn't until 2012.

21            **THE COURT:**  So, in other words, when I'm looking at

22   the stipulation regarding park areas Named Plaintiffs visited

23   or were specifically deterred from visiting, that does not have

24   any dates on it.

25            **MR. COOPER:**  That's correct, Your Honor.  And we went

```
 1   through every single one of those places -- every single one of
 2   those stipulations, we compared it to the record.  And of all
 3   of those, the only one in that we're not disputing where
 4   there's standing is Mr. Mendoza's trip to Rodeo Beach.  Every
 5   single other one is either before the statute of limitations,
 6   came after the filing of the lawsuit, or is too vague.
 7             So, for example, Plaintiffs occasionally say they
 8   went to Marin Headlands.  But Marin Headlands is thousands of
 9   acres.  And as we point out in *Lujan v. National Wildlife*
10   *Federation,* the Supreme Court said you can't get standing by
11   saying you went to some unidentified part of an immense tract
12   of land.
13             **THE COURT:**  Well, I think when they were talking
14   "immense," that was a factor of a hundred or a thousand times
15   more immense than the Marin Headlands.
16             **MR. COOPER:**  They were talking about thousands of
17   acres, Your Honor, because at issue --
18             **THE COURT:**  I mean, multiple, multiple, multiple, I
19   think, weren't they?  I would like to see the exact --
20             **MR. COOPER:**  Yes, so what was going in *National*
21   *Wildlife Federation* was there are a few millions acres at stake
22   in the whole area, but only 4,500 acres were disputed.  And the
23   plaintiffs had said --
24             **THE COURT:**  Right.
25             **MR. COOPER:**  -- they had gone to --
```

1          THE COURT:  So, a few million.

2          MR. COOPER:  -- essentially part of it.

3          THE COURT:  A ratio of 4,500 out of a few million is

4    much higher than anything about how big the Headlands are.

5    Right?

6          MR. COOPER:  I think it's hard to say, Your Honor.  I

7    mean, if --

8          THE COURT:  Okay.  I'll ask for -- afterwards, I want

9    some mathematical calculations on that, briefly.

10         MR. COOPER:  So, but that's what we were trying to do

11   in Appendix A, is where we say no personal injury, no future

12   injury --

13        (Reporter interruption)

14         MR. COOPER:  I'll slow down.  That's what we were

15   trying to do, Your Honor, in Appendix A.

16         THE COURT:  So, but -- well, I think what I need from

17   the parties is a new version -- you don't have to agree or

18   disagree on the implications, but of the facts that somehow

19   measures Appendix A, and the joint stipulation gives me a

20   column with a time frame, so I understand, you know, when.  And

21   then the argument, Defendant outside the action period, the

22   Plaintiff not, or an explanation.

23          But, for example, in this Fort Mason, I would not

24   break it down to separate buildings within Fort Mason.  So, if

25   -- if a Named Plaintiff went to Fort Mason at all during the

1   actionable period, I think there's standing to challenge

2   Fort Mason in general.  You know, on the other hand, I don't

3   know that anybody's arguing that they want to play tennis.

4   But -- I haven't heard that.

5           But, putting that aside, just generally being able to

6   get around Fort Mason I think would be --

7           **MR. COOPER:**  That's fine, Your Honor.  We'd be happy

8   to submit something, if you like.  I also have the information

9   here.

10          **THE COURT:**  Well, I think -- you know, it's already

11  after -- it's already almost 11:15, and if we go -- you know, I

12  can't keep you beyond around noon, at the latest.  And so, I

13  don't -- I'd would rather get it in a form that's very

14  digestible and simple.

15          **MR. COOPER:**  Certainly, Your Honor.

16          **THE COURT:**  Some kind of table, ideally, that you

17  both agree on the facts.  Not -- not what the implications are,

18  but the facts.

19          **MR. COOPER:**  Would something like the demonstrative

20  exhibit the Plaintiffs just handed out, is that what you're

21  looking for?

22          **THE COURT:**  Yeah.

23          **MR. COOPER:**  Because I'm sure --

24          **THE COURT:**  Yeah.  Something like that.

25          **MR. COOPER:**  Well, I would think we could come to

1  some sort of agreement about the relative dates.

2          **THE COURT:**  Uh-huh.  And then --

3          **MR. COOPER:**  A format like that.

4          **THE COURT:**  And then for ease -- I certainly know

5  Ms. Gray by now, but what the disability they have is, the

6  person, because these -- some are vision, some are mobility,

7  et cetera.

8              And then, the non-class members separated out from

9  the class members.

10          **MR. COOPER:**  Certainly, Your Honor.  And, I would

11  also just, again, add that Footnotes 4 and 5 of our brief have

12  all of these dates, though I agree it could be better

13  formatted.

14          **THE COURT:**  Yeah.  I think -- I don't think you all

15  appreciate that, having spent a lot of last week and a lot of

16  the weekend on this, it's still very hard for me to get my

17  hands around all the detailed facts like this.  So --

18          **MR. COOPER:**  And so, that's Appendix A.  The only

19  other point I would make about Appendix A is that when -- we

20  also would then later break it down by persons with mobility

21  versus vision disabilities.

22          **THE COURT:**  Right.

23          **MR. COOPER:**  And that's --

24          **THE COURT:**  I agree.

25          **MR. COOPER:**  Yeah.

1          **THE COURT:**  I don't think there's really any dispute.

2   I mean, Ms. Gray has both, so any place she visited would

3   address both of those.

4          **MR. COOPER:**  Uh-huh.

5          **THE COURT:**  But I don't think that the Plaintiffs

6   dispute that they only have standing to challenge things

7   related to one disability.  Right?

8          **MR. PARADIS:**  Correct.  Yes, Your Honor.

9          **THE COURT:**  Okay.

10         **MR. COOPER:**  So, just in conclusion, if you look at

11  our first page of our -- excuse me, the second page of our

12  reply brief, we list every single site where the Plaintiffs

13  have not shown a timely injury in fact, and have also not shown

14  a future injury.  Namely, plans to return, or specific

15  deterrence.

16         **THE COURT:**  Well, I mean, I think it's somewhere in

17  between what -- your client's specific deterrence and general

18  deterrence.

19         I mean, if somebody has, for example, been to Fort

20  Mason or Muir Woods, and says, "I really can't get around; I

21  like those places; I'd like to go back if I knew it was

22  accessible," I think that's enough.

23         **MR. COOPER:**  And I would agree, Your Honor.  But, if

24  you look at the evidence the Plaintiffs have submitted, that's

25  not the kind of thing they submit.  Setting aside the untimely

1    barriers, the evidence of deterrence Plaintiffs provide is

2    minimal and insufficient.

3           Specifically, we asked every single Named Plaintiff

4    at deposition if they intended to return to GGNRA.  Every

5    single one said either "No, not right now," or "I don't know."

6    And --

7           **THE COURT:**  But I think a lot of them followed up by

8    saying "No, unless I learn that it's been made accessible."

9           **MR. COOPER:**  Exactly, Your Honor.  And, only one

10   Named Plaintiff said that, and that was Plaintiff Mendoza.  And

11   what he actually said was, "I don't have plans right now

12   because I'm not sure what's accessible, and it's not on the

13   website."

14          But Mr. Mendoza hadn't looked on the website in two

15   years, as of the date of his deposition, which was a couple of

16   years ago.

17          And so, the level of deterrence that's needed, I

18   think, from what the court said in *Chapman*, and I think what

19   Your Honor was getting at in your prior order, was if you know

20   that there's a specific barrier and that's preventing you from

21   returning, then that's deterrence.  And Defendants would agree

22   with that position.

23          But if you just say, "I'm not sure if it's

24   accessible, and nobody has come and specifically told me it is,

25   then I'm not going to go until they do" --

1          THE COURT:  There's some in-between.  I think the

2    *Doran* case says if you know of one barrier and you're not sure

3    if there are others, but you have a valid concern, of course,

4    because you already know of one, then unless and until -- if

5    you're uncertain, that's a deterrence, in itself.

6          MR. COOPER:  And I would agree, if you know of one

7    barrier.  But, the Plaintiffs don't provide evidence that the

8    Named Plaintiffs know of even one barrier at these places that

9    they now are saying that they're deterred from going to.

10          THE COURT:  Well, all right.  Looking further at your

11    Exhibit A, then I think it goes on -- the stuff like "No

12    personal injury and no future injury to any Named Plaintiff"

13    and "Any injury is not fairly traceable to Defendants," that --

14    and then Camera Obscura, et cetera, that's about park partners

15    or other people being responsible.  Right?

16          MR. COOPER:  That's correct, Your Honor.

17          THE COURT:  And I'm not sure -- you know, I think --

18    I mean, I think all of this -- I don't want to spend the time

19    going through this entire thing, but I think I need it to be

20    more spelled out along the lines that I was talking about.

21          MR. COOPER:  (Nods head)

22          THE COURT:  And eventually, we should get to

23    Appendix B, but that we'll get to on the next round.

24          MR. COOPER:  Okay.  Are there any other standing

25    points Your Honor would like argument on?  I don't want to

1  waste your time with arguing things you've already decided, or

2  thought through.

3          **THE COURT:**  Well, I mean, I'm struggling.  I don't

4  think this case is like any of the other cases, exactly.

5          **MR. COOPER:**  I think that's right.

6          **THE COURT:**  Well, I think for now, that's all.

7          **MR. COOPER:**  Certainly, Your Honor.  I'll move on,

8  then, to -- I think the next point was about programs, overall.

9  It is -- as Your Honor noted, the fundamental question under

10  504 is: Is there program accessibility?

11          And Defendants have presented evidence that analyzes

12  GGNRA's programs, in their entirety.  And that's in Blackseth's

13  expert report.  And there are additional details found in some

14  of the declarations, as well.

15          Plaintiffs have, as I think Your Honor noted, not

16  submitted evidence about what programs GGNRA offers, or

17  evidence analyzing these programs in their entirety.

18          And so I think, as a matter of law, Plaintiffs have

19  not provided sufficient evidence that a reasonable jury or a

20  reasonable factfinder could rule upon.  And that, alone,

21  entitles Defendants to summary judgment.

22          **THE COURT:**  This would -- now, you mentioned "jury."

23  For better or for worse, this would be a judge trial, I think.

24  Right?

25          **MR. COOPER:**  I think that's right, Your Honor.

1              **MR. PARADIS:**  It's a bench trial, Your Honor.

2              **THE COURT:**  Yeah, okay.  Anyway, we're not there yet.

3              But, well, what about the arguments that we just

4    heard?  For example -- and, the NCA is -- certainly, it's, I

5    think -- I would not be inclined to exclude any of the evidence

6    that either side has proffered.

7              And, I think Mr. Margen is entitled to rely on the

8    NCA, which he says is a reputable expert.  And, I would hope

9    so, and it appears to be.

10             I would hope so, because they've been busy providing

11   services to the national parks.  But, there's more than hope.

12   I mean, there's evidence to support that.  And, they have taken

13   a position that disagrees in a lot of respects with Blackseth.

14   And, so has Mr. Margen.

15             So I would -- as to some of these things, there's --

16   I think you would have to acknowledge some triable issues.

17             **MR. COOPER:**  Well, respectfully, we would disagree,

18   Your Honor.

19             **THE COURT:**  If there's standing.

20             **MR. COOPER:**  Yeah.  Assuming standing.  And the only

21   other point I'll make right now about standing is that the

22   Plaintiffs mention that Plaintiff Sieck has now testified in

23   her 2012 declaration that she wants to go camping.  But she's

24   never been to any campsites at GGNRA; she's never tried to camp

25   at GGNRA.  And even in her declaration, she does not say she

1  wants to go camping at GGNRA.  She just says she now likes to

2  go camping.  And so, I don't think that there's any actionable

3  injury about camping.

4          And more broadly, even if there is, GGNRA is

5  undertaking this -- this project at Kirby Cove, which should be

6  completed in Fiscal Year 2013, and that will make Kirby Cove

7  fully accessible.  And under the Ninth Circuit's decision in

8  *Midgett*, it's not proper to enter an injunction against a

9  government agency when the agency is already taking the

10 necessary steps to provide program access.

11         **THE COURT:**  Well, I'm not sure that *Midgett* is on

12 point as much as that.  I mean, that was a very narrow

13 undertaking, relatively, with a very specific program.  I'm not

14 sure that I've got that level of detail as to these future

15 improvements, such as Kirby Cove.

16         **MR. COOPER:**  (Nods head)  If Your Honor doesn't think

17 you have enough details, we'd be happy to provide more -- we

18 think it's relatively -- I think it, in fact, is undisputed.

19 Plaintiffs haven't said that the plans -- which we turned over

20 during discovery -- if completed, would not provide access to

21 Kirby Cove.  And Black- --

22         **THE COURT:**  The question would be then, presumably,

23 should I then order that the plans be completed.

24         **MR. COOPER:**  And while -- the park has said in their

25 declarations they are undertaking it.  And so, I don't think

1  the Court needs to use its equitable powers to order the agency

2  to do what it already says it's in the process of doing.

3          Additionally, Your Honor, the Plaintiffs mentioned

4  the park headquarters.  This is somewhat of a side point.

5  First of all, it's not a program -- it's not a program that the

6  Defendants identified, and the Plaintiffs have not provided any

7  evidence that it is a program.

8          **THE COURT:**  But is it -- it's in Fort Mason.

9          **MR. COOPER:**  It is in Fort Mason, Your Honor.

10  Correct.

11          **THE COURT:**  And I think it's part of the Fort Mason

12  experience, and it's also a place where you can get special-use

13  permits and go to meetings.

14          **MR. COOPER:**  That's true, Your Honor, but the park is

15  closed to the public.  This is in Roth's declaration,

16  Paragraph 41.  And so --

17          **THE COURT:**  But when it says "closed to the public,"

18  does that mean -- I mean, I was unclear, but it seems as if

19  there's a conflict, that there might be meetings, public

20  meetings there.

21          **MR. COOPER:**  There are no public meetings held there

22  anymore, Your Honor.  If you look at Roth's declaration,

23  Paragraph 41, all public meetings are now held at the

24  Fort Mason Officers Club, which has been completely renovated

25  and is accessible.

```
 1          THE COURT:  And, where are permits issued?

 2          MR. COOPER:  Permits are still issued from an

 3  adjacent building that does have -- I think it's in the

 4  record -- is not entirely accessible.  But you can contact the

 5  accessibility department.  If you're seeking a special permit

 6  and can't access that building, you can get it issued to you at

 7  an adjacent building, such as the Fort Mason Officers Club.

 8          THE COURT:  So, if you go to an alternative building.

 9  But you can't go to the main -- the building where most people

10  go.

11          MR. COOPER:  Well, there is access to the main

12  building, Your Honor.  There are technical violations of the

13  ABAAS, but --

14          THE COURT:  Sounded like more than technical, that

15  people have been stranded, waiting for 20 minutes or a half an

16  hour at the back door.

17          MR. COOPER:  Your Honor, there is evidence about -- I

18  think that's Plaintiff Mendoza who tried to ring the bell, and

19  it wasn't answered, because the door in the back is locked.

20          And in part, now, the building is not open to the

21  public for that very reason.  But, there is undisputed evidence

22  that persons in wheelchairs have entered and used this facility

23  with no problem, once they get inside.

24          THE COURT:  Yeah, well, I mean, that doesn't sound

25  like access to me.
```

1          **MR. COOPER:**  But, again, it's not open to the public,

2     so it -- I don't think it would matter.

3          **THE COURT:**  You say it's not open to the public, but

4     it's where you go to get permits.  So, it is open to the

5     public.

6          **MR. COOPER:**  It's -- it's not where you go to get

7     permits anymore, Your Honor.  Permits were always issued out of

8     a different building.  And because the headquarters is more

9     accessible than that other building, as an accommodation, the

10    park would provide these permits to persons with disabilities

11    at the park headquarters.

12         But, again, now, that's no longer the case.  If -- if

13    it's -- if needed.

14         **THE COURT:**  And if you want to go meet with the --

15    with Mr. De La O, who's the head of program accessibility?

16    He's in this building, right?

17         **MR. COOPER:**  His office is in that building, but he

18    can also meet you at an adjacent building that is fully

19    accessible.

20         **THE COURT:**  All right.  So, that's park headquarters.

21    What else?

22         **MR. COOPER:**  That's the park headquarters.

23         Um, just a couple of points about NCA, Your Honor.

24    First of all, in addition to the -- the NCA reports,

25    themselves, acknowledge that they go beyond program access

 1 │ requirements.  They didn't survey or analyze programs in their

 2 │ entirety.  They analyzed, piece by piece.  They also --

 3 │         **THE COURT:**  What about -- I mean, that's true, but

 4 │ what about the testimony by -- that was cited earlier, that one

 5 │ of the top NCA people said, "Everything we -- we had except for

 6 │ some picnic tables and the like is necessary"?

 7 │         **MR. COOPER:**  That's incorrect, for a couple of

 8 │ reasons.  First of all, Your Honor, if you complete a phased

 9 │ evaluation, if you complete the first phase and haven't yet

10 │ evaluated the subsequent phases, you can't say that any

11 │ problems in the first phase are necessary for program access,

12 │ if, when you evaluate other parts of the program in subsequent

13 │ phases it turns out the program is accessible at an alternate

14 │ location.

15 │         So, if, for example -- this is hypothetical -- there

16 │ were ten coastal overlooks all along a road, and you evaluated

17 │ only the first two in Phase 1, and you found them inaccessible,

18 │ and you wrote up the report, and then in Phase 2 you evaluated

19 │ the other eight and found they were all accessible, I don't

20 │ think you could come to the conclusion that you need to change

21 │ the first two to achieve program access.

22 │         **THE COURT:**  But I take it, her testimony was after

23 │ the first four phases.

24 │         **MR. COOPER:**  But each report was written in

25 │ succession -- or, let me clarify.  The Phases 1 and 2 were

1   written together.

2           **THE COURT:**  Right.

3           **MR. COOPER:**  Phase 3  was written separately, Phase 4

4   was written separately.  And there weren't revisions, to my

5   understanding, to the first -- the original reports.

6           **THE COURT:**  And then, the Plaintiffs' expert has

7   said, "Well, you know, they might" -- something along the lines

8   of "There might be better ways to do it, but this one is fine."

9           **MR. COOPER:**  But, Plaintiffs' expert, Your Honor,

10  hasn't assessed GGNRA, or the vast majority of it, himself.  He

11  hasn't gone to Alcatraz; he hasn't gone to Muir woods.

12          **THE COURT:**  But he said -- well, anyway, I think that

13  -- all right.  Go ahead.  Anyway, we need to move on.

14          **MR. COOPER:**  So, that's one issue.  Another issue is

15  that NCA includes a lot of places not open to the public.  So,

16  that's another flaw with the NCA reports.

17          Another flaw is a lot of the NCA evidence is

18  outdated, and it's undisputed that things they have identified

19  have either been fixed, or they're erroneously identified as

20  being barriers.

21          And a final point, Your Honor, is budget.  The NCA

22  never considered the cost of any of these --

23          **THE COURT:**  Yeah, but I'm left with --

24          **MR. COOPER:**  -- factors.

25          **THE COURT:**  -- ships passing in the night on this,

because you've said in general, we have budget shortfalls, and
for example, there's a lot of deferred maintenance.  And I'm
sure that's the case.  It's not disputed.  But, but you have
also -- but I need something more concrete for undue hardship.

          And for example, presumably, something like changing
interpretive exhibits and adding some more audio tours that are
specifically developed for blind people, things of that nature,
while not free, certainly, would be a lot cheaper than creating
a lot of accessible trails or installing ramps at Ocean Beach
and so on.  But, so, probably not undue hardship.

          Now, I'm just exercising common sense, but I haven't
been given anything concrete enough to make those kind of
calls.  Or whether, for example, installing a ramp at Ocean
Beach, first you do a -- you know, a technical feasibility,
spell it out: Can it really be done, and how much will it cost.
We're not there yet.

          Then if it costs a lot, could it be done over ten
years?  You know, I don't have that kind of information.  And
it's short of a chicken-and-the-egg thing at this point.

          **MR. COOPER:**  Well, I guess I would respectfully
disagree with that last point of Your Honor's, the
chicken-or-egg thing.  It is, as the Ninth Circuit has made
clear, the Plaintiffs' burden to identify the reasonable
accommodations they seek that are necessary for program access.
And --

 1          **THE COURT:**  Well, I think they are claiming that -- I

 2   mean, I agree that they should have done it sooner, and more

 3   specifically.  But I think, in the brief, they get to the point

 4   where they say, "Do what the NCA said."

 5          Now, you disagree with that, but that is identifying

 6   something.  I don't think that you -- I don't think that your

 7   undue-burden argument gets rejected because there hasn't been,

 8   you know, a signed finding.  But, I think they finally did come

 9   up with that in their brief.

10          And so the question is: What's the response to that?

11          **MR. COOPER:**  That's true, Your Honor, they do mention

12   implementing the NCA transition plans as their requested

13   relief.

14          Now, of course, that omits much of what they're

15   challenging in this case.  That doesn't talk -- there's no

16   recommendations about website; there's no recommendations about

17   policy changes; there's no recommendations about changes to any

18   barriers in Phases 5 or 6.

19          And there's -- and so, the only thing, then, we would

20   do an undue-burden analysis on are the NCA recommendations for

21   Phases 1 through 4.  But that is a much smaller world than what

22   Plaintiffs are challenging in this lawsuit.

23          And we, of course, didn't have time to do that in our

24   reply briefs, since we didn't learn what Plaintiffs were

25   requesting until they filed their opposition brief.

1          THE COURT:  Well, is that something you could do?

2          MR. COOPER:  We could certainly look at it.  If --

3  you know, assuming standing is resolved, and we identified what

4  programs there are potentially issues in, then we could go

5  through their NCA recommendations for Phases 1 through 4, and

6  figure out what, if any, would be reasonable accommodations.

7          And the only other thing I would add about that,

8  Your Honor, is that the NCA recommendations, many of them are

9  for things to be done ten, 15 years down the road.  So this

10 wouldn't -- this isn't about making an immediate fix.  This is

11 making things, ten, 15 years down the road.

12         And I'm not sure that's an appropriate -- appropriate

13 at this juncture to do.

14         THE COURT:  Well, I -- just -- I don't know about

15 this juncture versus which juncture.  But I think, in general,

16 doing things that long down the road, there's nothing to say

17 that's off the table.  And I think the Plaintiffs are aware

18 that sometimes, with budgetary constraints, that is the way

19 it's handled.

20         I think, for example, how the lawsuit against the

21 State and CalTrans was handled, with a settlement in that case,

22 but a very long time frame, for budgetary reasons.

23         MR. COOPER:  That's true, Your Honor.

24         THE COURT:  And scope.

25         MR. COOPER:  That's true, Your Honor.  And if an

1   injunction were to be entered against the government, we

2   certainly would want the long-term flexibility, to be able to

3   bring our resources to bear, and --

4            **THE COURT:**  I mean, for example, the government makes

5   very good -- you know, I don't think the Plaintiffs would

6   disagree with this.  They might disagree with the priorities.

7            But that, you know, if you're going to renovate

8   something, say, in two years, then it makes sense, you renovate

9   everything you need for all the different kind of users.  But,

10  making sure we remedy the problems for the blind and the

11  disabled, as opposed to, you know, putting these things in

12  separate pots.  It's much less efficient.

13           But, I don't think we're at that point yet.

14           **MR. COOPER:**  I agree.  And so, if there is a ruling,

15  Your Honor, on standing and program access, and there are still

16  programs challenged, and the Plaintiffs identify which parts of

17  the transition plans then match up with the programs that

18  they're -- they can challenge, we could do at that point the

19  undue-burden fundamental-alteration analysis, to see if there

20  are -- would be any problems.

21           **THE COURT:**  And the fundamental alteration is another

22  one which, again, I don't think -- we're probably at that

23  stage, but hasn't really been fleshed out.

24           But, for example -- I guess we're really not talking

25  about that with an urban park.  But, I don't know if there

1  would be a point at which having a wheelchair-accessible trail

2  would be arguably a fundamental alteration, if there were some

3  very kind of wild type of place.  And I haven't really heard

4  anything about that.  And, I don't know.

5           And I suppose the answer -- one answer to that could

6  be, well, having some of them, but leaving many others that

7  aren't accessible and are wild would be the solution.

8           Again, that's not very precise.  But, that's

9  something I have not heard much about, but I wondered about.

10          **MR. COOPER:**  We agree, Your Honor --

11          **THE COURT:**  But certainly, to lay, for example, large

12  amounts of concrete down in the woods would change the

13  experience, whereas at Crissy Field, it doesn't.

14          **MR. COOPER:**  We agree, Your Honor.  And it's

15  difficult, because you have all those considerations.  And

16  sometimes, to avoid laying concrete, for example, at Muir

17  Woods, we now do these wonderful elevated wooden boardwalks

18  that --

19          **THE COURT:**  Which seems like an excellent solution.

20          **MR. COOPER:**  Which is great.  The problem, of course,

21  is they cost $70,000 for every 100 feet.

22          **THE COURT:**  Right.  So there, I think, you get into

23  the undue-burden issue.

24          **MR. COOPER:**  And so, that becomes difficult.

25          One other thing I would add, though, I'm not sure

1  that it's proper to think of this as separate merits versus

2  remedies questions, because as the Ninth Circuit said in

3  *Pierce*, and in *Memmer* and in *Zukle* and the other cases we cite,

4  it's part of Plaintiffs' prima facie case to identify

5  reasonable accommodations.

6      I don't think you can say a program is not

7  meaningfully accessible if no reasonable accommodations have

8  been identified.

9      **THE COURT:**  Well, I agree, to some extent.  But I

10  think that that's what I'm saying, I think they finally did, in

11  their brief.

12      **MR. COOPER:**  Okay.

13      **THE COURT:**  Now, you might disagree that it's

14  reasonable, but that's what they're saying is reasonable.  And

15  then the burden would shift to you to say why it's undue burden

16  or fundamental alteration.

17      **MR. COOPER:**  That's correct, Your Honor.  And the

18  only thing I would add about that, in addition to being able to

19  do an undue-burden alteration -- analysis later on is that it's

20  quite curious that the only remedy Plaintiffs can identify is

21  implementing transition plans, when that's not a legal remedy.

22      **THE COURT:**  Correct.  It's not.  But then, I think,

23  for example, if it was determined that there was standing and

24  -- and so on, that beach access might -- might very well, I

25  think, certainly -- almost certainly require programmatic

1  access, that there be at a minimum, as I said, different kind

2  of beaches, such as ocean and bay.

3         **MR. COOPER:**  (Nods head)

4         **THE COURT:**  And, the extent that's not the case, then

5  something to be done about it, unless it was undue burden or

6  fundamental alteration.

7         **MR. COOPER:**  We agree, Your Honor.  And on that note,

8  let me move to the beach program.  I'll just give you a few

9  facts about that.

10        First of all, the GGNRA has -- I think it's ten beach

11  wheelchairs.  It's in the declaration of Richard De La O.

12  These are usable at all of GGNRA's breaches.

13        Named Plaintiff Ann Sieck testified in her deposition

14  that she uses these beach wheelchairs, and they provide her

15  access to the beach.

16        **THE COURT:**  But, according to what I just heard, she

17  said in her declaration she -- I though that I heard from the

18  Plaintiffs that she had a declaration that she wouldn't be able

19  to use them, or wants to go -- or can use them, but would

20  prefer to go to Rodeo in her power chair, or something like

21  that.

22        **MR. COOPER:**  I'm not sure if Plaintiffs said that

23  about Ms. Sieck.  It may be that she said that she prefers

24  that.  I'm not familiar with that point in the record, so I

25  can't say if it is or isn't.  But, she definitely did testify

1  at deposition that she does enjoy using the beach wheelchair

2  at -- I think it's Rodeo Beach.

3         **THE COURT:**  Okay.

4         **MR. COOPER:**  Additionally, I would note that GGNRA

5  has implemented these Mobi-Mats, which are these bright blue

6  mats that you lay down over sand.

7         **THE COURT:**  And they're at Stinson, and somewhere

8  else?

9         **MR. COOPER:**  They're at a couple of places.

10         **THE COURT:**  Chrissy?

11         **MR. COOPER:**  First of all, they're at Crissy Field,

12  and that's here in San Francisco, of course, and five or ten

13  minutes from Ocean Beach.

14         And they're also at Stinson Beach, which is an ocean

15  beach.  And they're there year-around, though they are pulled

16  up in some of the winter months when there are storm -- storm

17  warnings, because --

18         **THE COURT:**  I thought they were only at Stinson Beach

19  for four months in the summer.

20         **MR. COOPER:**  That's incorrect, Your Honor.  You can

21  look at the declaration of Don Mannel, the head of facilities

22  at GGNRA.  And he explains that the beaches -- the mats are

23  there year-around, though they are pulled up in advance of

24  winter storms, because the storm surge at Stinson Beach can go

25  all the way up to the parking lot, so you can't leave them out.

1          THE COURT:  Right.  Well, that would seem a safety

2     necessity.

3          MR. COOPER:  Exactly.

4          THE COURT:  But there are other access problems with

5     Stinson Beach, though, that would make it -- if you can't even

6     get -- park your car and get a path of travel to get to where

7     the mats are, then you can't --

8          MR. COOPER:  If you look at Mr. Blackseth's expert

9     report, he analyzed Stinson Beach, and he found that there are

10    some technical violations, but that the beach as a whole is

11    accessible, programmatically, for persons with mobility

12    disabilities.

13          I would also add --

14          THE COURT:  I'm having trouble, this sort of pile

15    upon pile upon -- on the one hand, you know, you don't have to

16    make every beach accessible, only one or two.  And even those

17    have, quote, technical violations which would preclude some

18    people altogether from getting there, or make it dangerous.

19          MR. COOPER:  I don't think any of the technical

20    violations are of that sort, Your Honor.  I think there are

21    some technical violations with -- there's a -- there are a few,

22    I think, path-of-travel issues.  But I think those are not -- I

23    don't think those fully prevent access to the beach.

24          And Mr. Blackseth goes through it in good detail in

25    his expert report, so you can look at that, if unsure.

1          I would also add that the park has in the plans to

2    make about $1 million worth of accessibility upgrades at

3    Stinson Beach within - I think it's either the next year or

4    next two years.  And that's in the declarations of Aaron Roth

5    and Richard De La O.

6          I would also add that, as Mr. De La O notes in his

7    declaration, there are now Mobi-Mats being tested at Muir

8    Beach.  And, this is outside of the record, but I've been

9    informed that in the past two weeks, Mobi-Mats have been laid

10   out at Rodeo Beach.  Again, they're being tested.

11         Part of the difficulty at Ocean Beach is the sand

12   moves so much and it blows so much that -- and GGNRA only has

13   the resources to conduct weekly maintenance, if -- if that.

14   And so, you don't want to leave mats out; that proved to be

15   unsafe.

16         And so, we are testing them out to see if they will

17   work.  And if they do, they will be put there full-time.

18         And so I think, between the combination of beach

19   wheelchairs and Mobi-Mats, it's not just that four -- two,

20   three, or four beaches are accessible, but every beach is

21   accessible in some fashion, even if it's not always the optimal

22   means of accessibility.

23         I would also add one point, Your Honor.  I think this

24   came up briefly, about independence.  You can look at the Ninth

25   Circuit's decision in *Bird*, where the Ninth Circuit said --

```
 1          THE COURT:  Which case?

 2          MR. COOPER:  Bird, B-Y-R-D -- or, excuse me, B-I-R-D,

 3   303 F.3d, 1015.  Where the Ninth Circuit said that a college

 4   was providing an accessible program, even though in part they

 5   provided helpers to help somebody --

 6          THE COURT:  Right.  Well, I read that.  I mean, that

 7   -- I mean, that's an interesting case.  It's important.  Of

 8   course, it's not directly applicable, or it's not identical, as

 9   no case is.  But, this one is a little more outside the norm

10   than many.

11          But there, she had a combination of independent

12   experiences and dependent experiences.  And, and there were

13   many examples of the college doing a tremendous amount to make

14   things accessible to her.  But there were some instances of --

15   of dependence, and less than optimal, that were -- that did not

16   result in a lack of program access.

17          MR. COOPER:  We agree, Your Honor.  And we agree this

18   case is not exactly on all fours with Bird.  But, I think if

19   you look at our declarations, GGNRA similarly provides a mix of

20   independent and dependent access to beach -- to the beaches,

21   through the beach wheelchairs and the Mobi-Mats.  And, they

22   also go out of their way to make reasonable accommodations.

23          I mean, one of the interesting parts of this case is

24   that a lot of these issues Plaintiffs -- I don't want to get

25   too ahead of myself, but this goes to the website a little bit.
```

1   Plaintiffs complain that the park has only made changes now.

2           A lot of the things that have been fixed were never

3   made aware of to the park.  The websites are very large; the

4   park is very large.  Sometimes you're not aware that there is,

5   you know, a picture on a website that's not fully accessible.

6           If you look at the declarations of Richard De La O,

7   and of Michael Faw, Richard De La O says that every single

8   request for a reasonable accommodation has been fulfilled by

9   the GGNRA, with the sole exception of in a couple of instances,

10  people have requested sign-language interpreters sort of

11  immediately or quickly before the event they need the

12  sign-language interpreter for.  And, that hasn't always been

13  able to be fulfilled.  But every other request to the park,

14  itself, has been fulfilled.

15          And similarly, with the website, there have never

16  been any complaints about accessibility at the website made to

17  the park, itself.  And it wasn't until Plaintiffs brought their

18  fourth amended complaint that they ever identified what parts

19  of the website they thought were inaccessible.

20          And so, even setting aside the standing problem, the

21  park didn't know about these.  And as soon as they found out

22  about them, it fixed them.  And, it seems strange to complain

23  that fixes are being made, and the park is being made more

24  accessible.

25          **THE COURT:**  All right.  Well, let me -- I think it's

 1   hard for litigants, as a moving target.  On the other hand,

 2   it's a good thing that there are actually improvements being

 3   made.

 4          On maintenance, because that came up, Plaintiffs'

 5   expert Margen says it's a policy deficiency that there's

 6   maintenance only every five years.  And, that the backlog of

 7   deferred maintenance, albeit it's -- it affects people without

 8   disabilities, too, it has a more severe impact on people with

 9   disability.  And, that makes sense.  You know, if you're

10   ambulatory, you might trip over a crack, but you have a chance

11   of stepping over it.  If you're in a wheelchair, you don't have

12   that alternative.

13          Seems to me there is a policy issue about

14   maintenance.  Now, I mean, there's certainly an issue about

15   undue burden, as well.  But I think that -- that is something

16   that seems to cut across a lot of the problems.  You have

17   accessible parking places but, you know, they start crumbling.

18          And of course, some of it's -- it's somewhat inherent

19   in the difference between -- you know, a place with a lot of

20   trees, you get tree damage, that you don't have in a strictly

21   urban area as much.

22          **MR. COOPER:**  I'd point out a couple of things in

23   response, Your Honor.  First, I think it's interesting -- I

24   don't think the Plaintiffs once in their presentation, oral

25   presentation just now, ever mentioned policies.

1            **THE COURT:**  I know.  And I'm surprised, given the

2    emphasis that I put on it in the class cert decision, how

3    little attention it's gotten.  It is in the declaration of the

4    expert.

5            **MR. COOPER:**  It's in the declaration of the expert,

6    but the expert, of course, never investigated any of the

7    policies at GGNRA.  He relied solely on NCA.  So, it's

8    really -- the NCA reports are really the only evidence.

9            I mean, for the most part, Plaintiff's expert,

10   Mr. Margen, is like somebody who's talking about a book, having

11   read the book review.  But --

12           **THE COURT:**  Okay.  But on maintenance, though -- and

13   I do that all the time, so, maybe that's not a good analogy.

14           **MR. COOPER:**  I think we all do it.  I think we all do

15   it, but it doesn't make you an expert, you know.

16           **THE COURT:**  Well, maybe not you.

17      (Laughter)

18           **THE COURT:**  But, back to maintenance, though, I mean,

19   that does seem to be a problem, because some of the places that

20   Mr. Blackseth says are accessible, more or less, but he also

21   says, "But yeah, there's a problem, you know, with the

22   maintenance here."

23           Or, or Margen says, "Well, they say it's accessible,

24   but I -- but there's problems now," which seems to be more

25   maintenance than structural.

1          **MR. COOPER:**  Maintenance is certainly an issue at

2   GGNRA, Your Honor.  And I think the best place for you to look

3   is the declaration of Don Mannel, who is the head of facilities

4   at GGNRA, and the head of maintenance.  And he goes through, in

5   some detail, the number of facilities GGNRA has, --

6          **THE COURT:**  It's huge, I know.

7          **MR. COOPER:**  -- which is humongous.  The amount of

8   money -- I think they're supposed to have approximately

9   $25 million a year to -- under industry benchmarks, to maintain

10  these facilities.  And they get approximately 5 million.

11         **THE COURT:**  No, it's a big problem.  And I'm not sure

12  what --

13         **MR. COOPER:**  And so, it's hard to see what exactly

14  can be done, other than reallocating maintenance resources from

15  one place to another.  And, it's not clear that that would

16  solve the problem.

17         I would also --

18         **THE COURT:**  Well, but it sounds as though perhaps, at

19  least, an improvement would be to prioritize maintenance that

20  really affects accessibility at -- that's key to programmatic

21  access.

22         **MR. COOPER:**  And I think if Your Honor looks at the

23  declaration of Mr. Mannel, he explains how they prioritize

24  facility maintenance.  And it's prioritized to places where

25  there is high visitor access, and where it's essential to

1  program access.

2          **THE COURT:**  Uh-huh.  Well, let me -- we're running

3  out of time.  I think we need to have you wrap up this part of

4  it, and talk about the issue of "conducted by" and "park

5  partners."

6          **MR. COOPER:**  Certainly.  Let me just add one last

7  thing about interpretive exhibits, since I think that was

8  touched on briefly.

9          **THE COURT:**  Yeah.

10          **MR. COOPER:**  First of all, I would say that perhaps

11  the best way information is communicated at the park is through

12  docents, through the trained staff.  And that's not just for

13  persons with disabilities.  That's for all people.  When you go

14  to any park location, you talk to the staff, you talk to the

15  docents.  And they're all trained, as our declarations has

16  explained, to communicate specifically with persons with

17  disabilities.

18          I also think it's somewhat disingenuous to say that

19  Alcatraz is the only park site with an audio tour specifically

20  tailored to persons with vision disabilities.  I think it's the

21  only audio tour that has orientation information in that way.

22          But, most park sites don't have audio tours because

23  it's not the kind of place where you would need an audio tour.

24  There's not that many places at the park that there are tours

25  at all.  And for every major GGNRA site, there are either

1  brochures that are available online -- you can look at the

2  website and check them out, yourself, if you wanted to -- that

3  are available in large print, that are available in audio

4  description.  A lot of this is in the declaration of Michael

5  Faw, I think it's at Paragraph 42, in particular.

6          Also, I think the major issue here for interpretive

7  exhibits are what are the accommodations Plaintiffs want.

8  Because, you know, maybe it's having more docents; maybe it's,

9  you know, having every single wayside sign have something, have

10 something -- somebody talk to you and read the information.  I

11 mean, there's a lot of different ways you can prevent -- excuse

12 me -- present or communicate information.

13         And unless we're told what specifically the

14 accommodations that are desired are, we can't -- can't

15 necessarily evaluate what's the proper course to go forward.

16         **THE COURT:**  Well, I think you just heard some of it,

17 which was -- it sounded like, "We don't want to rely always on

18 somebody standing there reading it to us.  We want Braille or

19 audible, things like that."

20         **MR. COOPER:**  And, well, I would add first of all,

21 just about the Braille map because I think that was a specific

22 point, it's available at the Muir Woods Visitor Center.  Anyone

23 who enters Muir Woods can request it.

24         **THE COURT:**  Uh-huh.

25         **MR. COOPER:**  On the larger point, I would think that

1   providing docents is a reasonable accommodation.  I don't think

2   either side gets into the real facts about how are all of the

3   interpretive exhibits presented at, say, Muir Woods or at a

4   particular site.

5           And I think part of this is Plaintiff's failure to

6   provide the requisite evidence.  That we can't respond to

7   allegations of inaccessible exhibits if they're not going to

8   come and say, "Here's what you needed to do instead," and then

9   we can say, "Well, we are already doings this X, Y, and Z which

10  are reasonable accommodations and are sufficient.  And going

11  beyond that would be too much."

12          **THE COURT:**  We're going to have to switch gears.

13          **MR. COOPER:**  Certainly, Your Honor.

14          **THE COURT:**  But, I think --

15          **MR. PARADIS:**  Could I clarify one thing he said?

16          **THE COURT:**  Yes.

17          **MR. PARADIS:**  In Mr. Elsberry's declaration, we

18  submitted our discovery interrog responses in which we laid out

19  exactly what relief we're seeking.  It's not simply to

20  implement the transition plan.

21          Mr. Margen went through NCA's findings, and

22  determined which barriers he believed do deny program access.

23  He excluded almost all of those treated as minor.

24          **THE COURT:**  Well, he basically said "critical or

25  serious."

1        **MR. PARADIS:**  Well, if you -- and then, when they

2  stopped the NCA inspections, we had Mr. Margen go and inspect

3  Phase 5.  So we are also including the Phase 5 --

4        **THE COURT:**  So, well, is that --

5        **MR. COOPER:**  I would also ask Your Honor to look at

6  that same -- same exhibit that Plaintiffs have submitted,

7  because all Plaintiffs say in it is, "Here are the barriers we

8  want fixed."  They never say "What fixes we want."  And, that's

9  exactly the problem we identified in our briefs.  And, it has

10  been a problem throughout this litigation.

11        So, they do say, "We want barriers in Phases 1, 2, 3,

12  4, and 5 fixed," but they don't say "Here are the fixes we

13  want".  They don't effect say, "Implement the NCA transition

14  plans."  This is all in the --

15        **THE COURT:**  Which they couldn't say, from a legal

16  point of view.  But -- okay.  We have to switch gears.

17        I have to tell you that I'm left in a really

18  difficult position, because I cannot spend the next two months

19  going back and forth between the various declarations and

20  trying to figure out -- I'm -- I'm hearing representations that

21  are inconsistent.  How am I going to resolve them?  I can't do

22  that.

23        So, we will have to think of some way.  And, it may

24  be that you're going to have to do some further appendix; I

25  don't know.  But it's just not realistic, what the Court is

1  being asked to do.

2          But I want to get to "conducted by," and we only have

3  six more minutes.  So, I think there are some very strong

4  arguments made by the Defendants that are not really adequately

5  responded to by the Plaintiff.

6          It seems as if, on concession contracts, I don't

7  think the park is disputing that it has a duty with concession

8  contracts to -- one, I think the plain language of -- I think

9  it's the regulation, says you have to insert a provision that

10 they provide access.  And then, of course, the park can enforce

11 it through -- through the contract.

12         **MR. COOPER:**  We're not disputing, Your Honor, that

13 we're responsible for concessioners.

14         **THE COURT:**  Okay.  Then we get to the special-use

15 permits.  And that is under dispute.  And, although some of

16 them have been declared off limits by stipulation, but there

17 are still some left, apparently, like Miwok Stables.

18         And I don't -- I'm pretty much persuaded by the

19 defense position that those -- that's not similar to

20 contracting out some essential function.  But, it's -- it's

21 special.  It's unusual, and it's not the kind of thing that the

22 park would normally provide.

23         Then there's -- I think the commercial use

24 authorization which I saw in camera, there's only one of those

25 is somewhat in the same position.

```
 1              The cooperative agreements also -- for the most part,
 2    I think the parties have agreed to put those off limits.  But,
 3    with the exception, I think, of the Marine Mammal Center and
 4    the Conservancy.  And I'm not sure what the positions are on
 5    that.
 6              Although, part of the Conservancy is apparently a
 7    limited-concession contract.  And, I'm not sure what that
 8    refers to, but I assume you're not putting that off limits.
 9              MR. COOPER:  We're not putting that off limits,
10    Your Honor.  It's, I think, referenced in more detail in
11    Mr. Blackseth's report, in the chapter on visitor services.
12              Specifically, as I understand it, the Conservancy has
13    a couple of portions of giftshops --
14              THE COURT:  Hmm.
15              MR. COOPER:  -- at GGNRA, at a couple of locations.
16    Those are detailed, again, in Mr. Blackseth's report.  But,
17    that's the only part that operates under this
18    limited-concessioner contract.
19              THE COURT:  Okay.  All right.  So, I don't know;
20    briefly.  One or two minutes is all you've got.
21              MR. PARADIS:  Certainly, Your Honor.
22              There's no case authority that suggests that a
23    contractual arrangement between a public entity and private
24    entity to operate on the public entity's land is not covered by
25    the --
```

1      THE COURT:  Well, then, this is where there is a big

2  problem, because when the -- the other statute says "Anything

3  on our lands has to be accessible."  This statute doesn't say

4  that.  It's "programs conducted by the government."

5      MR. PARADIS:  Yes.  And, the -- the regulations

6  issued by the Department of Interior mirror exactly the

7  language of the Department of Justice regulations under

8  Title II.  So, the statutes are slightly different.  Title II

9  says programs of --

10     THE COURT:  All right.  And where did you cite that

11 in your brief?

12     MR. PARADIS:  That would be in our opposition brief.

13     THE COURT:  Okay.

14     MR. PARADIS:  Mr. Elsberry will look for that.

15     THE COURT:  All right.

16     MR. PARADIS:  So, so, the regulations are identical.

17 One --

18     THE COURT:  Do you agree with that?  Are the

19 regulations identical?

20     MR. COOPER:  I think they are similar, Your Honor,

21 but I think what Plaintiffs' counsel is referring to is that

22 there's a regulation that says the agency can't avoid its

23 obligations by contracting out.  And --

24     THE COURT:  Right.

25     MR. COOPER:  And Defendants aren't disputing that.

 1           THE COURT:  Right.  The question is:  What are their

 2  obligations, then.

 3           MR. COOPER:  Right.

 4           THE COURT:  What is a governmental activity, as

 5  opposed to some add-on that is conducted on government

 6  property?

 7           MR. COOPER:  And there's no regulation that says

 8  government property is covered by 504.

 9           THE COURT:  Right.

10           MR. PARADIS:  And so, it's our opposition brief and

11  reply --

12           THE COURT:  Yeah.

13           MR. PARADIS:  On Page 24.

14           THE COURT:  Well, I think what he just said refreshes

15  my memory.  And that's why I'm just not really persuaded by

16  that.

17           I mean, I think if you -- you know, if you have

18  prisons, and you contracted out to a private government, that's

19  an essential government function.  And, you don't escape it by

20  contracting it out.  And that's where I think the concessions

21  are, in the same view.

22           But, for example, special-use permits -- I mean, they

23  give some good examples.  You know, having, you know, Burning

24  Man Festival, that doesn't make the government have to make it

25  accessible.

1          And, I don't think you have really shown why these

2   activities on the special-use front fall within the other side

3   of the line, that they're essentially a government function

4   that's been contracted out.  As opposed to just a permissive

5   special use of the land.

6          **MR. PARADIS:**  Yeah.  If it's purely a permissive

7   special use, that may be exempted under both Title II and 504.

8          The question here, though, is when you're giving

9   permission for ongoing operation of a section of your park

10  land.  How is that different than a Title III?  When a lessor

11  enters into a lease, the Department of Justice says they can

12  allocate responsibilities between themselves, but as to the

13  public, they're both responsible.

14         **THE COURT:**  Now, what about -- and let me also ask,

15  have any of the Named Plaintiffs said they want to go riding,

16  for example?

17         **MR. PARADIS:**  No.  We have no evidence on the

18  equestrian issue.  So, it may be a moot point.

19         **THE COURT:**  So, that may be moot.  And what about

20  Fort Mason Community Garden?

21         **MR. PARADIS:**  We exempted that.

22         **THE COURT:**  Oh, that's right.  Okay.  And, what about

23  the Gulf of the Farallones National Marine Sanctuary?

24         **MR. PARADIS:**  I think we exempted that, too.

25         **THE COURT:**  Not according to Appendix B.

1          **MR. PARADIS:**  Then, we have no specific evidence from

2    a Named Plaintiff on that.

3          **THE COURT:**  Or absent class member?

4          **MR. PARADIS:**  I'm not sure.  Except to the extent it

5    may be covered by *Conservancy*.  But, no, we have no -- I don't

6    recall any specific evidence on the Gulf of the Farallones.

7    But we certainly do, for entities like Cliff House and Marine

8    Mammal Center.

9          **THE COURT:**  And I don't think -- with Cliff House, I

10   don't think there's a -- a dispute that it's -- well --

11         **MR. COOPER:**  There's no dispute, Your Honor.  It

12   operates under a concession contract.

13         **THE COURT:**  Right.

14         **MR. COOPER:**  So, we weren't arguing about it under

15   this "conducted by."

16         **THE COURT:**  But, which was the other?  Marine Mammal

17   Center?

18         **MR. PARADIS:**  Yes, Your Honor.

19         **THE COURT:**  Where does that fall on this table,

20   Appendix B?

21         Oh, there it is.  It's a cooperative agreement.  And

22   your argument on the government's behalf is that it's not

23   "conducted by."

24         **MR. COOPER:**  That is the government's argument.

25         **MR. PARADIS:**  And I could not find a single case that

1   says the language distinction there makes a difference.

2   *Armstrong v.* --

3            **THE COURT:**  Well, yeah.  I don't read *Armstrong* as

4   broadly as you do.  I just explained why.  The contracting out

5   of an essential function versus something else.

6            All right.  Well, we need to stop.  I may be asking

7   -- I've already asked for one thing.  And, you can meet and

8   confer, and tell me when it's reasonable to give it to me.

9   Sooner is better than later, while I have all of this in mind.

10           And, I may need some additional things.  But I --

11  I'll just have to see.  And if I do, I'll ask for them.

12           So, very good job on all sides.  But, unfortunately,

13  very knotty issues.  And difficult ones for the Judge.

14           **MR. COOPER:**  Thanks, Your Honor.

15           **MR. PARADIS:**  Thank you, Your Honor.

16           **MR. COOPER:**  Thank you very much, Your Honor.

17           **THE COURT:**  Thank you for a very good argument.

18           **THE CLERK:**  Court is in recess.

19       (Proceedings concluded)

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

/s/  Belle Ball

Saturday, January 26, 2013

Belle Ball, CSR 8785, CRR, RDR