**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LORI GRAY, et al.                                No. C 08-00722 EDL

        Plaintiffs,                        **ORDER GRANTING IN PART AND**
**DENYING IN PART PLAINTIFFS'**
  v.                                            **MOTION FOR SUMMARY JUDGMENT;**
**GRANTING IN PART AND DENYING IN**
GOLDEN GATE NATIONAL                    **PART DEFENDANTS' CROSS-MOTION**
RECREATIONAL AREA, et al.               **FOR SUMMARY JUDGMENT**

        Defendants.
_____/

## I.    Introduction

      Individual named plaintiffs Lori Gray, Peter Mendoza, Ann Seick, and Marc Sutton and

institutional plaintiff California Council of the Blind filed this class action complaint on January 31,

2008 against Defendants Golden Gate National Recreation Area ("GGNRA") and the National Park

Service ("NPS") and affiliated individual defendants based on alleged violations of Section 504 of

the Rehabilitation Act due to a lack of programmatic access throughout GGNRA.  This Court

certified a class under Federal Rule of Civil Procedure 23(b)(2) of:

> All persons with mobility and/or vision disabilities who are being denied programmatic
> access under the Rehabilitation Act of 1973 due to barriers at park sites owned and/or
> maintained by Golden Gate National Recreation Area.  For the purpose of class
> certification, persons with mobility disabilities are those who use wheelchairs, scooters,
> crutches, walkers, canes, or similar devices to assist their navigation. For purposes of
> class certification, persons with vision disabilities are those who due to a vision
> impairment use canes or service animals for navigation.

Thereafter, the Court granted in part a motion for reconsideration and required a Fourth Amended

Complaint, and granted in part and denied in part a motion to dismiss.

**United States District Court**
For the Northern District of California

1   Now before the Court are the parties' cross-motions for summary judgment.  With respect to

2   the threshold issue of standing, Plaintiffs contend that the Court should find as a matter of law that

3   they have standing to seek broad prospective injunctive relief relating to all access barriers and

4   policies throughout all areas of GGNRA on behalf of the certified class. Defendants counter that no

5   named Plaintiff has standing to bring any claim, and even if a named Plaintiff has standing, such

6   standing is significantly limited in scope and does not allow for the broad relief sought by Plaintiffs.

7   As discussed below, some of the Plaintiffs have standing to assert Rehabilitation Act claims against

8   the Defendants, but the Plaintiffs do not have standing to seek broad prospective injunctive relief

9   throughout the entire GGNRA because each of the named Plaintiffs' standing is significantly limited

10  based on his or her particular experiences at GGNRA.

11   On the merits, the parties dispute whether there are triable issues of fact regarding

12  Defendants' liability for failure to provide program access under Section 504, for the actions of

13  third-party "park partners," and for website accessibility.  The Court concludes that, to the extent

14  that Plaintiffs have standing to bring Rehabilitation Act claims against Defendants, there is a triable

15  issue of fact as to Defendants' liability with respect to some but not all of the challenged barriers.

16  Because Plaintiff has not presented evidence that the challenged third-party "park partner" activities

17  are programs "conducted by" Defendants within the meaning of the Rehabilitation Act, partial

18  summary judgment is granted in favor of Defendants on this issue.  Because no Plaintiff claims to

19  have attempted to access the GGNRA website until after the complaint was filed, and there is no

20  evidence that any Plaintiff ever attempted to access the Conservancy website, Plaintiffs lack

21  standing to challenge these websites and partial summary judgment is granted in favor of Defendants

22  on this issue.

23  **II.    Factual Background**

24   The factual background of this case is largely uncontested, was described in detail in the

25  Court's Order Granting Class Certification (Dkt. # 99) and is incorporated by reference herein, and

26  is not otherwise repeated except as necessary to resolve the cross-motions for summary judgment.

27  **A.    The Rehabilitation Act of 1973**

28  Plaintiffs' sole claim alleges a violation of Section 504 of the Rehabilitation Act of 1973

United States District Court
For the Northern District of California

("Section 504"), 29 U.S.C. § 794.  This statute provides in pertinent part that: "No . . . individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency."  To prove a violation of section 504, Plaintiffs must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds.  American Council of the Blind v. Paulson, 525 F.3d 1256, 1266 (D.C. Cir. 2008).  It is undisputed that GGNRA and NPS are subject to Section 504.  It is also undisputed that the named Plaintiffs and the class they represent are persons with disabilities who are qualified to participate in the programs and activities at issue.  Therefore, the primary issues in this case concern whether they were excluded from, denied the benefit of, or subject to discrimination under a program or activity[1] carried out by a federal agency.

### B.    Plaintiffs

Individual named Plaintiff Gray has both visual and mobility disabilities and has encountered access barriers at multiple GGNRA park areas.  See generally Appx. Ex. E (Gray Decls.). Individual named Plaintiff Seick has a mobility disability and uses a wheelchair and has encountered access barriers at multiple GGNRA park areas.  See generally Appx. Ex. O (Seick Decls.). Individual named Plaintiff Mendoza has mobility disabilities and uses a wheelchair, and has encountered access barriers at multiple GGNRA park areas.  See generally Appx. Ex. J (Mendoza Decls.).  Individual named Plaintiff Sutton is blind and has encountered access barriers at multiple GGNRA park areas.  See generally Appx. Ex. P (Sutton Decls.).  Mr. Sutton has also had trouble accessing the  the GGNRA website using his screen access software.  Id. ¶ 13.

Organizational Plaintiff California Council of the Blind ("CCB") is a non-profit organization composed of Californians who are blind or have low vision.  The mission of CCB is to gain full

---

[1]Throughout this litigation, the parties have focused their arguments entirely on the "programs" conducted within GGNRA, and have not discussed any challenged "activities" or distinguished between "programs" and "activities."  Therefore, the Court's decision is focused on the "programs" within the GGNRA .

United States District Court
For the Northern District of California

1  independence and equality of opportunity for all blind and visually disabled Californians.  Several

2  CCB members claim to have encountered access barriers at GGNRA park areas.  See Appendix of

3  Class Member Declarations Ex. A (Buchmann-Garcia Decls.); Ex. I (Lozano Decl.); Ex. C

4  (Donovan Decl.); Ex. G (Knudson Decl.); Ex. K (Moses Decl.).

5  **C.    Defendants**

6         GGNRA is among the world's largest urban national parks, consisting of a number of distinct

7  park areas encompasses more than 75,000 acres bordering the California coastline for nearly sixty

8  miles in and around the San Francisco Bay Area.  Dkt. # 80 (Plaintiff's Request for Judicial Notice

9  in Support of Motion for Class Certification) Ex. A, B.  GGNRA has been described as the

10 "backyard" of Bay Area residents, but also attracts approximately 20 million visitors from around

11 the United States and around the world.  Id.  GGNRA is comprised of at least 36 separate park

12 areas,[2] and boasts "a huge variety of natural and cultural resources and different ecological zones

13 that will interest almost anyone."   Id. Ex. E, F.

14        New factual details provided in connection with the cross-motions generally relate to

15 Defendants' commitment to achieving and improving accessibility, their challenge in balancing

16 accessibility with other obligations such as conservation and terrain preservation, their dire

17 budgetary situation, and their lack of discretion to obtain Congressional funds or allocate existing

18 funds for accessibility work.  See Dkt. #183 at 1-12.  Defendants contend that, based on budgetary

19 and other constraints, they are forced to limit the programs they conduct, and an inter-disciplinary

20 task group determined that only the following eleven "programs" are conducted by Defendants at

21 GGNRA:  beach access, bird watching, camping, coastal overlooks, fishing, hiking and walking,

22 historic fortifications, interpretive and educational programs, picnicking, visitor centers and

23 museums, and visitor services.  Roth Decl. ¶¶ 26-28.  Defendants also contend that GGNRA enters

24 into agreements with third party "park partners" to conduct programs that complement the programs

25 offered by GGNRA but that GGNRA would not otherwise offer due to lack of funding or expertise.

26 Carter Decl. ¶¶ 21-22, 28, 33, 43, 49, 56, 74.  Defendants provide significant evidence of their recent

27

28        [2]Throughout this decision, the Court uses the term "park area" to mean one of these 36 separate
   areas which are listed in Exhibit E to Plaintiff's Request for Judicial Notice in Support of Class
   Certification.  See Dkt. # 80-5.

4

efforts to achieve and improve accessibility, including, among other things, work on an accessible campground, additional audio tours and tactile models, acquisition of beach wheelchairs, and improved website access.  Roth Decl. ¶¶ 29, 57-59); Handwerger Decl. ¶¶ 12-24; Faw Decl. ¶¶ 11, 23-44; Gee Decl. ¶ 9; Paciello Decl. ¶¶ 7-20, Ex. A at 8-14; De La O Decl. ¶¶ 21-22.  None of these new facts are in dispute, and they are discussed in more detail where relevant below.

**III.     Summary Judgment Legal Standard**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

IV.     **Analysis**

        **A.     Standing**

        As they did in connection with Defendants' motion to dismiss, the parties continue to dispute whether any named Plaintiff has standing to seek broad prospective injunctive relief against Defendants, and if so what the scope of that standing is after a class has been certified.

                        **1.      Legal Standard for Standing**

        "[T]o satisfy Article III's standing requirements, a plaintiff must show: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc., v. Laidlaw Envt'l. Serv's., Inc., 528 U.S. 167, 180–81 (2000).   Plaintiffs "'must demonstrate standing for each claim [they] seek to press' and 'for each form of relief' that is sought." Davis v. FEC, 554 U.S. 724, 734 (2008).  To establish standing to pursue injunctive relief, plaintiffs must demonstrate "a sufficient likelihood that [they] will again be wronged in a similar way[.]" Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1081 (9th Cir. 2004).  In other words, they must establish a "real and immediate threat of repeated injury." Id. (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)).  To properly show this real and immediate threat in the context of discrimination, a plaintiff may demonstrate either an "intent to return to a noncompliant accommodation" or that he or she is "deterred from visiting a noncompliant public accommodation because he has encountered barriers related to his disability there." Chapman v. Pier One Imports (U.S.), Inc., 631 F.3d 939, 950-51 (9th Cir. 2011).  At the summary judgment stage, plaintiffs may not rely on allegations in the complaint but instead must "'set forth' by affidavit or other evidence 'specific facts' establishing each element of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

                        **2.      Court's Prior Order on Standing**

        In its previous Order on Defendants' motion to dismiss, the Court evaluated many of the same arguments made in connection with the cross-motions for summary judgment, and ultimately held that "the scope of named Plaintiffs' standing is limited to the geographic areas of GGNRA that

they have visited or have been demonstrably deterred from visiting," but noted that the precise contours of Plaintiffs' standing would likely be a question for summary judgment or trial. Dkt. # 152 at 10-11. In coming to this conclusion, the Court rejected Defendants' argument that standing is strictly limited to the actual barriers that a named Plaintiff encountered. The Court held that the rule in Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939 (9th Cir. 2011) that "[a]n ADA plaintiff who has Article III standing as a result of at least one barrier at a place of public accommodation may, in one suit, permissibly challenge all barriers in that public accommodation that are related to his or her specific disability," could apply in the Rehabilitation Act context. See Chapman, 631 F.3d at 950-51 (quoting Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1047 (9th Cir. 2008)). The Court also rejected Defendants' argument that, at the pleading stage, the named Plaintiffs lacked standing to pursue any claim because they did not sufficiently allege concrete plans to return at an identifiable time to a specific GGNRA facility or location listed in the FAC, or the deterrent effect of the alleged barriers and policies on any named Plaintiff. The Court concluded that, "Examined in the light most favorable to Plaintiffs, allegations that the named Plaintiffs have chosen not to re-visit various parts of GGNRA based on past experience with barriers are sufficient at the pleading stage to allege a deterrent effect of the barriers. . . Allegations that Plaintiffs 'continue to experience' access barriers are also minimally sufficient to show an intent to return. . . ." Dkt. # 152 at 8.

After making these determinations, the Court turned to the scope of Plaintiffs' standing and reasoned as follows:

Plaintiffs argue that their standing extends to all areas of the GGNRA (including geographic areas admittedly never visited by any named Plaintiff) because GGNRA and all facilities and programs within it are centrally controlled by the National Park Service. Defendants counter that the Chapman/Doran rule relates to barriers "in the same facility" or at "one place of accommodation," but does not confer standing to challenge barriers at multiple distinct locations even when they are controlled by the same entity.

Defendants cite several cases limiting standing to barriers in locations where the plaintiff had shown an injury and likelihood to return or deterrence, but not other locations owned by the same entity where there had not been such a showing by the plaintiff. For example, in Equal Rights Center v. Hilton Hotels Corp., 2009 WL 6067336, *7 (D.D.C. 2009), a district court held that individual and institutional plaintiffs challenging accessibility on behalf of a class at 2,896 Hilton hotels nationwide only had standing to challenge barriers at the 24 locations where they knew of violations. The court acknowledged that "at some point, the known accessibility barriers at certain related locations could be so widespread that a disabled individual could claim to be deterred from visiting all those locations, [but that] the plaintiffs fall well short of that point." Id. (noting that there was no allegation that the different hotels were architecturally similar

and no facts to support an allegation that Hilton had adopted a policy of non-compliance with the ADA). However, the court did note that "the mere existence of accessibility barriers at some significant percentage of Hilton hotels might provide a sufficient factual basis for claims of a corporate policy of non-compliance, but, as before, the plaintiffs have not made that allegation." Id.; see also Clark v. Burger King Corp., 255 F.Supp.2d 334, 343 -344 (D.N.J. 2003) (finding standing as to multiple restaurants plaintiff visited based on a likelihood of future injury because they were within a reasonable distance from his house and he expressed a desire to return, but not other restaurants he had not visited absent allegations regarding commonality of construction or a corporate policy violative of the ADA). In another case cited by Defendants, Scherr v. Marriot Intern., Inc., 2011 WL 2606184, *8 (N.D.Ill. 2011), the court held that an individual plaintiff could challenge accessibility at one Marriott hotel location where she would have returned but for a barrier, but not 56 other Marriott hotels where she did not allege that she was deterred from visiting the hotels or would visit in the future. See also Moyer v. Walt Disney World Co., 146 F.Supp.2d 1249, 1254 (M.D.Fla. 2000) (individual plaintiff had standing to challenge accessibility at one Disney theme park, but not other Disney facilities he had never visited).

Unlike several of these cases, here Plaintiffs do allege GGNRA-wide policies of non-compliance with the Rehabilitation Act and pervasive barriers throughout all areas and aspects of the GGNRA. However, Defendants argue that it would contravene Constitutional standing principles to find that a plaintiff who encountered one type of barrier in one aspect of one part of GGNRA is "reasonably likely" to encounter barriers in other types of programs or in other parts of GGNRA in the future. Given the large geographic area and the variety of programs being challenged, this argument carries some weight. For example, the GGNRA is comprised of a collection of separate park areas encompassing more than 75,000 acres and stretching from northern San Mateo County to Southern Marin County (FAC ¶ 2), but no named Plaintiff claims to have visited any GGNRA park area in San Mateo.

At oral argument, Plaintiffs responded by arguing that a different standing analysis should be applied pre- and post-certification. For this position, they relied on Armstrong v. Davis, 275 F.3d 849, 861 (9th Cir. 2001). While there are some statements in Armstrong from which it might be inferred that the Ninth Circuit's standing analysis was impacted by the fact that a class had previously been certified, this Court does not read Armstrong as generally expanding the scope of named plaintiffs' standing post-certification, as Plaintiffs seem to urge. For example, Armstrong noted that "where the plaintiffs constitute a certified class, 'it is not irrelevant that [the named plaintiffs] s[eek] to represent broader interests than [their] own.'" Id. at 861 (quoting LaDuke, 762 F.2d at 1326). The Ninth Circuit went on to explain that, "[w]hen a named plaintiff asserts injuries that have been inflicted upon a class of plaintiffs, we may consider those injuries in the context of the harm asserted by the class as a whole, to determine whether a credible threat that the named plaintiff's injury will recur has been established." Id. In another section of the decision, the Armstrong Court further reasoned that:

> Class membership may also be relevant to show an immediate likelihood of future injury. Where a named plaintiff is a member of a plaintiff class, and "members of the class have repeatedly suffered personal injuries in the past that can fairly be traced to the [defendants'] standard ... practices," the defendant's treatment of the class as a whole must be considered to determine whether the individual plaintiff "ha[s] been and will continue to be aggrieved by the defendants' [illegal] pattern of conduct." LaDuke, 762 F.2d at 1326. Here, plaintiffs provided overwhelming evidence of discrimination against the named plaintiffs as well as other, individually identified class members. That discrimination stretches back, in some

8

**United States District Court**
For the Northern District of California

1    instances, over ten years, and at the time of trial showed no signs of
2    abating. The injury suffered by the named plaintiffs is sufficiently similar
     to that endured by the rest of the class to establish a pattern of
3    discrimination that threatens to recur.

4    Id. at 864.  The Court interprets these statements to mean that, after a named plaintiff has
     shown that he has been injured in the past, in considering whether there is a likelihood of
5    future harm to a named Plaintiff, the Court can take into account both strong evidence of
     widespread discrimination against the named Plaintiff and a pattern of similar injuries to
6    the broader class.  However, this does not alter the basic standing requirements for named
     Plaintiffs just because a class has been certified.

7    Here, in addition to the named Plaintiffs' allegations of harm, there are allegations of a
     pervasive parkwide policy of noncompliance affecting the class as a whole.  However,
8    the scope of Plaintiffs' standing is not unfettered.  Given all of the foregoing, the Court
     concludes that the scope of named Plaintiffs' standing is limited to the geographic areas
9    of the GGNRA that they have visited or have been demonstrably deterred from visiting.
     At the hearing and in a separate order, the Court requested that the parties meet and
10   confer to stipulate about the places within the GGNRA that the named Plaintiffs have
     actually visited, or had a plan to visit but were deterred from visiting due to their
11   knowledge of barriers, discriminatory policies, and the like.  See Dkt. #151.  The scope
     of Plaintiffs' standing will be informed by their response, but may ultimately be a
12   question for summary judgment or trial.

13
     Dkt. #151 at 8-11.
14
                    **3.      Additional Information Relating to Standing**
15
16          Following the Court's Order, the parties submitted a "Joint Stipulation Regarding Park Areas

17   Named Plaintiffs Visited or Were Specifically Deterred From Visiting."  See Dkt. # 170.  However,

18   this stipulation did not include any citations to evidence, information about the dates of these visits,

19   which programs or activities the individuals participated in or encountered barriers when attempting

20   to access them, or other information that would have been helpful to the Court's evaluation of the

21   scope of Plaintiff's standing.  In connection with their summary judgment motion, Defendants

22   included an "Appendix A" containing their lists of the barriers which they contend Plaintiffs lack

23   standing to challenge.  See Dkt. # 183 at 61-65. At the summary judgment hearing, Plaintiffs

24   provided the Court with a demonstrative chart of park sites they claim were visited by Plaintiffs and

25   class members.  Because this chart conflicted somewhat with the information provided by

26   Defendants, and none of the charts or lists provided to the Court contained all of the information that

27   would have been helpful to the Court in evaluating standing, at the hearing the Court ordered the

28   parties to meet and confer and provide a comprehensive chart containing information about where

     the plaintiffs went, when they went, their intent to return or deterrence, what their disability is, and

                                                    9

United States District Court
For the Northern District of California

1   whether they are a named class member or not.   The parties' most recent stipulation sets forth most

2   of the requested information, although it does not provide any information about deterrence.  See

3   Dkt. # 190.   The Court has considered all of these submissions is coming to its conclusions relating

4   to standing discussed below.

5                          **4.       Analysis**

6          In connection with their summary judgment motion now before the Court, Plaintiffs argue

7   that the Court's view of standing as expressed in its Order on Defendants' motion to dismiss is too

8   narrow, and continue to assert that, after a class has been certified, the Court should look beyond the

9   named Plaintiffs' injuries to the class as a whole to determine standing.  In contrast, Defendants

10  argue that the Court's prior statement in the Order on the motion to dismiss regarding the named

11  Plaintiffs' standing is too broad, because the named Plaintiffs must show an actual injury at a

12  specific place that they visited, as well as concrete plans to return to that particular place or specific

13  allegations that they have been deterred from returning to that particular place due to knowledge of

14  barriers.  These general arguments are largely repetitive of those previously rejected by the Court. At

15  the summary judgment stage, however, the Court has the benefit of additional evidence to help

16  refine the application of its standing analysis.

17                  **a.       Impact of prior class certification order**

18         As they did in connection with the motion to dismiss, Plaintiffs continue to argue that the

19  Constitutional standing analysis at this stage of the case is different merely because a class has been

20  certified.  The Court has previously rejected this argument, and followed the Supreme Court's

21  statement that the fact that a suit is a class action "adds nothing to the question of standing" because

22  the named plaintiffs must still allege and show that they personally have been injured.  Warth v.

23  Sedlin, 422 U.S. 490, 502 (1975); see also Lewis v. Casey, 518 U.S. 343 (1996) (certified class

24  could challenge one prison policy but not another because "a plaintiff who has been subject to

25  injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in

26  litigating conduct of another kind, although similar, to which he has not been subject"); see also,

27  e.g., Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1045 (9th Cir. 1999) (holding that the named

28  plaintiff must be entitled to the injunctive relief sought, and injury to unnamed class members is

irrelevant to whether named plaintiffs are entitled to that relief).

Plaintiffs continue to rely heavily on the Ninth Circuit's statement in Armstrong v. Davis, 275 F.3d 849, 871 (9th Cir. 2001) regarding the scope of relief available to a certified class: "class certification serves to alter the court's inquiry: when a class is properly certified, the injury asserted by the named plaintiffs at the standing stage of our inquiry is asserted on behalf of all members of the class." Id. at 871.  There, the Ninth Circuit determined that broad state-wide injunctive relief in favor of a class was warranted based on the experiences of 17 plaintiffs.  The Court has previously considered this portion of Armstrong and determined that it does not alter the basic Article III standing requirements for named Plaintiffs just because a class has been certified, because the Ninth Circuit's evaluation of the scope of relief available to the class was conducted *after* the Ninth Circuit found that the named plaintiffs personally had standing to pursue their claims.

In relying on later sections of Armstrong discussing the scope of relief and whether system-wide relief was appropriate, Plaintiffs gloss over the initial Article III standing inquiry: which, if any, named Plaintiff has Article III standing to get their proverbial "foot in the courthouse door" based on an actual encounter with a barrier coupled with an intent to return or deterrence within the applicable limitations period?  In Armstrong, the Ninth Circuit agreed with the lower court that the named plaintiffs had standing because they suffered actual injury due to inaccessible parole and parole revocation hearings, and evidence of written policies and practices of not providing adequate accommodation for disabled prisoners and parolees showed that they were routinely deprived of their rights under the ADA and therefore there was a likelihood of future harm at future parole hearings.  Id. at 860-67.  This conclusion was bolstered by evidence that other unnamed class members suffered the same type of harm and that, even at the time of trial, the pattern of discrimination showed no signs of abating.  Id. at 864.  Thus there was Article III standing for all of the named plaintiffs.  Plaintiffs' focus on other portions of Armstrong is premature because the Armstrong decision evaluated a district court's findings of facts and conclusions of law after a ten-day bench trial, whereas this case is still at the summary judgment stage.  Plaintiffs' Article III standing in this case is still very much in dispute and, as discussed below, Plaintiffs have failed to present evidence to show that they have standing to pursue much of the case they advance.

11

**United States District Court**
For the Northern District of California

1    In the later sections of <u>Armstrong</u> that Plaintiffs now focus on, the Court went on to review

2  the lower court's determination of the scope of relief available to the certified class.  In finding that

3  broad prospective injunctive relief was appropriate, the lower court in <u>Armstrong</u> identified three

4  specific failures of defendant: defective communications regarding parole hearings, failure to modify

5  policies and procedures to provide accommodation, and failure to select accessible facilities.  <u>Id</u>. at

6  870.  The district court held that these failures were system-wide, so system-wide injunctive relief

7  was warranted.  The defendants argued to the Ninth Circuit that the system-wide injunctive relief

8  ordered by the district court was overbroad, and relief should be limited to the specific injuries

9  suffered by the named plaintiffs.  The Ninth Circuit disagreed that injunctive relief should be so

10  limited where the injury was the result of policies and practices pervading the whole system.  In this

11  context, the Ninth Circuit held:

12      [T]he court's determination that relief may be sought by a class of plaintiffs is relevant to
        the scope of relief to be awarded.  In fact, class certification serves to alter the court's
13      inquiry: when a class is properly certified, the injury asserted by the named plaintiffs at
        the standing stage of our inquiry is asserted on behalf of all members of the class.
14      Accordingly, although in a class-action lawsuit, as in any other lawsuit, 'the remedy must
        . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has
15      established,' the 'plaintiff' has been broadened to include the class as a whole, and no
        longer simply those named in the complaint.

16

17  <u>Id</u>. at 871.  The court concluded that in the case before it, where there was evidence that the

18  defendants' treatment of the 17 named class members was symptomatic of a broad class of disabled

19  inmates, and all of the violations stemmed from policies and practices that permeated the institutions

20  and were condoned by a broad range of officials, broad system-wide relief was warranted.  <u>Id</u>.  The

21  Court noted that this conclusion was consistent with <u>Lewis v. Casey</u>, 518 U.S. 343 (1996), because

22  there was no concern that the injunction was broader than necessary or prohibited conduct that was

23  not threatened, in view of the systematic policies that had injured the plaintiffs.  <u>Id</u>. at 871-72.

24    In addition to <u>Armstrong</u>, Plaintiffs argue that other cases and treatises similarly hold that the

25  scope of relief for a certified class is determined by the standing of the entire class, not just the

26  named Plaintiffs. Again, however, this argument puts the "cart before the horse" because Plaintiffs

27  assume that they have Article III standing simply by virtue of the class having been certified.

28  However, Defendants present several persuasive arguments that Plaintiffs lack standing to pursue at

United States District Court
For the Northern District of California

1   least some of their claims, and lack standing to pursue the broad prospective injunctive relief sought.

2   It may be that, after trial on what remains of Plaintiffs' case, some system-wide injunctive relief in

3   Plaintiffs' favor will be appropriate as it was in <u>Armstrong</u>.  However, the Court does not believe

4   that the fact that it has previously certified a class, alters its obligation to conduct a thorough Article

5   III standing evaluation before evaluating the scope of relief to which Plaintiffs may be entitled if

6   they prevail on their claim.  The Court continues to reject Plaintiffs' arguments to the contrary and

7   proceeds to evaluate the named Plaintiffs' Article III standing based on the evidence currently before

8   the Court.

9                           **b.      Standing of Named Plaintiffs**

10                          **1.      Concrete and Particularized Injury in Fact**

11                               **a.      Lack of specificity**

12          Defendants first advance the view that a "plaintiff must use the specific place at which she

13  seeks to enjoin injurious conduct, not a site 'in the vicinity' or roughly nearby," and seek to apply it

14  quite narrowly, for example, to a specific building visited by a plaintiff within Fort Mason and not

15  the adjacent buildings within this compact complex.  <u>See</u> Dkt. # 183 at 14, 19.  Defendants rely on

16  <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 886-89 (1990), which held that plaintiffs' declarations

17  that they used land "in the vicinity of" the federal lands in question were insufficient tosupport

18  standing.  Defendants contend that Plaintiffs' allegations regarding their visits to GGNRA are

19  similarly impermissibly vague given the diversity and breadth of GGNRA.  For example, they argue

20  that evidence of a visit to "the Marin Headlands" is insufficient because the Marin Headlands

21  contains several diverse programs and terrain.  <u>See</u> Sutton 2011 Decl. ¶ 9.  Plaintiffs counter that

22  they have presented evidence of the specific areas within GGNRA that they have visited and barriers

23  encountered.  <u>See</u> generally FAC.

24          The evidence regarding the park areas visited by Plaintiffs, as contained in their declarations

25  and in some cases elaborated on during deposition, is not nearly as vague as the "in the vicinity of"

26  declarations held insufficient in <u>Lujan</u>.  497 U.S. at 886-87.  While GGNRA is large, it is not nearly

27  as vast as the two million acre geographic area at issue in <u>Lujan</u>, which is over 26 times larger, and

28  Plaintiffs have specified which park areas of GGNRA they have visited with reasonable

**United States District Court**
For the Northern District of California

1   particularity.  See id at. 887.  Further, Plaintiffs' FAC specifically lists barriers in the areas of

2   GGNRA they have visited, whereas in Lujan it was somewhat unclear whether any plaintiff would

3   actually be impacted by the challenged government action in the first place given the vagueness of

4   the declarations and the vast area in question.  Additionally, in this case the parties have stipulated to

5   the park areas where the named Plaintiffs have visited, presenting an additional layer of specificity.

6   See Dkt. # 170, 190.

7          Defendants' request for summary judgment for lack of standing based solely on the

8   vagueness of Plaintiff's claims regarding the precise location of their visits to GGNRA is denied,

9   with the exception of Tennessee Valley.  The only named Plaintiff who visited this region of

10  GGNRA prior to filing the complaint, Mr. Sutton, stated that he visited a beach "near Tennessee

11  Valley" as well as other beaches throughout GGNRA and encountered barriers that made him unable

12  to independently navigate the beaches.  Sutton Decl. ¶¶ 6-7.  This vague statement about the

13  location of his visit is insufficient evidence to confer standing on Mr. Sutton to challenge all barriers

14  relating to his disability throughout Tennessee Valley.  Since no other named Plaintiff claims to have

15  visited the Tennessee Valley park area, let alone encountered a barrier there or been deterred from

16  returning, Plaintiffs may not pursue claims related to the Tennessee Valley park area.

17                          **b.     Timing of visits to GGNRA**

18         Defendants also argue that even Plaintiffs' more specific allegations regarding visits to

19  GGNRA are insufficient to establish standing, because they relate to trips made after the initial

20  complaint was filed on January 31, 2008 or prior to the statute of limitations period which began on

21  January 31, 2002 ("the actionable time period").  See Clark v. City of Lakewood, 259 F.3d 996,

22  1006 (9th Cir. 2001) (standing determined by facts in existence at time complaint filed).  Defendants

23  argue that evidence of visits outside of the time frame January 31, 2002 to 2008 cannot be

24  considered to establish standing, citing Steger v. Franco, Inc., 228 F.3d 889, 893 (8th Cir. 2000) and

25  Doran v. Del Taco, Inc., 2006 WL 2037942, *7 (C.D.Cal. July 5, 2006).  In these cases, there was no

26  evidence that the plaintiff had visited the challenged facility before filing the complaint.  For

27  example, Steger held that plaintiffs who had not attempted to enter a place of accommodation prior

28  to filing suit lacked Article III standing, while a plaintiff who had entered the building and

14

encountered a barrier had standing.  <u>Doran</u> held that there was no standing because there were too many inconsistencies in the evidence to determine that the plaintiff had actually visited the single store in question prior to filing the complaint.  These cases lend support to Defendants' argument that park areas that no named Plaintiff visited within the actionable time period should be excluded from the case based on lack of  Article III standing.

Plaintiffs counter that evidence of visits outside of the actionable time period can be relevant to standing.  Plaintiffs rely on <u>D'Lil v. Best Western Encina Lodge & Suites</u>, 538 F.3d 1031, 1037-39 (9th Cir. 2008), which held that Plaintiff had standing at the time she filed the complaint, because there was evidence that by the time the complaint was filed, she had been to the hotel in question, had plans to return to the area, wanted to return to the hotel, and had been deterred from returning.  The Court considered other evidence subsequent to the filing of the complaint, but also held that there was sufficient evidence of standing due to actual injury and deterrence at the time the complaint was filed.

As is evident from the cases discussed above, both parties are partially correct.  The threshold question of Article III standing is a "yes or no" one examined as of the date of filing: did a named Plaintiff have an encounter with or knowledge of a barrier and deterrence based on the barrier at the time the complaint was filed? If no, than the Plaintiff lacks standing to pursue a claim for injunctive relief.  If yes, then the Court must proceed to examine the scope of that Plaintiffs' standing, and evidence outside of the actionable time period can be relevant.  Thus, the Court can and does consider additional evidence of visits outside of the actionable time period, but the evidence must relate to experiences that the named Plaintiffs had within the actionable time period and cannot retrospectively confer standing on the named Plaintiffs when it otherwise does not exist.  As discussed below, the limited evidence presented by Plaintiffs of visits within the actionable time period significantly restricts the geographic scope of their standing in this case.

              **c.**        **Standing limited to Plaintiff's particular disability**

Standing is also limited to barriers in park areas timely visited by a named Plaintiff related to that particular named Plaintiff's specific disability.  <u>See Chapman v. Pier 1 Imports (U.S.) Inc.</u>, 631 F.3d 939 (9th Cir. 2011) (a plaintiff who "has standing as a result of at least one barrier at a place of

United States District Court
For the Northern District of California

1    public accommodation may, in one suit, permissibly challenge all barriers in that public

2    accommodation that are related to his or her specific disability.")  Thus, Plaintiffs acknowledge that

3    mobility-impaired Plaintiffs Mendoza and Sieck lack standing to challenge vision barriers, and

4    vision-impaired Plaintiffs Sutton and CCB similarly lack standing to challenge mobility barriers

5    unrelated to vision. Plaintiff Gray is vision and mobility impaired, and thus has standing to challenge

6    both types of barriers at places she visited within the appropriate time frame.

7                    **d.       Geographic extent of Plaintiff's standing**

8            Plaintiffs contend that the Court should not divide GGNRA by park sites, or even by

9    counties, but rather GGNRA should be considered a single integrated park system with their injury a

10   general "lack of access" throughout the entire GGNRA for the purpose of standing.  They contend

11   that dividing GGNRA geographically would lead to confusion and inefficiency because numerous

12   other lawsuits would have to be filed.  While that might be so, Plaintiffs cannot cite any precedent

13   for treating an area as large and diverse as GGNRA, with as many different types of challenged

14   barriers in so many distinct and largely physically separated parks and buildings, as a single entity

15   for standing.

16           None of the cases discussed by either side are class actions involving a "facility" as broad

17   and diverse as GGNRA.  Most focus primarily on whether or not a plaintiff had visited, and been

18   deterred from returning to, a single place at the time the complaint was filed, such as a store or hotel,

19   or at most a chain of similar stores or hotels.  Therefore, although they provide some guidance, these

20   factually dissimilar cases cannot be applied directly to this much broader case involving a 75,000

21   acre, multi-park area.  GGNRA encompasses 36 highly distinct parks and facilities in different,

22   largely separated locations sprinkled around the greater San Francisco Bay Area, each with its own

23   distinct character and history.  For example, Fort Mason is a former military facility that now houses

24   arts and community groups adjacent to a mixed urban residential and commercial neighborhood in

25   San Francisco.  Other than being under the same large GGNRA umbrella, Fort Mason has little in

26   common with Muir Woods,  a much less developed redwood forest park  in a non-urban part of

27   Marin County miles away and separated by the Bay.

28           In Doran v. 7-Eleven, Inc., 524 F.3d 1034 (9th Cir. 2008), the Ninth Circuit addressed the

                                                16

United States District Court
For the Northern District of California

1    difference between Article III standing and prudential standing considerations.  It held that a

2    plaintiff's encounters with and knowledge of certain limited barriers to access at a particular 7-

3    Eleven store prior to filing the complaint "gets him inside the courthouse door," id. at 1041-42, for

4    purposes of Article III standing, but did not answer the question of the scope of barriers he could

5    challenge in the case once inside the courthouse.  Id.  The Court concluded that the plaintiff, having

6    established Article III standing to challenge the barriers he encountered at the 7-Eleven which

7    deterred him from returning, also had Article III standing to conduct discovery and challenge other,

8    unencountered barriers in that particular store related to his specific disability.  Id. at 1042-44.  The

9    Ninth Circuit recognized that this conclusion implicated the prudential aspects of standing, but

10   determined that in the case before it there were no "abstract questions" which other governmental

11   institutions might be more competent to address because the plaintiff had a personal desire to return

12   to the particular store in question.  Id. at 1044-46.  Further, the prudential consideration of judicial

13   economy favored the result because, otherwise, the plaintiff could be forced to bring a series of

14   related lawsuits challenging multiple barriers related to his disability at a single establishment.  Id.

15   However, the Ninth Circuit expressly rejected the possibility that a plaintiff challenging the lack of a

16   disabled parking spot in a shopping center could extend the lawsuit to other establishments at the

17   shopping center not responsible for the injury caused by the lack of accessible parking.  Id. at 1047

18   n.9 ("All that our opinion does today is to explore the scope of the Article III claims that Doran has

19   against 7-Eleven once it violated his rights under the ADA. Our ruling does not in any way suggest

20   that a person precluded from visiting a shopping center by lack of a disabled parking space at the

21   shopping center could automatically have discovery against multiple establishments in the center

22   that were not responsible for the injury to the disabled person caused by the lack of accessible

23   parking.").

24          Though the Court's "parking lot" example in Doran differs insofar as the shopping center's

25   parking space was not under the same control as the various stores there, whereas here the various

26   park areas within GGNRA are under unified control,[3] this example also reflects the Ninth Circuit's

27

28          [3] An exception is areas under the control of third-party "park partners" as discussed elsewhere
     in this Order.

**United States District Court**
For the Northern District of California

1   recognition that a plaintiff's standing must be reasonably congruent with the plaintiff's own

2   experiences with barriers, geographically and otherwise.  By contrast, Plaintiffs' position that

3   visiting any single park area within the actionable time period, encountering a barrier, and being

4   deterred from returning confers standing to challenge all barriers throughout the entire GGNRA

5   must be rejected because it extends well beyond any reasonable analogy to a single store or what can

6   be considered the same "facility."

7          This Court concludes that Plaintiff's standing extends to the park areas that a named Plaintiff

8   visited within the actionable time period where he or she encountered a barrier (and for which there

9   is sufficiently specific evidence of deterrence thereafter as discussed below), but not to barriers

10  within other park areas.  Based on the parties' most recent stipulation, at least one named Plaintiff

11  visited the following GGNRA park areas and encountered a barrier therein within the actionable

12  time period:  Alcatraz (Donovan Decl. ¶ 4, 8); Baker Beach (Mendoza Decl. ¶ 9); Cliff House (Gray

13  Decl. ¶ 24-25; Mendoza Decl. ¶ 10); Chrissy Field (Gray Decl. ¶ 9); Fort Cronkhite (Sieck Decl. ¶ 6,

14  9); Fort Mason (Donovan ¶ 4, 6; Mendoza Decl. ¶ 4; Sutton Decl. ¶ 11); Fort Miley (Donovan Decl.

15  ¶ 4-5); Fort Point (Buchmann-Garcia Decl. ¶ 5-6); Lands End (Sieck Decl. ¶ 7); Marin Headlands

16  (Gray Decl. ¶ 18-21; Sutton Decl. ¶ 6, 9); Marine Mammal Center (Gray Decl. ¶ 23); Muir Beach

17  (Sutton Decl. ¶ 6-7); Muir Woods (Donovan Decl. ¶ 4, 7; Gray Decl. ¶ 13-17; Lozano Decl. ¶ 12,

18  14; Mendoza Decl. ¶ 5; Sieck Decl. ¶ 5; Sutton Decl. ¶ 9-10, 14); Rodeo Beach (Mendoza Decl. ¶

19  6); Stinson Beach (Lozano Decl. ¶ 13; Mendoza Decl. ¶ 8); and Sutro Baths (Seick Decl. ¶ 7).[4]

20  Plaintiffs cannot challenge any other park areas within GGNRA because no named Plaintiff has

21  standing to challenge barriers within them, including: Battery Spencer, Bay Area Discovery

22  Museum, Camera Obscura, China Beach, Fort Baker, Gulf of Farallones Visitor Center, Hawk Hill,

23  Kirby Cove, Milagra Ridge, Miwok Stables, Mori Point, Muir Beach Overlook, Ocean Beach,

24  Phleger Estate, Point Bonita Lighthouse, Presidio, Sutro Heights, and Sweeney Ridge.

25                          **2.      Intent to Return or Deterrence**

26         As to deterrence, Plaintiffs contend that they "collectively have standing to assert claims

27  _____

28         [4]  As discussed above, Plaintiff Sutton only claims to have visited a beach "near" Tennessee Valley.  This evidence is too vague to show that he has standing to challenge barriers within this park area.

United States District Court
For the Northern District of California

regarding barriers throughout GGNRA because they collectively have been generally deterred from visiting the entire GGNRA park system." Dkt. # 171 at 9. Plaintiffs cite various declarations submitted in support of their motion for summary judgment in which Plaintiffs attest that barriers within GGNRA have generally deterred them from returning to GGNRA, or that they would like to visit GGNRA again when it is accessible. See generally Dkt. #175-1 to 175-17 (Appendix of Plaintiffs and Class Members' Declarations). Plaintiffs argue that there is no difference between specific and general deterrence for a "discrete park system" like GGNRA which is located "in the[] immediate geographic area" of most Plaintiffs. However, elsewhere Plaintiffs inconsistently argue that programmatic access is not accomplished by having each program accessible in at least one location within GGNRA as a whole because they should not have to travel to less conveniently located park locations.

To support their "general deterrence" theory, Plaintiffs cite Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1043-44 (9th Cir. 2008), which held that a plaintiff's uncertainty about whether barriers at a single facility remained could constitute deterrence sufficient to show an actual injury. See also Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1137-38 (9th Cir. 2002) (current deterrence from attempting to gain access to a single store was sufficient injury). However, both of these cases relate to challenges to access barriers at single stores, which are distinguishable from Plaintiffs' challenge to GGNRA as a whole and all of the many different park areas within it.

Defendants counter that there is no legal support for Plaintiffs' "general deterrence" theory, and that the cases cited by Plaintiffs are outmoded because they pre-date Chapman. Plaintiffs contend that Chapman does not cut against broad standing, but held that a disabled person "suffers a cognizable injury if he is deterred from visiting a noncompliant accommodation because he has encountered barriers related to his disability there." 631 F.3d at 949. However, Chapman does not mention, much less adopt, a theory of "general deterrence," and Plaintiffs point to no case holding that a plaintiff's encounter with a single barrier at a single place within a much larger area sufficiently deters the plaintiff from re-visiting the entire area to establish standing to challenge the entire area. See Chapman, 631 F.3d at 953 (must have visited a specific facility and either be deterred from returning to facility or have plan to return to facility); see also Doran v. 7-Eleven, Inc.,

19

United States District Court
For the Northern District of California

1    524 F.3d 1034 (9th Cir. 2008) (focused on single 7-Eleven store); <u>Pickern v. Holiday Quality Foods</u>, 293

2    F.3d 1133 (9th Cir. 2002) (focused on single grocery store); <u>Steger</u>, 228 F.3d 889 (focused on single

3    office building).

4           Plaintiffs also rely on <u>Celano v. Marriott Int'l, Inc.</u>, 2008 WL 239306 (N.D.Cal. Jan. 28,

5    2008), but <u>Celano</u> did not adopt such a sweeping view of standing.  Instead, <u>Celano</u> held that the

6    plaintiffs had standing to challenge 26 Marriott golf courses after physically attempting to play only

7    one course because they were specifically informed of a uniform national corporate policy not to

8    provide them with the identical type of accessible golf cart that they needed, coupled with evidence

9    of sufficient interest in playing on Marriott courses nationwide.  Therefore, they were specifically

10   deterred from visiting the other golf courses.  <u>Id.</u> at *7.  There is no such evidence of a uniform

11   GGNRA-wide policy to refuse to provide Plaintiffs an accommodation, nor do Plaintiffs seek any

12   single type of accommodation analogous to the golf cart, but rather a wide variety of measures.

13   Further, there is no evidence that any Plaintiff has plans to visit all park areas throughout GGNRA.

14          At the same time, in light of the posture of this motion, affirmative evidence of a named

15   Plaintiff's firm intention to return to the precise place that he or she previously visited, or evidence

16   that he or she has been deterred from returning to the exact same place that he or she visited

17   previously, is not necessarily required.  While a "vague desire to return is insufficient to satisfy the

18   requirement of imminent injury," <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 496-97 (2009),

19   several, but not all, of the named Plaintiffs have expressed something more than a "vague desire" to

20   return to GGNRA.  Additionally, at the time that Plaintiffs were gathering evidence, preparing

21   declarations, and taking depositions, Defendants had not made the argument that such specificity

22   should be required.  Neither side appears to have questioned the named Plaintiffs with any precision

23   about their specific plans to return to, or deterrence from returning to, the exact places within

24   GGNRA that they previously visited.  Instead, both parties focused on whether the Plaintiff intended

25   to return to GGNRA or was deterred from attempting to return to GGNRA more generally.  <u>See</u>

26   Kennedy Decl. at Ex. A (Gray Depo.) at 53 (no personal visits to GGNRA planned but might return

27   as part of her job but "not sure yet"); Ex. B (Mendoza Depo.) at 103-107 (no specific plans to return

28   to GGNRA right now but would like to go when knows what is accessible); Ex. C (Sieck Depo.) at

1  74 and Dkt. 175-15 (Sieck Decl.) ¶ 3-9 (no future visits planned, but if she knew trails, campgrounds

2  and beaches were accessible she would intend to go); Ex. D (Sutton Depo.) at 32, Supp. Elsberry

3  Decl. Ex. E (Sutton Depo.) at 175-76 (no trips planned, but if could return to GGNRA alone, would

4  definitely return); Lozano Depo. at 92.

5       After reviewing all of the evidence presented by the parties in connection with these cross-

6  motions for summary judgment, the Court concludes that there is insufficient evidence that the

7  following named Plaintiffs, all of whom visited a park area and encountered a barrier within the

8  actionable time period, were deterred from returning to GGNRA and therefore they lack standing to

9  pursue a Rehabilitation Act claim: Donovan, Buchmann-Garcia, and Lozano.  Since only these

10  Plaintiffs visited the following park areas, these areas are no longer at issue in the case:  Alcatraz,

11  Fort Miley, and Fort Point.

12       The following named Plaintiffs, all of whom visited a park area and encountered a barrier

13  within the actionable time period, have presented some specific evidence that they would like to

14  return to GGNRA, or a specific area therein, if they knew that accessibility was improved or

15  particular barriers they previously encountered were remedied: Gray, Mendoza, Seick, and Sutton.

16  The Court concludes that the evidence is sufficient to confer standing on these individuals to

17  challenge all barriers related to their disabilities within the park areas that they visited only to

18  encounter barriers within the actionable time period.  The Court's evaluation of Plaintiffs' Article III

19  standing leaves the following park areas remaining in the case: Baker Beach, Cliff House, Chrissy

20  Field, Fort Cronkhite, Fort Mason, Lands End, Marin Headlands, the Marine Mammal Center, Muir

21  Beach, Muir Woods, Rodeo Beach, Stinson Beach, and Sutro Baths.

22                    **c.    Injury Fairly Traceable to Defendants**

23       Plaintiffs' claims related to programs conducted by third-party "park partners" also fail for

24  lack of standing.  For the reasons stated in Section IV.B.3 below, the Court concludes that there is no

25  triable issue of fact that Defendants "conduct" the programs or activities run by park partners within

26  the meaning of the Rehabilitation Act.  The Court's jurisdiction is limited to injuries "that can be

27  fairly traced to the challenged action of the defendant, and not injury that results from the

28  independent action of some third party not before the court."  Simon v. Eastern Kentucky Welfare

21

1   Rights Organization, 426 U.S. 26, 41-42 (1976).  Because the actions of the park partners are not

2   fairly traceable to Defendants, they must be excluded from the case and summary adjudication of

3   this issue is granted in Defendants' favor.  Accordingly, Plaintiffs may not challenge barriers

4   associated with the Marine Mammal Center even though a named Plaintiff may have visited it within

5   the actionable time period.  For the same reason, Plaintiffs may not challenge barriers associated

6   with programs or activities conducted by third party park partner the Conservancy.

7                              **d.      Standing to Challenge Website Deficiencies**

8               Plaintiffs also lack standing to challenge GGNRA or Conservancy websites because no

9   named Plaintiff claims to have been injured by any of the alleged GGNRA and Conservancy website

10  barriers listed in the FAC within the actionable time period.  Specifically, *no* named Plaintiff has

11  used the Conservancy website, and in any event the Conservancy website is not conducted by

12  Defendants but instead run by a third party park partner.  Only one named Plaintiff, Mr. Sutton, tried

13  to access the GGNRA website, but he did not do so until approximately two years *after* the

14  complaint was filed.  See Sutton 2011 Decl. ¶ 13; Kennedy Decl. Ex. D (Sutton Depo.) at 43.

15  Further, even if Mr. Sutton had visited the website within the actionable time period, he claims that

16  he had trouble with one PDF document on the website, but concedes that the difficulties were not

17  system-wide.  Sutton Depo. at 167-9; Sutton 2011 Decl. ¶ 13.  Therefore, it is unclear that he ever

18  encountered an access barrier on the website that would confer standing on him to challenge the

19  website as a whole.  Summary adjudication of Plaintiffs' claims based on website barriers is granted

20  in Defendants' favor.

21          **B.      Cross-Motions for Summary Judgment on the Merits**

22              On the merits, both parties move for summary judgment of Plaintiff's sole claim for violation

23  of Section 504 of the Rehabilitation Act.  Plaintiffs contend that there is no triable issue of fact and

24  Defendants are liable for a violation of Section 504 based on undisputed evidence of systematic

25  access barriers throughout GGNRA, while Defendants contend that Plaintiffs have not shown that

26  they lack meaningful access to GGNRA's programs when viewed in their entirety, and that some of

27  the challenged programs are not conducted by Defendants.  Additionally, Defendants contend that

28  Plaintiffs have not met their burden of identifying any reasonable accommodations necessary to

**United States District Court**
For the Northern District of California

1  achieve program access or otherwise suggested an appropriate remedy under Federal Rules of Civil

2  Procedure 23 and 65.

3         **1.     Legal Standard**

4        As stated above, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides in

5  pertinent part that, "No . . . individual with a disability . . . shall, solely by reason of her or his

6  disability, be excluded from the participation in, be denied the benefits of, or be subjected to

7  discrimination . . . under any program or activity conducted by any Executive agency."  To prove a

8  violation of section 504, Plaintiffs must show that (1) they are disabled within the meaning of the

9  Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit

10  of, or subject to discrimination under a program or activity, and (4) the program or activity is carried

11  out by a federal executive agency or with federal funds.  American Council of the Blind v. Paulson,

12  525 F.3d 1256, 1266 (D.C. Cir. 2008).   Program access has been interpreted broadly to require that

13  people with disabilities be provided with "meaningful access" to covered programs and activities.

14  Id. at 1267.  To achieve meaningful access, "while a grantee need not be required to make

15  'fundamental' or substantial' modifications to accommodate the handicapped, it may be required to

16  make 'reasonable' ones.  Alexander v. Choate, 469 U.S. 287, 300 (1985).   Only the third and fourth

17  elements are in dispute here.

18         **2.     Denial of meaningful access to a program or activity**

19         **a.     What programs are at issue?**

20        The Department of Interior, which governs the NPS and GGNRA, has promulgated

21  regulations regarding accessibility at 43 C.F.R sections 17.501 through 17.570.  These regulations

22  provide that: "No qualified handicapped person shall, on the basis of handicap, be excluded from

23  participation in, be denied the benefits of, or otherwise be subjected to discrimination under any

24  program or activity conducted by the agency."  43 C.F.R. § 17.530(a).  Additionally, "[t]he agency,

25  in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other

26  arrangements, on the basis of handicap – Afford a qualified handicapped person an opportunity to

27  participate in or benefit from the aid, benefit or service that is not equal to that afforded others."  43

28  C.F.R. § 17.530(b)(1)(ii).

**United States District Court**
For the Northern District of California

43 C.F.R. § 17.550 further specifies that:

(a) General. The agency shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not –

(1) Necessarily require the agency to make each of its existing facilities or every part of a facility accessible to and usable by handicapped persons;

(2) In the case of historic preservation programs, require the agency to take any action that would result in a substantial impairment of significant historic features of an historic property; or

(3) Require the agency to take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens. In those circumstances where agency personnel believe that the proposed action would fundamentally alter the program or activity or would result in undue financial and administrative burdens, the agency has the burden of proving that compliance with § 17.550(a) would result in such an alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the agency head or his or her designee after considering all agency resources available for use in the funding and operation of the conducted program or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, the agency shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that handicapped persons receive the benefits and services of the program or activity.

(b) Methods

(1) General. The agency may comply with the requirements of this section through such means as redesign of equipment, reassignment of services to accessible locations, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock, or any other methods that result in making its programs or activities readily accessible to and usable by handicapped persons. The agency is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. The agency, in making alterations to existing buildings, shall meet accessibility requirements to the extent compelled by the Architectural Barriers Act of 1968, as amended (42 U.S.C. 4151-4157) and any regulations implementing it. In choosing among available methods for meeting the requirements of this section, the agency shall give priority to those methods that offer programs and activities to qualified handicapped persons in the most integrated setting appropriate.

(2) Historic preservation programs. In meeting the requirements of § 17.550(a) in historic preservation programs, the agency shall give priority to methods that provide physical access to handicapped persons. In cases where a physical alteration to an historic property is not required because of § 17.550(a)(2) or (a)(3), alternative, methods of achieving program accessibility include--

(I) Using audio-visual materials and devices to depict those portions of an historic property that cannot otherwise be made accessible.

(ii) Assigning persons to guide handicapped persons into or through portions of historic properties that cannot otherwise be made accessible; or

1          (iii) Adopting other innovative methods.

2          (3) Recreation programs. In meeting the requirements of § 17.550(a) in recreation
programs, the agency shall provide that the program or activity, when viewed in its
3    entirety, is readily accessible to and usable by handicapped persons. When it is not
reasonable to alter natural and physical features, accessibility may be achieved by
4    alternative methods as noted in § 17.550(b)(1) of this section.

5

6    See also Bird v. Lewis & Clark College, 303 F.3d 1015, 1021 (9th Cir. 2002) (because "central

7    inquiry is whether the program 'when viewed in its entirety, is readily accessible to and useable by

8    individuals with disabilities'" no violation even though some aspects of college study abroad

9    program were not accessible); Equal Rights Center v. Dist. of Columbia, 741 F. Supp. 2d 273, 288

10   (D.D.C. 2010) (in ADA challenge to accessibility of lottery sales locations statewide, holding that

11   "there is no minimum requirement for percentage of accessible program locations" when a program

12   is offered in more than one location, but this can impact assessment of overall program

13   accessibility).

14          Defendants contend that, when viewed "in their entirety," all of the programs or activities

15   conducted by Defendants at GGNRA are accessible (with the exception of camping, which they

16   concede is currently inaccessible but contend that work is in progress to make camping an

17   accessible program).  They reach this conclusion by taking a somewhat narrow view of what

18   constitutes a "program" and a very broad view of the phrase "viewed in its entirety."  Defendants

19   offered evidence that they convened an inter-disciplinary task group that determined that only the

20   following eleven programs are programs conducted in GGNRA: interpretive and educational

21   programs, visitor centers and museums, visitor services, historic fortifications, picnicking, hiking

22   and trails, beach access, camping, coastal overlooks, bird watching, and fishing.[5]  Roth Decl. ¶¶ 26-

23   28.  While Plaintiffs quarrel in the abstract with Defendants' evidence of what constitutes a

24   "program," they did not provide any evidence regarding other programs conducted by GGNRA, or

25   specifically propose additional programs that they contend Defendants conduct in evaluating

26   program access.

27   _____

28          [5]It is undisputed that no Plaintiff has expressed an interest in fishing. The Court has also not
located any evidence relating to any Plaintiff's desire to go bird watching. Plaintiffs therefore lack
standing to pursue claims related to these programs.

1    The term "program" must be defined with reasonable specificity; each and every action that

2    a visitor to GGNRA might wish to engage in is not necessarily a "program" conducted by GGNRA.

3    See, e.g. Daubert v. Lindsay Unified School Dist., 2012 WL 1593968, *11 (E.D.Cal. 2012)

4    (rejecting ADA/Rehabilitation Act plaintiff's argument that he was denied access to the "program"

5    of being able to watch a football game in bleacher seats with the rest of the spectators, holding that

6    "the football game is the program offered, not the seating.  The seating is part of the facility.").

7    Faced with a vacuum of opposing evidence from Plaintiffs to raise a triable issue of fact, and no

8    contrary authority, the Court accepts that the eleven programs listed by Defendants are the

9    programs conducted by Defendants at GGNRA.

10    However, the Court cannot accept Defendants' position that viewing the accessibility of

11    these programs "in their entirety" means looking at them in the context of the entire 75,000 acre

12    GGNRA.  Just as it stretches Article III too far to say that a Plaintiff who encountered a single

13    barrier at a single place within GGNRA has standing to challenge all barriers related to his or her

14    disability throughout the entire park system, it is also unreasonable to say that the program of

15    hiking, for example, is accessible if one portion of one trail in one area of GGNRA is accessible.

16    Indeed, like Plaintiffs, Defendants also try to have it both ways, albeit in reverse.  According to

17    Defendants, Plaintiffs can only challenge specific places with barriers that they encountered before

18    filing suit, but Defendants can prevail as to these more limited areas by showing that another

19    separate location, however far away, does not have the same barriers, even though Defendants

20    complained that Plaintiffs had not demonstrated any interest in visiting that different location.

21    Instead, just as Plaintiffs' standing extends only to the specific park areas that they visited

22    within the actionable time period, program access "when viewed in its entirety" must be assessed

23    on a park area by park area basis.  Thus, to the extent that any of the programs conducted by

24    Defendants are conducted in a park area that Plaintiffs have standing to challenge (namely, Baker

25    Beach, Cliff House, Chrissy Field, Fort Cronkhite, Fort Mason, Lands End, Marin Headlands, Muir

26    Beach, Muir Woods, Rodeo Beach, Stinson Beach, and Sutro Baths), the program must be

27    accessible within that particular park area.

28    **b.      What regulations apply to accessibility of these programs?**

United States District Court
For the Northern District of California

1    There is no dispute that existing buildings within GGNRA built after May 8, 2006 must

2   comply with the Architectural Barriers Act Accessibility Standards ("ABAAS"), while those built

3   earlier must comply with the Uniform Federal Accessibility Standards ("UFAS").  43 C.F.R. §

4   17.551; 41 C.F.R. § 102-76.65(a)(1); Margen Decl. ¶ 13-14.  It is also undisputed the ABAAS and

5   UFAS do not govern many of the outdoor features and facilities at issue in this litigation such as

6   beaches, trails and campgrounds.  Cf. Norkunas v. Seahorse NB, LLC, 444 Fed. Appx. 412, 416

7   (11th Cir. 2011) (regulations governing beach walkways do not exist).

8    Plaintiffs argue that in the absence of binding standards, industry practice is to use non-

9   binding guidelines such as the U.S. Access Board's Proposed Accessibility Guidelines for Outdoor

10   Developed Areas ("Draft AGODA") (Pl.'s RJN Ex. A) and the NPS Harper's Ferry Center

11   programmatic accessibility guidelines for NPS interpretive media ("Harper's Ferry Guidelines")

12   (Pl.'s RJN Ex. B).[6]  See Elsberry Decl. Ex. A (Ellis Depo.) at 226-228, 232-235; Ex. B (York

13   Depo.) at 227-228; Elsberry Supplemental Decl. Ex. H (Margen Depo.) 81-83; Margen Decl. ¶ 18-

14   19; Ex. G (Blackseth Depo.) at 220.  Further, some cases have held that, although not mandatory,

15   standards such as ADAAG "can be used as guidance to access program accessibility standards."

16   See, e.g., Pascuiti v. New York Yankees, 87 F.Supp.2d 221, 226 (S.D.N.Y. 1999) (plaintiffs in an

17   ADA case were allowed to compare existing facilities at Yankee Stadium with non-binding

18   requirements set forth in ADAAG as part of their effort to establish individual barriers to access

19   because the standards "provide valuable guidance for determining whether an existing facility

20   contains architectural barriers").

21    Defendants counter that AGODA has absolutely no legal effect because it is in draft form

22   (see Eustace v. Commissioner of Internal Revenue, 312 F.3d 905, 908 (9th Cir. 2002) (refusing to

23   apply draft regulations in another context), and even if AGODA were finalized it would not apply

24   to GGNRA because it has not been adopted as a requirement of the Architectural Barriers Act

25   necessary to carry out Section 504.  See 43 C.F.R. § 17.551 ("Each building or part of a building

26

27    [6]Defendants admit that they apply the Harpers Ferry Guidelines for audiovisual programs and
tours, exhibits, publications, signage, and waysides when designing new interpretive media even though
28   they are non-binding.  See De La O Decl. ¶ 26; Faw Decl. ¶ 12-13; Gee Decl. ¶ 5, 19 (Def.'s binder tabs
6, 8, 9).

United States District Court
For the Northern District of California

1   that is constructed or altered by, on behalf of, or for the use of the agency shall be designed,

2   constructed, or altered so as to be readily accessible to and usable by handicapped persons. The

3   definitions, requirements, and standards of the Architectural Barriers Act (42 U.S.C. 4151-4157) as

4   established in 41 C.F.R. § 101-19.600 to 101-19.607 apply to buildings covered by this section.").

5   Defendants also contend that application of a hodge-podge of non-binding standards such as

6   AGODA and Harper's Ferry Guidelines to determine accessibility throughout GGNRA in this case

7   would usurp the DOI's power to determine what regulations are necessary to carry out Section 504,

8   in violation of <u>Chevron</u> deference.  <u>See Chevron U.S.A. Inc. v. Natural Resources Defense Council,</u>

9   <u>Inc.</u>, 467 U.S. 837 (1984).

10          While the fact that a given barrier does not comply with non-binding draft AGODA or

11  Harper's Ferry guidelines does not by itself establish a denial of program access to warrant

12  summary judgment in favor of Plaintiffs, it may eventually have some relevance to programmatic

13  accessibility at trial.  <u>See Daubert v. Lindsay Unified School District</u>, 2012 WL 1593968, *8 (May

14  4, 2012 E.D.Cal.) (noting that "the mere fact that an existing facility does not comply with ADAAG

15  does not render the program inaccessible.  Instead, assessing a program's accessibility is a

16  subjective evaluation that entails viewing the program in its entirety"). Further, the absence of a

17  binding regulation governing accessibility of a given feature, such as beach access, does not mean

18  that Defendants need not make any effort toward accessibility, although it certainly makes the

19  ultimate determination of how much and which efforts are required more difficult.  However, it is

20  unnecessary for the Court to resolve the parties' dispute as to precisely which standards should

21  apply to various features of GGNRA at the summary judgment stage.

22                    **c.      Plaintiff's evidence of denial of meaningful access**

23                           **1.      Lack of transition plan and other historical evidence**

24          Section 504 of the Department of Interior ("DOI") regulations required that by March 1988,

25  all entities within the DOI prepare self-evaluation and transition plans covering their policies,

26  practices, and facilities.  43 C.F.R. §§ 17.510, 17.550(d).  The plans were required to: (1) identify

27  physical obstacles in the agency's facilities that limit the accessibility of its programs or activities

28  to disabled persons; (2) describe in detail the methods that will be used to make the facilities

**United States District Court**
For the Northern District of California

1    accessible; and (3) specify the schedule for taking the steps necessary to achieve compliance and, if

2    the time period of the transition plan is longer than one year, identify steps that will be taken during

3    each year of the transition period.  Id. § 17.550(d).

4           Plaintiffs rely on evidence that Defendants' 1988 transition plan was inadequate because it

5    failed to meaningfully address how to make many of GGNRA's programs, facilities, and activities

6    programmatically accessible, did not address various barriers, was impermissibly vague, and

7    contemplated remedial work was never completed.  See Declaration of Peter Margen at ¶¶ 21-23;

8    see also Elsberry Decl. Ex. C (Dean Depo.) at 98-99; Ex. D (De La O Depo.) at 77-78 (GGNRA

9    officials do not know if recommended work was ever completed or if there is funding for the work).

10          In 2000, the DOI issued a report documenting a study to improve access for the disabled to

11   outdoor recreational opportunities on federal lands entitled "Improving Access to Outdoor

12   Recreational Activities on Federal Lands."  Elsberry Decl. Ex. F.  The report identified deficiencies

13   including access being a low priority among DOI leadership, lack of accountability for

14   accessability, and no dedicated funding to remove barriers.  Id.  However, this memo does not

15   mention GGNRA specifically and looked at federal forest, park and wildlife areas more generally.

16   Id.  Plaintiffs also cite a 2006 memo from the Director of NPS, in which he admitted that NPS was

17   falling short of the minimum level of access required by law and stated that there needed to be more

18   accountability.  Elsberry Decl. Ex. G at 1.  This memo is also not directed to GGNRA, however, and

19   Defendants point to evidence that GGNRA does not suffer from the specific NPS deficiencies

20   identified in the memo.  See Blackseth Report at 149-62; De La O Decl. ¶¶ 4, 6-7, 24-33, 39-41

21   (Def.'s binder tab 6); Gee Decl. ¶¶ 4, 7-14, 18-22 (Def.'s binder tab 9); Mannell Decl. ¶¶ 21-29

22   (Def.'s binder tab 13).

23          Also in 2000, Defendants designated Mr. De La O to perform the duties of Accessibility

24   Coordinator for GGNRA.  Elsberry Decl. Ex. D (De La O Depo.) at 9-13.  Mr. De La O discovered

25   that some of the information in the 1988 transition plan was obsolete and/or inaccurate.  Id. at 26-

26   27.  He prepared a December 2000 update to the 1988 transition plan, but the updated plan did not

27   address, among other things, third party park partners.  Id. at 112-113.

28          Plaintiffs argue that Defendants' undisputed lack of an adequate transition plan, while

29

United States District Court
For the Northern District of California

admittedly not actionable by itself  as a Rehabilitation Act violation, is relevant to show a

systematic violation of Section 504's program access requirement.  For this position, they cite

Cherry v. City College of San Francisco, 2005 WL 2620560 (N.D.Cal. 2005), but that case actually

concluded not only that the lack of a transition plan was not actionable as a matter of law, but also

that "[t]he admissibility of evidence pertaining to defendants' alleged failure to comply with the

self-evaluation and transition-plan regulations *remains to be decided another day*. . . . This order

recognizes, however, that such evidence *could* be relevant, if causally related to plaintiffs' claims of

discrimination."  Id. at *4-5 (emphasis added).  This is far from holding that such evidence is

always relevant and admissible to support a claim under Section 504.  See also Lonberg v. City of

Riverside, 571 F.3d 846, 851-52 (9th Cir. 2009) (in ADA case, "existence or non-existence of a

transition plan does not, by itself, deny a disabled person access to a public entity's services, nor

does it remedy the denial of access.  Indeed, a public entity may be fully compliant with § 202

without ever having drafted a transition plan, in which case, a lawsuit forcing the public entity to

draft such a plan would afford the plaintiff no meaningful remedy. Conversely, a public entity may

have a transition plan that complies with section 35.150(d), but may still be in violation of § 202

by, for example, failing to alter its sidewalks in a way that provides meaningful access."); Skaff v.

City of Corte Madera, 2009 WL 2058242, *2-3 (N.D. Cal. July 13, 2009).

    The Court concludes that evidence that Defendants' history of failure to study accessibility,

formulate transition plans, remove known barriers and generally improve accessibility has led to

pervasive barriers throughout GGNRA, while not irrelevant, is insufficient to warrant summary

judgment in favor of Plaintiffs.  Plaintiffs still need to present evidence of their individual

experiences and injuries to show that they have been denied access to the programs and activities

conducted by Defendants at GGNRA when viewed in their entirety.  It is not enough to merely

show that GGNRA has not had, and does not have, an adequate transition plan or that, in the past,

NPS agreed that it needed to do more in federal parks generally to achieve its accessibility goals.

**2.     NCA evaluation of accessibility at GGNRA**

United States District Court
For the Northern District of California

1    In 2006, NPS began discussions with the National Center on Accessibility ("NCA")[7] to

2    conduct physical and programmatic assessment of its programs, policies, and facilities.  Elsberry

3    Decl. Ex. D (De La O Depo.) at 51-52, 83-84.  In 2007, as part of an agreement between the parties

4    to facilitate settlement of this action, NPS and NCA entered into a contract pursuant to which NCA

5    would conduct an evaluation and prepare a transition plan for all GGNRA policies, facilities, and

6    programs.  Id. at 51-52.  In November 2008, the parties to this action executed a Memorandum of

7    Understanding("MOU").  See Elsberry Decl. Ex. K (MOU).  The MOU divided GGNRA into six

8    "phases," and called for an assessment by NCA of GGNRA's facilities and policies to identify

9    those barriers and conditions that needed to be remedied to meet the requirements for program

10   access under Section 504, and propose remedies to such barriers.  MOU at 2-3.  The assessments

11   for Phases I and II were completed in 2009, and NCA prepared written reports of these assessments

12   prioritizing barriers according to a three-level ("minor," "serious," or "critical") system developed

13   by NPS.  Elsberry Decl. Ex. D (De La O Depo.) at 119.  The assessment identified numerous access

14   barriers, many of which were found to be serious or critical, and recommended solutions for most

15   of the barriers and a proposed remediation timetable.  Elsberry Decl. Ex. L.  Based on these

16   assessments, Defendants prepared a draft transition plan for Phases I and II.  Elsberry Decl. Ex. N.

17   Thereafter, NCA conducted an assessment of facilities included in Phase III and

18   prepared a report in February 2010 identifying numerous serious and critical access barriers and

19   recommending solutions for most of the barriers and a proposed remediation timetable.  Elsberry

20   Decl. Ex. O.  A draft transition plan for Phase II was prepared in December 2010.  Elsberry Decl.

21   Ex. P.  After completion of the Phase III assessments, NCA conducted a Phase IV assessment of

22   barriers at trails in different park areas within GGNRA, and prepared a draft report that identified

23   pervasive trail barriers and recommended solutions.  Elsberry Decl. Ex. Q; Ex. B (York Depo.) at

24   74.  Plaintiff's expert later evaluated and found access barriers to trails at all Phase V locations with

25   trails that he inspected.  Margen Decl. ¶¶ 43-45, 63, 66-69.

26   Thereafter, settlement discussions between the parties ceased and the draft transition plans

27

28        [7] NCA was created in 1992 when funded by Congress to benefit outdoor access for people with
     disabilities.  Elsberry Decl. Ex. A (Ellis Depo.) at 76-79.  One of the two employees assigned to NPS'
     Accessibility Management Program works on-site at NCA.  Id. at 12-13.

United States District Court
For the Northern District of California

1   for Phases I through III were never finalized, no draft transition plan was prepared for Phase IV,

2   and no assessments were made for Phases V and VI.  Elsberry Decl. Ex. C (Dean Depo.) at 23-26.

3   Plaintiff's expert Peter Margen has inspected Phase V locations and found barriers at every

4   location.  Margen Decl. ¶¶ 30, 55, 70, Ex. J.

5          In July 2010, NCA also prepared a draft self evaluation of GGNRA's park-wide policies

6   and procedures and recommended necessary changes in such policies and procedures.  Elsberry

7   Decl. Exs. R, S.  This assessment found approximately thirty system-wide deficiencies in policies

8   and procedures relating to, among others:  lack of beach access, lack of camping access, limited

9   picnicking access, issues with access to trails, unavailability of public information on accessibility

10  features and services, park partners and permitted groups' lack of understanding and commitment

11  to accessibility and lack of assessment of their compliance with accessibility requirements, failure

12  to consider needs of disabled in new and existing programs and lack of oversight, lack of accessible

13  orientation and exhibit information, failure to apply accessibility standards in new construction, and

14  inconsistent maintenance and inspection of accessible trails.  Id.  Plaintiff's expert opines that these

15  identified policy deficiencies further establish that Defendants have failed to ensure that class

16  members have programmatic access to GGNRA.  Margen Decl. ¶ 57.

17         Defendants do not and cannot dispute that the NCA found many barriers throughout the

18  areas of GGNRA that it evaluated.  What Defendants dispute is the impact that this evidence has on

19  Plaintiffs' Section 504 claim.  While Plaintiffs rely heavily on the existence of the many barriers

20  scattered throughout GGNRA, Defendants maintain that, even if all of the alleged barriers exist, the

21  existence of barriers is immaterial if there is still meaningful access to the programs conducted by

22  Defendants when the programs are viewed in their entirety.  As noted above, Defendants take an

23  unduly minimalist view of what constitutes access when viewed in its entirety, such that, for

24  example, someone in a wheelchair being able to navigate one short path in one park area could

25  suffice for the hiking program as to the entire GGNRA.  Nonetheless, it is undisputed that the NCA

26  did not take a holistic view of program access at GGNRA, and instead inspected facilities in phases

27  without looking at programs in their entirety.  See Kennedy Decl. Ex. G (York Depo.) at 94-95

28  (NCA Director admitting that phased approach not a good approach because it "chopped it up" and

United States District Court
For the Northern District of California

1    resulted in "not being able to have a good programmatic approach" and would likely not be used

2    again); but see Margen Supp. Decl. ¶ 4-7 (phased approach was appropriate and did not prevent

3    NCA from making programmatic assessments).

4            Having reviewed NCA's findings several times during the course of this litigation, the Court

5    acknowledges that NCA found "pervasive" access barriers throughout all of the areas of GGNRA

6    that it surveyed and does not seek to minimize the importance of NCA's conclusions.  However,

7    because NCA was not examining barriers on a program by program basis or programmatic access

8    in any given park area, but instead focused on individual barriers, the NCA evidence is not

9    dispositive of the question of whether the programs conducted by Defendants at the park areas

10   currently at issue in this case are accessible when viewed in their entirety.

11                          **3.        Expert testimony**

12           Both sides presented expert testimony and reports supporting their view of the merits of

13   Plaintiffs' Rehabilitation Act claim.  As the Court stated during oral argument on this motion, it has

14   considered both Plaintiff's expert Mr. Margen and defendants' expert Mr. Blackseth's expert

15   reports in their entirety and will not exclude either report, or any portion thereof, on the basis of any

16   of the other side's objections, which are overruled.  However, given the parties' and their experts'

17   vastly differing approaches to analyzing program access in its entirety at GGNRA, and the fact that

18   (not surprisingly) neither of those approaches adopted the Court's view of how accessibility should

19   be analyzed in this case, triable issues of fact remain as to the merits of Plaintiff's Rehabilitation

20   Act claim for the programs conducted at the park areas still at issue in this case.  Therefore, neither

21   side's expert opinions warrant a grant of summary judgment.

22                          **a.        Plaintiffs' Expert Peter Margen**

23           Plaintiff's expert Peter Margen's opinions are set forth in his declaration (Dkt. # 173) and

24   supplemental declaration (Dkt. #186).  All of the program access barriers and deficient policies

25   identified by Mr. Margen are listed in his declaration at paragraphs 35 through 71 and Exhibits E

26   through J.  Among other things, Mr. Margen has concluded that virtually no trails in GGNRA meet

27   the standards for disability access, all but a few are unusable by people with significant mobility

28   disabilities, and there is little public information regarding trail access.  See Margen Decl. ¶¶ 43-49,

                                                    33

63-69; Elsberry Decl. Ex. Q (NCA draft report regarding trails in Phase IV).  He also concludes that the "exhibits experience" is not programmatically accessible and the "beach experience" is not programmatically accessible to many individuals with mobility disabilities.  Margen Decl. ¶¶ 45-46, 52.

However, Mr. Margen never identified precisely which "programs" he evaluated or whether he reviewed them "in their entirety," though he believes there are hundreds of programs conducted by GGNRA. Kennedy Decl. Ex. I (Margen Depo.) at 64-68.  Thus, his opinions do not establish that the programs conducted by Defendants at the park areas for which Plaintiffs have standing to sue are inaccessible as a matter of law.

**b.    Defendants' Expert Blackseth**

Defendants' expert Mr. Blackseth analyzed whether each of the eleven programs that Defendants have concluded are conducted at GGNRA are accessible when viewed in their entirety throughout all of GGNRA, and determined that each program is meaningfully accessible *with the exception of camping*.  Blackseth Report at 17-19.  For example, Mr. Blackseth believes that beach access has been achieved through the provision of beach wheelchairs and portable beach access routes ("mobi mats") at two beach locations within GGNRA.  Blackseth Report at 13-14; see also De La O Decl. ¶ 15-18, Ex. A (Def.'s binder tab 6); Kennedy Decl. Ex. I (Margen Depo.) at 136 (mobi mat observed was "pretty accessible").   As another example, Mr. Blackseth found that the trail program at Muir Woods is accessible as of 2012.  Blackseth Report at 121-125, 198-200, 224-227, 233-236.  Mr. Blackseth's general conclusions conflict with Mr. Margen's opinions that beach and trail access are lacking because there are some specific barriers on certain beaches and trails within GGNRA.

Plaintiffs contend that Mr. Blackseth's report is insufficient to raise a triable issue of material fact regarding accessibility because it essentially admits that many barriers remain throughout GGNRA.  Specifically, Appendix A to the Blackseth report lists a number of barriers for which remediation work is in progress, planned, is part of a deferred maintenance plan, or remediation is unnecessary because another park area provides the same programmatic access.  See generally Blackseth Report Appendix A; Margen Decl. ¶¶ 86-89, 106-107, 111-112 (discussing

34

United States District Court
For the Northern District of California

1   these entries in Blackseth's Appendix).  It lists other barriers for which a staff member will provide

2   assistance, or where another park area provides access.  See Dkt. # 184 at 17-19 (detailing barriers

3   that Mr. Blackseth acknowledges currently exist).

4        However, neither expert's opinions shed light on whether he believes that the programs

5   conducted in each park area still at issue in this litigation are accessible.  The only exception to this

6   conclusion is the program of camping, which as discussed further below, is currently inaccessible at

7   all park areas.

8              **4.       Other evidence regarding access barriers**

9        In addition to the declarations of the named Plaintiffs regarding their personal experiences

10  with barriers at GGNRA and the expert opinions discussed above, Plaintiffs point to testimony from

11  representatives of NPS and NCA that existing barriers must be remedied to comply with Section

12  504.  See Elsberry Decl. Ex. B (York Depo.) at 49, 55, 60 (implementing a solution to eliminate or

13  provide alternative means of access for all barriers identified by NCA in Phases I through III that

14  are publicly accessible is necessary to ensure program access); Ex. A (Ellis Depo.) at 150-53

15  (barriers categorized as "serious" or "critical" must be remediated); see also Margen Decl. ¶ 30.

16  Defendants do not know the costs of remediation and have no firm plan for implementing all of the

17  required work.  Elsberry Decl. Ex. D (De La O Depo.) at 140-43; Ex. C (Dean Depo.) at 20-26, 39-

18  40, 94-95, 98-99.  Plaintiffs also argue that the draft transition plans completed for Phases I-III

19  "confirm the admissions of Defendants that the access barriers identified in these plans preclude

20  program access in violation of Section 504."  Dkt. #171 at 29.  Further, the work done by NCA on

21  Phase IV, and the NCA's report on policies, practices and procedures, "reflect clear admissions of

22  the lack of program access in Phases I through IV and what must be done to comply with Section

23  504."  Id.; see also Margen Decl. ¶¶ 32, 35-36, 60, 70, Ex. J.  According to Plaintiffs, most of the

24  previously-identified access barriers still have not been remedied and there is no clear plan for

25  remediation.  Even with respect to Phases I and II, approximately fifty percent of the "critical"

26  barriers appear to have been remedied but substantial work remains to be done.  Elsberry Decl. Ex.

27  D (De La O Depo.) at 79-81, 153-54, 162-64.

28        However, all of this evidence, even taken as true, only shows that there are some existing

**United States District Court**
For the Northern District of California

1  barriers at GGNRA but not necessarily that meaningful access to any particular program has been

2  denied (except camping).   See Daubert v. Lindsay Unified School Dist., 2012 WL 1593968, *11

3  (E.D.Cal. 2012) (defendant not required to make structural modifications to stadium where there

4  was already an existing plan to accommodate wheelchair user; "[w]here physical presence is

5  coupled with an opportunity to participate in the activity, the public agency has met its requirement

6  to provide program access, even if the level of access provided is not the most optimal or

7  convenient.").

8          With respect to camping, Defendants admit that there is currently no accessible camping

9  within GGNRA, but contend that the program of camping "will be meaningfully accessible" at

10  some future time once GGNRA completes its planned renovation of Kirby Cove Campground.

11  Roth Decl. ¶¶ 29, 57; Blackseth Report at 17-19, 84-85.  They argue that no named Plaintiff claims

12  to have been denied access to the camping program at GGNRA, and in any event the planned

13  remedy means that the Court should not issue an injunction regarding camping.  Cf. Midgett v. Tri-

14  County Metro. Transp. Dist., 254 F.3d 846, 850-51 (9th Cir. 2001) (local government already had

15  procedure in place to monitor wheelchair lift performance on buses "and ADA compliance militates

16  against a federal court's mandating substitute procedures of its own design to address the same

17  issues"). However, there is a triable issue of fact as to whether Plaintiff Seick wanted to go camping

18  and would have tried if she believed the program was accessible, so the program is not necessarily

19  out of the case for lack of standing. Further, Defendants' promise of future compliance, unlike the

20  situation in Midgett where lifts had already been installed, is not sufficient at this stage to preclude

21  an injunction for an admittedly inaccessible program if there is standing.

22          In addition to improvements to the camping program at Kirby Cove, Defendants claim to

23  have spent over $10 million on other accessibility projects in the last five years and continue to try

24  to improve accessability.  Roth Decl. ¶¶ 10, 57, De La O Decl. ¶¶ 22-23, 35; Mannell Decl. ¶¶ 4,

25  29; Gee Decl. ¶ 7; Dean Decl. ¶ 8.  Plaintiffs attempt to minimize Defendants' post-lawsuit recent

26  efforts and plans to remedy barriers and improve accessibility on the basis that Mr. Margen has

27  inspected areas that Defendants' claim to have recently worked on to remove barriers and found

28  some remaining barriers.  Margen Decl. ¶¶ 35, 59-60, Exs. F, G.  This conflicting evidence serves

United States District Court
For the Northern District of California

1    to highlight the existence of triable issues of fact as to whether and how many barriers remain and

2    what impact they have on program access when viewed in the context of specific park areas.[8]

### 5.    Evidence of Deficient Policies

4         Despite the Court's focus on the NCA's draft finding of deficient accessibility policies

5    throughout GGNRA in the class certification order, neither side focused on policy evidence in

6    connection with these cross-motions.  Defendants generally point to NPS and GGNRA accessibility

7    policies and directives on implementing these policies, which they contend show that they are

8    making every effort to make GGNRA accessible.  See generally Blackseth Report at 20-29.

9    Employees who work on accessibility at GGNRA have testified that they follow policies requiring

10   them to consider accessability in planning projects.  See, e.g., Gee Decl. ¶ 14; Roth Decl. ¶ 49.

11   Defendants also cite the testimony of Mr. Mannel that the GGNRA "will keep ensuring that some

12   beaches and picnic tables are accessible, even if we cannot afford to make every one completely

13   accessible," to show an ongoing commitment to accessibility in the face of funding barriers.

14   Mannel Decl. ¶ 15.  Plaintiffs persuasively counter that the existence of some sound accessibility

15   policies does not establish compliance with Section 504 as a matter of law, especially where there

16   is also evidence of unsound policies resulting in lack of access.  Margen Decl. ¶53 (policy of failing

17   to ensure appropriate maintenance of accessibility features); ¶59 (pattern of not accurately applying

18   accessibility standards in new construction, renovations and maintenance projects).  As with all of

19   the other evidence discussed above, the parties' conflicting evidence on the existence and impact of

20   deficient accessibility policies precludes summary adjudication of this issue.

21   _____

22   [8]Plaintiffs challenge the admissibility of much of the non-expert testimony relied on by
     Defendants on the basis that it lacks foundation, is hearsay, and is based on specialized knowledge
     within the scope of Federal Rule of Evidence 702 so they should have been designated as experts.  The
23   Court rejects Plaintiffs' challenges to the testimony of Defendants' non-expert witnesses. Their
     statements are based on personal knowledge gained through employment at NPS or GGNRA and
24   common sense, not specialized technical expert knowledge, so they need not have been disclosed as
     experts.  See, e.g., Committee Notes to Federal Rule of Evidence 701; Dkt. #188 at 23 n.16 (describing
25   witness' job duties).  Further, Plaintiffs have not described any prejudice from Defendants' failure to
     name these employees as experts.  The Court also rejects Plaintiffs' challenge to the reference in Mr.
26   De La O's declaration to: (1) newspaper reader polls (¶ 14), (2) descriptions of accessible features of
     Muir Woods in a book written by a class member (¶ 14), statements by park visitors regarding beach
27   wheelchairs (¶ 16), and a letter attached to the declaration as Exhibit A (¶¶ 18-19).  The use of these
     materials is non-hearsay, insofar as they are used to show that GGNRA's accessibility efforts have
28   received positive feedback.

United States District Court
For the Northern District of California

### 6.      Websites and publications

Plaintiffs' motion devotes significant attention to accessibility issues with Defendants' and park partner the Conservancy's websites.  Both sides have presented expert testimony on the subject.  However, because no named Plaintiff claims to have visited the Conservancy website (and that website is not "conducted by" Defendants), and the only named Plaintiff who visited the GGNRA website did so after the complaint was filed, Plaintiffs lack standing to challenge the websites.  Summary adjudication of Plaintiff's claims based on the accessibility of Defendants' websites is granted in favor of Defendants.

### 3.      Carried out by a federal executive agency

The Court has previously held that GGNRA and NPS are executive agencies subject to Section 504.  Dkt. # 152 at 20.  Plaintiffs contend that fact this establishes that all of the challenged programs are "carried out" by covered executive agencies, and reason that the activities of third-party "park partners" are properly included in this lawsuit because they are conducted "pursuant to contractual, licencing or other arrangements."  See 43 C.F.R. § 17.530(b)(1) ("The agency, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap – (I) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service . . .").  Importantly, however, the applicable regulation also specifies that "the programs or activities of entities that are licensed or certified by the agency are not, themselves, covered by this part."  43 C.F.R. § 17.530(b)(6).

Plaintiffs rely on Armstrong v. Schwarzenegger, 622 F.3d 1058, 1065-68 (9th Cir. 2010), where the Ninth Circuit rejected a challenge to the constitutionality of 28 C.F.R. section 35.130(b)(1), an analogous regulation relating to Title II of the Americans With Disabilities Act ("ADA").[9]  However, Armstrong addressed a situation in which the government had essentially

_____

[9]  Plaintiffs also cite the Justice Department's Title II regulations, 28 C.F.R. § 42.503(b)(1) and 28 C.F.R. § 35.130(b)(1) and its ADA Title II Technical Assistance Manual § II-1.3000 (attached as Pl.'s RJN Ex. B).  Some courts have found these regulations and DOJ guidance entitled to deference in the ADA context.  See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch, 179 F.3d 725, 732 n.11 (9th Cir. 1999).  However, the language of the Rehabilitation Act on this issue differs significantly from the language of the ADA, as  Title II does not contain the phrase "conducted by."  Therefore, the regulations and guidance for Title II are relatively unhelpful in interpreting this portion of the Rehabilitation Act.  Similarly, while Title III of the ADA requires an owner to ensure the

United States District Court
For the Northern District of California

1   outsourced its jail operations to a third party by contract, and the Ninth Circuit concluded that

2   "defendants cannot shirk their obligations to plaintiffs under federal law by housing them in

3   facilities operated by the third-party counties" and "even in the absence of a regulation explicitly

4   saying so, a State cannot avoid its obligations under federal law by contracting with a third party to

5   perform its functions." Id. at 1074.  On remand, the state was held liable for non-ADA compliant

6   conditions in county jails in which the state had contracted with counties to house parolees. See

7   Armstrong v. Brown, 857 F. Supp. 2d 919, 928-30 (N.D. Cal. 2012).

8            Unlike in Armstrong, here there is no evidence that Defendants have contracted away what

9   would otherwise be part of their "obligation" or "function" by allowing third parties to conduct

10  essential operations on their property.  Caselaw supports Defendants' position that programs are

11  "conducted by" the federal government only when the government directly operates the programs,

12  not when other third parties conduct ancillary programs pursuant to contracts or licenses such as the

13  park partner activities at issue in this case.  Redd v. O'Neill, No. 9701303 at 607 (D.D.C. July 17,

14  2001), an unpublished decision attached as Kennedy Decl. Ex. L, addresses this issue persuasively

15  and in detail.  Redd involved a Section 504 claim brought by an individual who worked as a tour

16  guide at the Bureau of Engraving and Printing ("BEP") under a service contract between the BEP

17  and a staffing agency.  The contract between BEP and the staffing agency provided that BEP would

18  provide uniforms and on-site job training, while the staffing agency would select, supervise,

19  schedule, pay and train the guides off-site.  The court held that the plaintiff  was  employed by the

20  staffing agency, not BEP, so the only question was whether the service contract under which she

21  worked qualified as a program or activity conducted by the government.  The court concluded that

22  the plain meaning of "conducted by" in Section 504 does not extend to programs or activities

23  conducted by other outside entities under contract with an agency.  The court noted that no case has

24  probed the pertinent statutory language in depth, but concluded that "conducted by" in the context

25  of Section 504 is limited to programs "operated directly by a federal agency." Id. at 9.  Redd also

26  pointed out that, if this portion of Section 504 were interpreted differently, another section of

27

28  accessibility  of  facilities  on  lands  he  or  she  "owns,"  42  U.S.C.  §  12182(a),  Section  504  requires
    accessibility for any program or activity "conducted by" an Executive agency.

39

United States District Court
For the Northern District of California

Section 504 allowing for liability for programs conducted with federal financial assistance would be superfluous because all programs conducted pursuant to a government contract could be considered to be operated with federal financial assistance.  See also Cal. Ass'n of the Physically Handicapped, Inc. v. FCC, 840 F.2d 88, 93 (D.C. Cir. 1988) (phrase "conducted by" "encompasses only the FCC's own activities, not those of entities licensed or certified by it," so excluded activities of broadcasters licensed by FCC); Stoutenborough v. NFL, 1994 WL 506150 *4 (N.D. Ohio May 18, 1994) (same).

Additionally, there is no evidence that Defendants "conduct" the non-essential programs operated by any of the challenged third party park partners, including Miwok Stables Center for Preservation and Public Programs, Fort Mason Community Garden (excluded from the case by stipulation per Dkt. # 141), Gulf of the Farallones National Marine Sanctuary, Giant Camera, Marine Mammal Center, San Francisco Conservation Corps, Warming Hut or the Parks Conservancy website.  Instead, Defendants have presented undisputed evidence that they do *not* conduct these programs.  For example, Miwok Stables, Fort Mason Community Garden, and the Marine Sanctuary operate under "special use permits" to conduct their own activities (equestrian, gardening, and marine sanctuary) that are not considered necessary visitor services.  Carter Decl. ¶¶ 5, 13-26, 28, 31-33.  The Miwok Stables and Marine Sanctuary permits require those entities to make their facilities, services and programs accessible.  Id. at ¶¶ 24, 36.  Defendants do not develop content, assign personnel, offer their own programs, contribute finding, or maintain land at these facilities.  Carter Decl. ¶¶ 22-23, 29-30, 34-35.[10]  Similarly, the Giant Camera operates under a "commercial use authorization" contract for non-essential commercial visitor services and Defendants play no role in funding, administering or conducting operations at that location.  Id. ¶¶ 37, 40-44.  The Marine Mammal Center and Conservation Corps operate under "cooperative agreements" that require them to be accessible, and are self-governing without input from Defendants.  Carter Decl. ¶¶ 50-51, 55-57.  Likewise, the Conservancy operates under a cooperative agreement that, among other things, allows it to operate its website and the Warming

---

[10]During oral argument, Plaintiffs conceded that no Plaintiff has expressed a desire to access any equestrian program, so Plaintiffs would lack standing to challenge the operations of Miwok Stables even if it were a program conducted by Defendants.

1   Hut at Chrissy Field, but Defendants have no control over the Conservancy's operations or website

2   development. Id. at ¶¶ 61, 67, 70-71; Faw Decl. ¶ 49.

3         Because the evidence is undisputed that Defendants do not conduct these programs within

4   the meaning of Section 504, summary adjudication of Plaintiffs' claims based on park partner

5   activities is granted in favor of Defendants.

6         **C.    Reasonable Accommodation and Undue Burden**

7         Defendants argue that Plaintiffs bear the burden of suggesting reasonable accommodations

8   that would enable them to participate in the programs at issue in this case, and that summary

9   judgment is warranted because they have failed to meet this burden.  In the context of the ADA, the

10  Ninth Circuit has held that "Plaintiffs bear the burden of establishing the elements of the prima

11  facie case, including—if needed—'the existence of a reasonable accommodation' that would enable

12  him to participate in the program, service, or activity at issue.'" Pierce v. County of Orange, 526

13  F.3d 1190, 1217-1219 (9th Cir. 2008) (ADA prison reform case holding that plaintiff had met his

14  burden where expert proposed "site-specific suggestions of structural, as well as non-structural,

15  accommodations" based on UFAS or ADAAG standards and alternative solutions for other

16  barriers) (quoting Zukle v. Regents of Univ. of Calif., 166 F.3d 1041, 1046 (9th Cir. 1999); see also

17  Memmer v. Marin County Courts,169 F.3d 630, 633 (9th Cir. 1999) ("because Memmer bears the

18  burden of establishing an ADA violation, she must establish the existence of specific reasonable

19  accommodations that MCC failed to provide"); Colombini v. Members of Bd. of Directors of the

20  Empire College School of Law, 2001 WL 1006785 (N.D.Cal. Aug, 17, 2001) (in ADA and

21  Rehabilitation Act case, stating in dicta that summary judgment would be warranted based on

22  plaintiff's failure to present evidence of a reasonable accommodation that he requested but was

23  denied).  "The public entity may then rebut this by showing that the requested accommodation

24  would require a fundamental alteration or would produce an undue burden." Pierce, 526 F.3d at

25  1217.  While the ADA and the Rehabilitation Act are often interpreted similarly, whether Plaintiffs

26  bear the same burden of establishing reasonable accomodations in the Rehabilitation Act context

27  appears to be an unsettled question in the Ninth Circuit. See American Council of the Blind, 525

28  F.3d at 1267 (in Rehabilitation Act case, holding that "we need not decide whether the plaintiffs'

41

1    burden includes demonstrating that a proposed accommodation is facially reasonable" as it did in

2    ADA Title I context).

3        Defendants argue that Plaintiffs have failed to present any evidence of proposed reasonable

4    accommodations that Plaintiffs were denied, and still have not proposed any specific relief, so

5    summary judgment of the entire case is warranted.  Defendants claim that they were prepared to

6    address the unreasonableness of any proposed accommodations, such as why the proposed

7    accommodations would impose an undue financial and administrative burden, fundamentally alter

8    the nature of a program, or conflict with other federal laws.  See 43 C.F.R. § 17.550.  However,

9    Defendants contend that they cannot address the reasonableness or unreasonableness of any

10   proposed accommodation because no specific accommodation has ever been proposed.

11       Regardless of whether Plaintiffs are required to present evidence of reasonable

12   accommodations to establish a violation of the Rehabilitation Act,  Defendants' position has some

13   merit.  Plaintiffs' FAC simply requests "[a]n order enjoining Defendants from violating Section

14   504(a)."  FAC at 56.  Federal Rule of Civil Procedure 65(d) requires that: "Every order granting an

15   injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms

16   specifically; and (c) describe in reasonable detail – and not by referring to the complaint or other

17   document – the act or acts restrained or required."  The Court has previously held that cases

18   interpreting Rule 65 preclude the issuance of a broad injunction to simply "obey the law."  Dkt. #

19   99 (Class Certification Order) at 30.  During class certification, the Court found that "Plaintiffs

20   have not proposed any specific language of an injunction that might meet Rule 65," but Plaintiffs

21   persuaded the Court that they could, at a later date, "present evidence supporting an injunction

22   providing specific directions to Defendants to meet their access obligations."  Id.  The Court

23   certified the class partially on the basis of Plaintiffs' contention that, with the future submission of

24   more specific evidence relating to proposed injunctive relief, "it would be possible to fashion an

25   appropriate injunction covering Plaintiffs' class claims."  Id.

26       In their motion for summary judgment, Plaintiffs still did not propose any specific

27   accommodations or other remedial mechanism, and only addressed the issue of reasonable

28   accommodation for the first time in opposition to Defendants' cross-motion.  Plaintiffs now contend

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   that they have sufficiently proposed reasonable accommodations because the FAC identifies the

2   barriers identified by NCA, NCA previously proposed solutions to the barriers for Phases I through

3   IV, and GGNRA's draft transition plans incorporated these proposed solutions.  Plaintiffs state that

4   the "implementation of such transition plans, in addition to implementation of the trail access

5   solutions recommended by NCA for Phase IV and remediation of the additional barriers identified

6   by Margen for Phase V and in a few other park areas inspected by Margen, would achieve program

7   access at GGNRA."  Dkt. # 184 at 15.  Elsewhere in their brief, Plaintiffs specify that they are only

8   seeking remediation of barriers designated serious or critical by NCA and those identified by Mr.

9   Margen as serious barriers to access.  Id. at 33.

10      Defendants counter that even Plaintiff's new statement of the relief sought falls short

11   because it would not allow for a single indivisible injunction under Rule 23(b)(2), and instead

12   would require a "barrier-by-barrier, accommodation-by-accommodation" approach to thousands of

13   individual barriers affecting class members in multiple different ways, which the Court has already

14   found impermissible.  See Dkt. # 99 (Class Certification Order) at 23, 31-33.  Defendants also point

15   out that Plaintiffs fail to propose any accommodations or modifications to the challenged polices

16   and procedures and present no evidence relating to reasonableness, so these claims should be

17   dismissed on this basis.  The Court agrees with Defendants that Plaintiffs should have made more

18   concrete proposals much earlier in the case and that the current proposal, while an improvement, is

19   still too much like a lengthy laundry list rather than a coherent specific proposal for injunctive

20   relief.  Nonetheless, Plaintiffs have now at least gone somewhat beyond an impermissible request to

21   "obey the law" and provided Defendants and the Court with some guidance on what relief they will

22   eventually seek if they prevail on their claim.  Summary judgment of the entire case is not

23   warranted based on Plaintiffs' failure to adequately propose reasonable accommodations.

24      Plaintiffs counter that Defendants have not established any "undue burden." Plaintiffs brush

25   away Defendants' significant evidence regarding lack of finances as "vague and speculative," but

26   offer no contradictory evidence that Defendants actually do have additional funds for accessibility

27   improvements that are not already being used or that remediation of all challenged barriers would

28   not constitute an undue burden on Defendants or require fundamental alteration of the nature of a

United States District Court
For the Northern District of California

1   program.[11]   Nonetheless, the Court concludes that it cannot grant summary judgment in Defendants'

2   favor on the issue of undue burden because both sides' positions and evidence are insufficiently

3   specific.  While it is clear from the evidence that Defendants' lack funds to *quickly* remediate *all* of

4   the barriers challenged in the FAC, identified by NCA, and addressed in the Margen Report, this

5   decision reduces the potential scope of any relief and it is unclear to what extent Defendants can

6   inexpensively and easily remediate *some* of the barriers still at issue, perhaps gradually over time,

7   sufficient to provide access to the programs still at issue.[12]

8           In the context of undue burden, Plaintiffs also contend that the Court should consider all

9   funds available for the service, program or activity at issue when evaluating the available resources

10  for remedying barriers to program access.  According to Plaintiffs, this would include all funds

11  available to GGNRA for access work, funds from NPS, and anticipated future annual revenue.

12  However, there is no evidence from either side regarding any of these potential funding sources

13  before the Court.  Plaintiffs additionally contend that the Court should consider the historical

14  availability of funds that could have been used to improve accessibility, and specifically that

15  GGNRA recently acquired a new $30 million park site through appropriated Congressional funds

16  and private funding.  Pl.'s RJN Ex. A at 1.  Plaintiffs opine that accessibility should be at the top of

17  Defendants' priority list, above new land acquisition and other discretionary projects, and argue

18

19          [11]Neither side focused on the issue of whether any of Plaintiffs' proposed accommodations
    would constitute an impermissible "fundamental alteration."  The Court assumes that this is also the
20  result of Plaintiffs' failure to propose any specific accommodation until now, and may consider
    additional argument and evidence on this point at an appropriate time before trial.
21
            [12]Pursuant to 43 C.F.R. § 17.550(a)(3), the agency decision that an action would result in undue
22  financial burden must be made by an agency head or his designee after considering all agency resources
    available for use in funding and operation of the challenged program and accompanied by a written
23  statement.  Defendants' agency head or a designee admittedly have not provided a written statement of
    the reasons for concluding that implementing changes to achieve program access at GGNRA would
24  constitute an undue burden and Defendants do not know how much complete remediation of all alleged
    barriers would cost.  See Elsberry Supp. Decl. Ex. B (Responses to Interrogatories); Elsberry Decl. Ex.
25  J, N (Roth Depo.) at 37-38, 107-115.  But see Roth Decl. ¶¶ 53-57 (discussing, among other things,
    financial burden of remediating all barriers in short time frame).  However, because Plaintiffs failed to
26  request any specific accommodation until now, it would have been impossible for Defendants to
    evaluate and provide a written statement regarding the undue burden of Plaintiffs' proposed
27  accommodation previously.  See Kirola v. City and County of San Francisco, 2010 WL 3476681, *6-7
    (N.D.Cal. Sept. 2, 2010) (written "undue burden" statement only required when a public entity denies
28  a specific proposed action, and evidence that proposed modifications would constitute undue burden
    not excluded from trial for lack of prior written statement).

**United States District Court**
For the Northern District of California

that the NPS should ask Congress for a dedicated source of funding to comply with Section 504, as it has done to attempt to remedy its $10 billion (now $11 billion and growing) deferred maintenance backlog.  See Elsberry Decl. Ex. O (Sheaffer Depo.) at 34-39, 63-74, 86-89; Sheaffer Decl. ¶ 12.

However, in addition to accessibility requirements, Defendants must also balance compliance with other statutory mandates such as conservation and preservation, the environment, endangered species preservation, and coastal zone management, so accessibility cannot always take top billing.  Also persuasively, Defendants explain that they are not permitted to spend money that they do not have and lack the power to use Congressional funds designated for land acquisition for another purpose such as accessibility projects.  See 16 U.S.C. § 460l-9; 31 U.S.C. § 1341(a); Sheaffer Decl. ¶¶ 12, 27.   Additionally, Defendants cannot unilaterally ask Congress for a designated appropriation, much less be assured of receiving one, because such requests go through the President of the United States, and the decision whether to grant any such request is up to Congress.  31 U.S.C. § 1104-05; Sheaffer Decl. ¶¶ 9-10; Elsberry Decl. Ex. O (Sheaffer Depo.) 34-35.  Defendants also somewhat persuasively reason that an appropriation specific to accessibility would not necessarily be the most beneficial approach, because it would be more efficient to consider multiple issues such as accessibility, energy efficiency, and safety in combination in any single project.  Dkt. #188 at 12 n. 8.

In short, while Defendants presented strong evidence and argument regarding the potential undue burden on them if the Court orders the relief sought by Plaintiffs, and may well ultimately prevail on this issue in part if not in whole, at this time the Court denies summary judgment on this issue because triable issues of fact remain as to whether Defendants can make the programs currently at issue in this litigation accessible without incurring an undue burden or requiring a fundamental alteration.

**IT IS SO ORDERED.**

Dated: February 20, 2013

_Elizabeth D. Laporte_

————————————————————————
ELIZABETH D. LAPORTE
United States Chief Magistrate Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California